UNITED STATES, Appellee,

v.

Ronald A. GRAY, Specialist Four,
U.S. Army, Appellant.

No. 93–7001.
CMR No. 8800807.

U.S. Court of Appeals for
the Armed Forces.

Argued March 7, 1995.

Reargued Dec. 17, 1996.

Decided May 28, 1999.

SULLIVAN, J., delivered the opinion of the Court in which CRAWFORD and GIERKE, JJ., joined. EFFRON, J., filed a dissenting opinion in which COX, C.J., joined.

For Appellant: *Captain Silas R. Deroma* (argued and reargued) and *Major Michael A. Egan* (reargued); *Colonel Stephen D. Smith, Colonel John T. Phelps II,* and *Captain Christopher W. Royer* (on brief); *Captain Michael E. Hatch* and *Captain Michael E. Smith.*

For Appellee: *Captain John G. Giovannelli* (argued) and *Major Lyle D. Jentzer* and *Captain Steven H. Levin* (reargued); *Colonel John M. Smith, Lieutenant Colonel James L. Pohl, Lieutenant Colonel Eva M. Novak,* and *Captain Michael E. Mulligan* (on brief); *Colonel Dayton M. Cramer, Ma-*

*jor Joseph C. Swetnam,* and *Captain Glenn
L. Kirschner.*

Index of Issues

| | | Page |
|---|---|---|
| Service–Connection | | 11 |
| I | Review *in favorem vitae*—application of | 11 |
| II | Unanimous vote and review *in favorem vitae* by CCA in capital case | 12 |
| III | Denial of Petition for New Trial based on organic brain damage | 12 |
| IV | Death sentence invalid because panel misinformed about mental condition at time of offenses | 14 |
| V | Denial of Psychiatric Expert | 16 |
| VI | Failure of DC | 18 |
| | (1) to investigate mitigating circumstances | 18 |
| | (2) to challenge competence of defense experts | 19 |
| | (3) to present an available defense | 19 |
| | (4) to present adequate case on sentencing | 19 |
| VII | Denial of Funding Motion | 19 |
| VIII | Denial of Funding by TJAG in this case but not in 2 others—effect of | 19 |
| IX | TJAG Policy Memo re funding—validity of | 20 |
| X | Use of statements made during state-court guilty-plea inquiry as violating Fifth Amendment | 23 |
| XI | Use of those statements as violation of civilian plea agreement | 23 |
| XII | CMR treatment of issue regarding use of statements—validity (violation of Article 31) | 23 |
| XIII | Failure of counsel to limit use of statements to use in civilian court | 23 |
| XIV | Prejudicial pretrial publicity | 27 |
| XV | Election of Forum—knowing and intelligent | 29 |
| XVI | Denial of investigative assistance | 29 |
| XVII | Challenge for cause—MSG McCormick | 31 |
| XVIII | Challenge for Cause—CSM Woods | 31 |
| XIX | Abuse of military's peremptory-challenge procedure | 32 |
| XX | Failure to comply with *Batson* rule | 32 |
| XXI | Peremptory challenge based on scruples against death penalty | 32 |
| XXII | Gruesome photographs | 35 |
| XXIII | Nondisclosure of exculpatory information (Registered Source) | 35 |

XXIV Denial of mistrial based on comment on appellant's silence 38

XXV Exclusion at sentencing of evidence on appellant's background 39

XXVI Multiplicity of larceny and burglary 42

XXVII Double counting of aggravating factors 42

XXVIII Instruction on meaning of "substantially outweighed" 44

XXIX No statement that finding regarding "substantially outweighed" was
 unanimous 45

XXX Decision on "substantially outweighed" as requiring finding beyond a
 reasonable doubt 45

XXXI No instruction on absolute discretion not to impose death sentence 45

XXXII Validity of aggravating factor regarding pain and suffering
 (RCM 1004(c)(7)(I)) 46

XXXIII Deliberating on sentence during recess 47

XXXIV Abatement of proceedings because of appellant's drug overdose
 (Doxipin) 48

XXXV Denial of indictment—Fifth Amendment 48

XXXVI Denial of right to jury trial—Article III 48

XXXVII Requirement of trial by members in capital case as denial of reliable
 verdict and due process 49

XXXVIII Prohibition against guilty plea in capital case—denial of mitigating
 factor 49

XXXIX Panel of less than 12 as denial of due process 49

XL Exclusion of females from panel-selection pool 49

XLI Exclusion of enlisted members of same unit as injecting improper
 criterion (enlisted status) for selecting members 49

XLII Questioning by panel members as denial of impartial jury 50

XLIII MJ as advocate for Government 51

XLIV Failure of military counsel to advise appellant of lack of experience or
 training in capital cases 52

XLV MJ gave misleading advice as to defense counsels' qualifications 53

XLVI Need for minimum standards for defense counsel in capital cases 53

XLVII Lack of continuity of counsel or of capital-qualified counsel 53

XLVIII Denial of review by Article III court 55

XLIX No power of Article I court to review constitutionality of Code or Manual provisions — 55

L Failure to specify which offenses carried death penalty and to instruct that a death sentence could not be imposed based on aggregate effect of all offenses — 55

LI Lack of meaningful distinction between premeditated and unpremeditated murder — 56

LII Sufficiency of murder instructions on distinction between premeditated and unpremeditated murder — 56

LIII Sufficiency of instruction on reasonable doubt — 56

LIV Instructions required vote on most serious offense first — 57

LV Senior member as presiding officer—effect on impartiality of members — 57

LVI Failure to instruct that "substantially outweighed" finding must be unanimous — 58

LVII Military death-penalty scheme as violation of *Furman* and separation of powers — 59

LVIII Lack of Manual protections against racially motivated imposition of death sentence — 59

LIX Failure to instruct that race could not influence sentencing — 59

LX Denial of equal protection because civilian could not get death sentence in federal court for identical criminal conduct — 59

LXI Selection of court members by convening authority to serve in capital case where offenses were subject to trial by jury in state court — 60

LXII Victim-impact statements — 60

LXIII Absence of signatures of all members on sentence work sheet or right to poll members in capital case — 60

LXIV Lack of authority of MJ to adjust or suspend improper death sentence — 61

LXV Denial of right to jury from cross-section of community — 61

LXVI Appellant's death sentence as cruel and unusual punishment — 61

LXVII Cumulative errors not harmless beyond a reasonable doubt — 61

LXVIII Proportionality review insufficient — 61

LXIX Death sentence inappropriate in this case — 63

LXX *Grostefon* issues — 63

Judge SULLIVAN delivered the opinion of the Court.

During December of 1987 and the first 4 months of 1988, appellant was tried by a general court-martial composed of officer and enlisted members at Fort Bragg, North Carolina. Contrary to his pleas, he was found guilty of the premeditated murder of Ms. Kimberly Ann Ruggles and of Private Laura Lee Vickery–Clay, and the attempted premeditated murder of Private Mary Ann Lang Nameth. *See* Arts. 118 and 80, Uniform Code of Military Justice, 10 USC §§ 918 and 880, respectively. He was also found guilty of rape (3 specifications), robbery (2 specifications), and forcible sodomy (2 specifications) with respect to the above victims, as well as burglary and larceny of property of another person, in violation of Articles 120, 122, 125, 121, and 129, UCMJ, 10 USC §§ 920, 922, 925, 921, and 929, respectively. On April 12, 1988, he was sentenced to death, a dishonorable discharge, total forfeitures, and reduction to Private E–1. On July 29, 1988, the Commanding General of the 82d Airborne Division approved the sentence.

The record of appellant's trial was then forwarded to Defense Appellate Division and received by that organization on August 8, 1988. Counsel filed initial pleadings with the Court of Military Review[1] on September 15, 1989. On February 13, 1990, that court ordered a sanity board, which, on June 30, 1990, found that appellant was mentally responsible at the time of the offense and that he was mentally competent to understand his trial and the present appellate proceedings. On July 20, 1990, the Government Appellate Division answered appellant's assignment of errors.

On December 27, 1990, appellant filed a motion with the Court of Military Review requesting that court to order the Government to provide $15,000.00 for an expert psychiatrist, a death-penalty-qualified attorney, and an investigator. Oral arguments were heard on the motion in January 1991. On March 12, 1991, the Court of Military Review denied the motion. 32 MJ 730. Appellant renewed the request for a psychiatrist and an investigator on August 7, 1991,

but the Court of Military Review denied it on August 23, 1991. On September 12, 1991, appellant filed a writ-appeal petition requesting that this Court order the Government to provide $10,000 and an emergency stay of the proceedings before the Court of Military Review. On October 18, 1991, this Court denied the writ-appeal petition and the stay application. 34 MJ 164 (summary disposition).

On December 16, 1991, appellant filed a motion with the Court of Military Review requesting that court to order additional medical and neuropsychological tests be performed by military authorities. On December 31, 1991, that court granted appellant's request and ordered a Magnetic Resonance Imaging (MRI) scan of the brain; a 20–channel scalp electrode, sleep-deprived EEG; and a SPECT scan of his brain, as well as intellectual, neuropsychological, academic, psychological, and personality tests. On February 18, 1992, a report based on these tests was completed by Fred H. Brown, Jr., Captain, Ph.D., a clinical neuropsychologist from Womack Army Medical Center, Fort Bragg. He later opined in an affidavit filed with the appellate court below that appellant was sane at the time of the offense and during these proceedings. On March 9, 1992, counsel filed a petition for new trial based on newly discovered evidence of lack of mental responsibility.

On February 26, 1992, appellant filed a supplementary assignment of errors, to which the Government responded on March 27, 1992. The Court of Military Review heard oral argument on April 8, 1992, and on December 15, 1992, denied the petition for new trial and affirmed the findings and sentence. 37 MJ 730, 734–35, 742–43, 749. On December 30, 1992, appellant filed a motion renewing his request for funds for an expert investigator and a behavioral neurologist. Appellant filed a petition for reconsideration of this decision on January 4, 1993. The Court of Military Review heard oral arguments on the motion for funding on January 21, 1993, and denied the motion for funding

---

1. *See* 41 MJ 213, 229 n. * (1994).

and the petition for reconsideration on January 22, 1993. On February 11, 1993, appellant filed a motion and suggestion for reconsideration by the court sitting *en banc* of the denial of funding, and a motion and suggestion for reconsideration by the court sitting *en banc* of the decision of December 15, 1992. On March 11, 1993, the court denied both motions and the suggestions for reconsideration *en banc*, but granted a motion allowing appellant to file a supplemental assignment of errors (XXVIII–LVI). The Government answered this assignment of errors on April 12, 1993. On June 9, 1993, the Court of Military Review again affirmed the findings and sentence. 37 MJ 751. Appellant filed a motion for reconsideration on June 28, 1993, which the court denied on June 30, 1993.

This case is before our Court for mandatory review pursuant to Article 67(a)(1), UCMJ, 10 USC § 867(a)(1) (1989). On July 2, 1993, this Court ordered appellant to file his final brief by August 31, 1993, but counsel did not do so until June 30, 1994. On September 10, 1993, appellant moved this Court for funding of an expert investigator and a behavioral neurologist whom he stated were necessary for appellant to perfect his appeal to this Court. The Government filed its opposition on September 17, 1993. On November 24, 1993, lead defense appellate counsel, Captain Michael Smith, filed a motion to withdraw from appellate representation because he was being transferred. On April 7, 1994, this Court granted Captain Smith's motion. 40 MJ 14.

This Court denied appellant's motion for funding on April 25, 1994, without prejudice to appellant's raising in the ordinary course of appellate review whether the Court of Military Review erred in upholding denial of the funding. 40 MJ 25. On June 30, 1994, appellant filed his final brief; however, the index was not received until July 11, 1994. The Government filed its answer to final brief on August 26, 1994, and appellant's reply was received on October 7, 1994. Oral argument was first heard in this case on March 7, 1995.

On May 4, 1995, defense appellate counsel, Captain Royer, moved to withdraw from appellate representation because he was being transferred; he also moved to admit an affidavit by appellant stating that he wished Captain Royer "be released from his representation of" appellant. This Court granted both motions on May 19, 1995. 43 MJ 129.

On June 3, 1996, the Supreme Court issued its decision in *Loving v. United States*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36. On November 20, 1996, based on Justice Stevens' separate opinion in *Loving*, 517 U.S. at 774–75, 116 S.Ct. at 1751–52, appellant's counsel moved to file a supplemental issue challenging the jurisdiction of his court-martial. On December 4, 1996, this motion was granted. 46 MJ 196. On December 13, 1996, the Government filed its Answer to Appellant's Supplemental Issue. Oral argument was held again in this case on December 17, 1996.

## FACTUAL BACKGROUND OF THE CRIMES

Before turning to the issues of this capital case, it is important to view this case and its issues in the factual context of appellant's crimes. In January 1987, appellant was identified and arrested for the rape of a woman in the vicinity of Fairlane Acres, a trailer park near Fort Bragg, North Carolina. The next day the body of Ms. Kimberly Ann Ruggles was found near that area on Fort Bragg. "She had received multiple stab wounds" and had "suffered bruises on her eyebrow, bruises on her nose, and a laceration on her lip." She had been raped and anally sodomized. Evidence in her vehicle and in his possession implicated appellant.

Later the same month, the body of Private (PVT) Laura Lee Vickery–Clay was found. "She had been shot four times (while she was alive), in the neck, forehead, chest, and back of the head. Also, she had suffered blunt force trauma to the right cheek, the left side of her face, around her left eye, her left breast, abdomen, and both legs and arms." PVT Vickery–Clay "had been raped and anally sodomized." Evidence on her car and the murder weapon implicated appellant.

Subsequent media coverage of appellant's arrest for these crimes produced another victim (PVT Nameth), who recognized his face from photographs of appellant on televi-

sion and in the newspaper. She reported that appellant had "raped her, and stabbed her repeatedly in the neck and side"; she "suffered a laceration of the trachea and a collapsed or punctured lung." 37 MJ at 736.

The above crimes were tried by court-martial which found appellant guilty and gave him the death penalty. Appellant was also convicted in a North Carolina state court of the murders and rapes of two other young women, and he was given sentences of life in prison. Appellant entered guilty pleas to the murders tried in State court. *See* 37 MJ at 733 n. 1.

## INTRODUCTION

Article 67(a) (1994) provides that the United States Court of Appeals for the Armed Forces shall review the record in all cases in which the sentence, as affirmed by a Court of Criminal Appeals, extends to death. Appellant was sentenced to death by the members of his court-martial, and this sentence was approved by the convening authority and affirmed by the Court of Military Review (now the Court of Criminal Appeals). Defense appellate counsel has raised 70 issues for this Court to consider with respect to the findings of guilty and the sentence in this case. Appellant himself has personally assigned 31 more issues for review.

This is a long opinion. It is long because we feel it is necessary to explain our resolution of the numerous issues involved in this case. Many of these issues raise systemic challenges to the military justice system in general or its capital sentencing procedures in particular which we have resolved in our previous decisions. The remaining issues concern application of these procedures in appellant's case. Except for the supplemental issue, which we consider first, we will turn our attention to the issues in the order raised by appellant.

### Supplemental Issue

WHETHER APPELLANT WAS DENIED DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BECAUSE HE WAS TRIED BY COURT–MAR-

TIAL FOR CAPITAL MURDER DURING PEACETIME.

The thrust of appellant's argument is that the decision of the Supreme Court in *Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), upholding court-martial jurisdiction solely on the basis of an accused's status as a servicemember, without considering the service connection of those offenses, applies only in non-capital cases. He cites Justice Stevens' concurring opinion in *Loving*, 517 U.S. at 774, 116 S.Ct. at 1751, where he stated that "[t]he question whether a 'service connection' requirement should obtain in capital cases is an open one[.]" Appellant finally contends that his capital-murder charges were not shown to be service connected.

We agree with Justice Stevens that the question whether *Solorio* applies in a capital case is an important question. However, our particular response to appellant is that this question need not be decided in his case. We note that appellant was a member of the military; one of his murder victims was a member of the military and the other was a civilian who did business on post; and both their bodies were found on post. Finally, we agree with the Government that there was overwhelming evidence presented in this case that the murders were committed on post. This is sufficient service connection even under *O'Callahan v. Parker*, 395 U.S. 258, 272, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), which *Solorio* overruled, 483 U.S. at 436, 107 S.Ct. 2924, to warrant trial by court-martial. *See generally Relford v. Commandant*, 401 U.S. 355, 369, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971) ("a serviceman's crime against the person of an individual upon the base ... is 'service connected' "). Accordingly, assuming this jurisdictional requirement applies in capital courts-martial, we hold that it was satisfied in appellant's case.

### ISSUE I

WHETHER MILITARY DUE PROCESS AND UCMJ ARTICLES 66 AND 67 REQUIRE THE COURT OF MILITARY

APPEALS [2] AND THE COURTS OF MILITARY REVIEW TO REVIEW ALL CAPITAL CASES *IN FAVOREM VITAE* SINCE CAPITAL LITIGATION IS IN ITS INFANCY IN THE MILITARY JUSTICE SYSTEM AND TRIAL AND APPELLATE DEFENSE COUNSEL LACK THE TRAINING AND EXPERIENCE NECESSARY TO PRESERVE THE RECORD ON ALL ISSUES AND PREVENT APPLICATION OF WAIVER.

## ISSUES II

WHETHER A FACTFINDING COURT OF MILITARY REVIEW MUST UNANIMOUSLY AGREE ON BOTH FINDINGS OF GUILT AND THE SENTENCE IN A CAPITAL CASE AND MUST APPLY A POLICY OF *IN FAVOREM VITAE.*

The first issue asks us to specifically mandate an "in favorem vitae" [in favor of life] policy for appellate review of capital cases in the military justice system. In other words, appellant asks this court to eschew waiver and overlook any procedural defaults by his counsel at trial in reviewing his death sentence. *See Smith v. Murray,* 477 U.S. 527, 539, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (Stevens, J., dissenting). We rejected such a request in *United States v. Loving,* 41 MJ 213, 266 (1994), *aff'd on other grounds,* 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). For the reasons stated in our *Loving* decision, we adhere to that rejection today. The second issue has not been specifically briefed by defense appellate counsel, but we otherwise conclude that it has no legal merit. *See* Art. 66, UCMJ, 10 USC § 866 (1989); *cf.* Art. 52, UCMJ, 10 USC § 852.

## ISSUE III

WHETHER THE ARMY COURT OF MILITARY REVIEW ABUSED ITS DISCRETION IN DENYING SPC GRAY'S PETITION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE OF ORGANIC BRAIN DAMAGE.

■ Article 73, UCMJ, 10 USC § 873 (1968), provides:

§ 873. **Art. 73. Petition for a new trial**

At any time within two years after approval by the convening authority of a court-martial sentence, *the accused may petition the Judge Advocate General for a new trial on the grounds of newly discovered evidence* or fraud on the court. If the accused's case is pending before a Court of Military Review or before the Court of Military Appeals, the Judge Advocate General shall refer the petition to the appropriate court for action. Otherwise the Judge Advocate General shall act upon the petition.

(Emphasis added.) *See* RCM 1210(f)(2), Manual for Courts–Martial, United States, 1984. Appellant presented such a petition to the Court of Military Review which in turn denied it. 37 MJ at 742–43. We review such decisions by a Court of Military Review on a clear-abuse-of-discretion standard. *See generally United States v. Williams,* 37 MJ 352, 356 (CMA 1993); S. Childress and M. Davis, *2 Federal Standards of Review* § 11.38 at 11–158 (2d ed. 1992) (clear-abuse-of-discretion standard).

The appellate court below noted the legal requirements which must be met to warrant a new trial under Article 73. Relying on RCM 1210(f)(2), it stated that appellant must show:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

37 MJ at 742. We agree with the Court of Military Review that this is a proper explanation of Article 73. *See Williams, supra* at

---

**2.** Now the Court of Appeals for the Armed Forces.

356. Moreover, we have previously commented on what constitutes an abuse of discretion in this context:

> Legal error (*i.e.*, an abuse of discretion) occurs if the findings of fact upon which he [the judge] predicates his ruling are not supported by evidence of record; if incorrect legal principles were used by him in deciding this motion; or if his application of the correct legal principles to the facts of a particular case is clearly unreasonable. *United States v. Travers*, 25 MJ 61, 62–63 (CMA 1987); *United States v. Rosser*, 6 MJ 267, 271 (CMA 1979). *See United States v. Thomas*, 3 USCMA 161, 11 CMR 161 (1953).

37 MJ at 356.

Turning to the present case, we note that the appellate court below essentially summarized the evidence offered by appellant as "newly discovered," as follows:

> In his petition the appellant relies heavily on an affidavit by Dr. Jonathan Pincus, a physician specializing in neurology. After reviewing the results of the tests and evaluations of the appellant, *Dr. Pincus concluded that the appellant suffers from organic brain defects that probably impaired his capacity to distinguish right from wrong and conform his conduct to the law.* Dr. Pincus did not personally examine the appellant, nor did he review the testimony of the experts. His diagnosis is based only upon his review of all the previous sanity evaluations and the neurological test results.

37 MJ at 742 (emphasis added).

That court also was required to determine "beyond a reasonable doubt" whether a reasonable factfinder, considering "the totality of evidence, would ... be convinced by clear and convincing evidence that appellant lacked mental responsibility for his crimes" or should not get the death penalty for them. *See United States v. Cosner*, 35 MJ 278, 281, 282 (CMA 1992), *cert. denied*, 510 U.S. 1085, 114 S.Ct. 918, 127 L.Ed.2d 206 (1994). The Court of Military Review concluded that this post-trial medical evidence was "not of a caliber to produce a more favorable verdict" and that they were "convinced beyond a rea-

sonable doubt that the panel would still have imposed the death sentence." *Id.* at 743. We see no clear abuse of discretion in this decision. *See generally United States v. McCarthy*, 54 F.3d 51, 55 (2d Cir.) (no abuse of discretion to deny new trial based on newly discovered interim psychiatric report), *cert. denied*, 516 U.S. 880, 116 S.Ct. 214, 133 L.Ed.2d 145 (1995).

Appellant was found guilty of numerous offenses of a heinous nature, namely two premeditated murders, one attempted murder involving multiple stabbing of the victim, as well as rapes and forcible sodomies. At his court-martial, he did not rely on a defense of insanity. *See* Art. 50a, UCMJ, 10 USC § 850a. However, he did introduce expert evidence on his mental state for purposes of sentence mitigation. RCM 1001(c)(1)(A) and (B); as well as 1004(b)(3) and (b)(4)(c). Post-trial he has attempted to raise the defense of insanity and introduce further mental-state mitigation evidence by means of the written statements of two psychiatrists and the results of further mental testing ordered by the Court of Military Review at his request. *Cf. Sawyer v. Whitley*, 945 F.2d 812, 823 (5th Cir.1991), *aff'd on other grounds*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

The Court of Military Review, in its opinion below, noted the development of evidence and other information concerning appellant's mental state. It stated:

— — —

> Prior to his court-martial, two psychiatrists and a psychologist individually examined the appellant. Based on their evaluations, including a statement that the appellant exhibited symptoms associated with organic involvement, the defense did not raise a sanity issue on the merits of the trial. Since his court-martial, the appellant has been the subject of two sanity boards and extensive neurological testing, which the appellant contends contains the new evidence warranting a new trial....

> \* \* \*

> The most recent sanity board (June 1990) concluded that the appellant's mental

infirmities were not so severe as to render him not mentally responsible. Additionally, although the members found undifferentiated brain damage, the board reported that it does not appear of sufficient magnitude to negate criminal responsibility. In the words of the board, in order to warrant a finding of a severe mental defect, there would have to be a severe organic disorder, which there is not. The neuropsychological evaluation, ordered by this Court on 31 December 1991 and administered by Dr. Fred Brown, a clinical neuropsychologist, does refer to evidence of organic brain damage. Nevertheless, although Dr. Brown states he did find evidence of symptoms of an undetermined organic brain syndrome, he did not find evidence of a psychological or personality disorder resulting from the organic brain syndrome such that it would meet criteria of an organic mood (thought anxiety).

*More specifically, in an affidavit dated 23 March 1992 obtained by the appellee, Dr. Brown stated that despite appellant's mild organic brain damage the appellant is now, and Dr. Brown believes was at the time of the offenses, able fully to appreciate the nature and quality of his acts and the wrongfulness of his acts.*

37 MJ at 742–43 (emphasis added).

■ Organic brain damage by itself does not equate to lack of mental responsibility for one's crimes, and its discovery after trial does not necessarily require a new trial. *See Robedeaux v. State*, 908 P.2d 804, 808 n. 22 (Okl.Cr.1995); *James v. State*, 489 So.2d 737, 739 (Fla.1986), *overruled on other grounds, James v. Singletary*, 957 F.2d 1562, 1574–75 (11th Cir.1992). Moreover, the establishment of conflicting expert opinion on an accused's mental state does not necessarily require a rehearing. *United States v. Van Tassel*, 38 MJ 91, 96 (CMA 1993). In appellant's case the Court of Military Review pointed out that there was some evidence of appellant's organic brain damage in existence prior to this trial and the post-trial evidence was disputed as to the *extent of this damage.* More importantly, the post-trial evidence was somewhat speculative on the effect of this mental condition on appellant at the time of

these offenses and it too was disputed. *See Oats v. Singletary*, 141 F.3d 1018, 1028 (11th Cir.1998); *Bryan v. Singletary*, 140 F.3d 1354, 1360 (11th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1068, 143 L.Ed.2d 72 (1999); *State v. Stuard,* 176 Ariz. 589, 863 P.2d 881, 901 (1992). In these circumstances we hold that the Court of Military Review did not clearly abuse its discretion in concluding this post-trial evidence, in light of all other pertinent evidence in this case, would probably not produce a substantially more favorable result for appellant at a new trial. *See Brewer v. Reynolds*, 51 F.3d 1519, 1526–27 (10th Cir.1995), *cert. denied,* 516 U.S. 1123, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996); *Robedeaux v. State, supra.*

## ISSUE IV

WHETHER APPELLANT WAS CONVICTED AND SENTENCED TO DEATH IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE THE SENTENCE AND CONVICTIONS ARE FOUNDED AT LEAST IN PART UPON MISINFORMATION OF A CONSTITUTIONAL MAGNITUDE CONCERNING HIS MENTAL HEALTH.

■ Appellant grounds this attack on his conviction primarily on the decision of the Supreme Court in *Johnson v. Mississippi,* 486 U.S. 578, 580, 590, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). There, the Supreme Court reversed a death sentence because it was based in part on aggravating-factor evidence which was purposefully presented to the jury and which was "materially inaccurate" (*i.e.,* a state conviction later reversed on appeal). Appellant argues here that the post-trial evidence concerning his mental state at the time of the offenses shows that his court-martial members were substantially misinformed when they found him guilty and sentenced him to death. *See United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) and *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690

(1948) ("misinformation of constitutional magnitude" or "materially untrue" required); *see also United States v. Mack,* 9 MJ 300, 319 (CMA 1980). He also asserts that the Court of Military Review employed the wrong legal standard in deciding this legal issue.

Appellate defense counsel argued as follows:

> [T]rial defense counsel did not present any evidence on the merits concerning appellant's mental health because they had been informed by Drs. Armitage and Rose that there was nothing that could be used on the merits. On sentencing, the trial counsel made repeated arguments to the court-martial panel that appellant's personality disorder was completely insignificant and that appellant had not given the court-martial any type of "empirical" explanation to help make some sense of the crimes for which appellant stood convicted. (R. at 2534–37.) The wealth of evidence in mitigation which has been uncovered following the court-martial shows that the government's position at trial, which was urged and apparently adopted by the panel, was incorrect and inaccurate.
>
> There is a great difference between a personality disorder described as "an umbrella, a nonspecific personality disorder ... a little bit of this, and a little bit of that ... he's not quite normal...." (R. at 2535), and a disorder which would cause marked cognitive impairment. Appellant's organic brain damage is a demonstrable, physical disorder of appellant's brain with broad reaching implications. (*See* Def. App.Exh. H, 0.) The powerful explanatory impact this evidence would have on a court-martial cannot be ignored. *See* Issue III.

Final Brief at 47–48 (footnote omitted).

The Court of Military Review in resolving this claim held that appellant had "failed to show by clear and convincing evidence that, but for constitutional error ... no reasonable court members would have imposed the death penalty under the Uniform Code of Military Justice." 37 MJ at 743–44; *cf. Romano v. Oklahoma,* 512 U.S. 1, 11, 114 S.Ct.

2004, 129 L.Ed.2d 1 (1994) (*Johnson* does not establish *per se* rule of reversal of a death sentence). Also, it rejected his argument based on *Johnson v. Mississippi, supra,* because appellant had not shown the information relied on by the court members was "incorrect." 37 MJ at 743; *see Mahaffey v. Page,* 151 F.3d 671, 681 (7th Cir.1998), *vacated as to another issue,* 162 F.3d 481 (7th Cir.1998); *Del Vecchio v. Illinois Dept. of Corrections,* 31 F.3d 1363, 1385 (7th Cir.1994) (mere inaccuracy in sentencing information is not enough to invalidate death sentence), *cert. denied,* 514 U.S. 1037, 115 S.Ct. 1404, 131 L.Ed.2d 290 (1995). As noted above, the post-trial evidence as to the extent of the organic brain damage and its impact on appellant's mental responsibility at the time of the offenses was speculative and disputed. *Cf. James,* 957 F.2d at 1575 (alleged actual incompetence rather than probable incompetence). Moreover, the court below pointed out earlier in a different context, that "according to the appellant's own brief there were 'clear indicators of appellant's organic brain damage ... presented at the time of trial....' " 37 MJ at 742. *See Wright v. Angelone,* 151 F.3d 151, 162 (4th Cir.1998). Accordingly, we conclude that there was no material or substantial inaccuracy in the sentencing information established in this case by the post-trial psychiatric evidence. *See generally Brewer v. Reynolds, supra.*

■ It is the normal rule of military appellate practice that review of the guilt of an accused is limited to evidence presented at trial. *United States v. Bethea,* 22 USCMA 223, 46 CMR 223 (1973). However, recourse to post-trial affidavits during direct review is appropriate to decide petitions for new trial under Article 73 (*see United States v. Parker,* 36 MJ 269, 270 (CMA 1993)), or clarify collateral matters such as claims of unlawful command influence or denial of effective assistance of counsel. *Id.* at 271–72. Finally, this Court has approved consideration of post-trial affidavits by Courts of Military Review on direct review to determine whether a post-trial sanity hearing should be ordered. *See United States v. Massey,* 27 MJ 371

(CMA 1989); RCM 706 and 1203(c)(5). We have never held, however, that a post-trial psychiatric report *per se* requires a new trial or a hearing under *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967).

## ISSUE V

WHETHER APPELLANT WAS CONVICTED WITHOUT DUE PROCESS OF LAW BECAUSE HE WAS DENIED COMPETENT PSYCHIATRIC ASSISTANCE IN THE EVALUATION, PREPARATION, AND PRESENTATION OF HIS CASE.

■ Appellant challenges the findings of guilty and his death sentence in this case on the basis that he was not provided "competent psychiatric assistance" at his court-martial. He particularly attacks the psychiatric assistance provided to him prior to and during trial by Doctor Armitage, Doctor Rose, and Doctor Warren. He claims that they all misdiagnosed him as having an unspecified personality disorder rather than organic brain damage and failed to follow recognized standards of care in treating him. He bases these claims on the post-trial statements of two other psychiatrists, Doctor Pincus and Doctor Merikangas.

The Supreme Court in *Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), stated:

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, *the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.* This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

(Emphasis added.) Who is a competent psychiatrist and what is an appropriate examination were not particularly delineated by the Supreme Court in *Ake.* The Court of Military Review flatly rejected appellant's proferred "national standard of care in psychiatry" and his argument based on this standard that his trial psychiatrists and psychologist provided him ineffective assistance under *Ake.* 37 MJ at 744–45. We agree. *See Harris v. Vasquez,* 949 F.2d 1497 (9th Cir. 1990), *cert. denied,* 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992); *Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991).

As a starting point, we note that prior to his court-martial appellant was personally examined by a military forensic psychiatrist, Colonel David Armitage. He was also personally examined by Doctor Selwyn Rose, a civilian forensic psychiatrist, and Doctor John Warren, a civilian psychologist. The latter two were chosen by the defense, Answer to Final Brief at 31 n. 22, and all three testified at appellant's sentence hearing. Moreover, all three were offered as qualified medical experts by the defense and accepted as such by the judge. Clearly, these persons were qualified experts within the meaning of *Ake. See Dunn v. Johnson,* 162 F.3d 302, 308 (5th Cir.1998); *Provenzano v. Singletary,* 148 F.3d 1327, 1333 (11th Cir.1998).

Appellant's post-trial attack, however, is on the psychiatric assistance these experts provided to the defense in his case. *See Wilson v. Greene,* 155 F.3d 396, 400 (4th Cir.1998). Initially, he focuses on "[t]he striking disparity between the pretrial [unspecified personality disorder] and post-conviction [organic brain damage] evaluations." Final Brief at 52, 53. He essentially argues that his trial experts were so wrong in their diagnosis of appellant that they must have been incompetent or ineffective. We must reject this argument.

We initially note that divergence of opinion among psychiatrists is not novel and does not provide a legal basis for concluding that one or the other is performing inappropriate tests or examinations. In *Ake,* the Supreme Court said: "Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on care and treatment, and on likelihood of future dangerousness." *See* 470 U.S. at 81, 105 S.Ct. 1087. In any event, four other post-trial evaluations of appellant substantially agree with the trial experts that appellant's personality disorders, even if accompanied by organic brain damage, did not eliminate his mental responsibility at the time of the offenses: Doctor (PhD) Kea, Doctor (MD) Marceau, Doctor (MD) Edwards, and Doctor (PhD) Brown. *See Vickers v. Stewart,* 144 F.3d 613, 615–16 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 809, 142 L.Ed.2d 669 (1999). Finally, unlike the seven other experts in this case, Doctor Pincus, the primary proponent of the organic-brain-damage diagnosis and appellant's lack of mental responsibility, did not personally examine appellant or the record in this case. *See United States v. Wimberley,* 16 USCMA 3, 8, 36 CMR 159, 164 (1966).

Nevertheless, appellant mounts a more particular attack on his trial psychiatrists and psychologist, resting on the post-trial affidavits of Doctor Merikangas, a civilian psychiatrist. Doctor Merikangas posits a "national standard of care" in psychiatry and asserts that the pretrial psychiatric assistance in appellant's case failed to meet that standard. He states in pertinent part:

9. Based upon my review of the above records, it is my professional opinion that Mr. Gray has not yet received a psychiatric evaluation that meets the applicable national standard of care for professional psychiatric evaluations. Specifically, the following problems are apparent with the psychiatric evaluations Mr. Gray has received to date:

a. the absence of a complete neurological work-up to include a battery of blood tests and Magnetic Resonance Imaging (MRI) scan of the brain. The absence of such a work-up in Mr. Gray's case alone violates the standard of care because of the numerous signs that point to possible brain damage: prior head injury, the nature of the crimes committed, the abnormal EEG results, and the history of alcohol abuse all are indicative of the need for further diagnostic steps.

b. the absence of a thorough history of Mr. Gray's including a medical history, with particular attention on Mr. Gray's prior head injury from military parachuting, a history of any present illnesses, a family history, and a history of his past life including development, education, occupations and marriage.

We, like the Court of Military Review, do not welcome descent into the "psycho-legal" quagmire of battling psychiatrists and psychiatric opinions, especially when one side wages this war against its own experts by means of post-trial affidavits. *Harris,* 949 F.2d at 1518. In any event, appellant's particular claim of inadequate psychiatric assistance we find without merit for several reasons. First, the Government provided appellant with two qualified psychiatric experts of his own choosing prior to trial. *Loving,* 41 MJ at 250–51; *cf. Smith v. McCormick,* 914 F.2d 1153, 1159 (9th Cir. 1990). Second, these defense experts provided appellant with favorable testimony, although not perhaps to the degree he desired. *Cf. Cowley v. Stricklin,* 929 F.2d 640, 645 (11th Cir.1991). Finally, the alleged deficiencies in the trial experts' evaluations were substantially obviated by the additional testing ordered in this case which produced substantially the same results. 37 MJ at 745; *see also Fairchild v. Lockhart,* 900 F.2d 1292, 1296 n. 3 (8th Cir.), *cert. denied,* 497 U.S. 1052, 111 S.Ct. 21, 111 L.Ed.2d 834 (1990). Accordingly, we conclude this issue is without merit. *See generally Wilson,* 155 F.3d at 400–02.

## ISSUE VI

WHETHER APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL DEFENSE COUNSEL'S FAILURE 1) TO INVESTIGATE THE MITIGATING CIRCUMSTANCES OF APPELLANT'S TRAUMATIC FAMILY, SOCIAL, AND MEDICAL HISTORIES AND APPELLANT'S INTOXICATION AT THE TIME OF THE OFFENSES; 2) TO CHALLENGE THE PROFESSIONAL COMPETENCE OF THE PRETRIAL EVALUATIONS OF APPELLANT BY THE TWO FORENSIC PSYCHIATRISTS AND TO ENSURE A COMPLETE AND COMPETENT MENTAL HEALTH EVALUATION OF APPELLANT WAS PERFORMED BEFORE TRIAL; 3) TO DEVELOP AND PRESENT AN AVAILABLE DEFENSE ON THE MERITS; 4) TO PRESENT AN ADEQUATE CASE DURING THE SENTENCING HEARING.

Appellant relies on *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to assert that he was denied his constitutional right to effective assistance of counsel. He then lists four areas in which he contends counsel's performance was deficient. Finally, he asserts that his counsel's conduct in this regard prejudiced him in a way directly leading to his convictions and sentence to death. We disagree with appellant that his lawyers' conduct was deficient within the meaning of *Strickland v. Washington, supra.*

■ The first part of the *Strickland* test focuses on whether defense counsel's performance was constitutionally ineffective. The Supreme Court has made clear that determination of this question requires assessment of the particular facts of a case, using *"an objective standard of reasonableness." Id.* at 688, 104 S.Ct. 2052 (emphasis added). Appellant must show that his counsel's conduct was not within the "wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052.

### (1) Failure to investigate

■ We turn first to appellant's argument that his defense counsel failed "to investigate the mitigating circumstances of appellant's traumatic family, social, and medical histories and appellant's intoxication at the time of the offenses." The problem with appellant's argument is that it equates failure to discover certain facts with failure to conduct a proper investigation. In addition, it ignores any role he himself may have played in remaining silent and failing to make full disclosure to his attorney on these matters. *See Wilson, supra* at 402–03; *Mahaffey,* 151 F.3d at 685; *Harris,* 949 F.2d at 1521 n. 22. Finally, it further· overlooks the substantial mitigating evidence presented in this case from appellant's trial psychiatric experts and his family. In these circumstances we find no defective or inadequate assistance of counsel. *See Harris, supra* at 1524–25; *cf. Brewer v. Aiken,* 935 F.2d 850, 857–58 (7th Cir. 1991) (no investigation at all).

In this regard, the Supreme Court stated in *Strickland:*

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's

other litigation decisions. *See United States v. Decoster, supra,* [199 U.S.App. D.C.] at 372–373, 624 F.2d, at 209–10.

466 U.S. at 691, 104 S.Ct. 2052.

### (2) Failure to challenge competence of psychiatrists

■ Appellant also chides his counsel for not challenging "the professional competence of the pretrial evaluations of appellant by the two forensic psychiatrists and" not ensuring "a complete and competent mental health evaluation of appellant was performed before trial." As noted earlier, we do not agree with appellant that he received inadequate psychiatric assistance prior to trial. Moreover, we also do not agree that his trial defense counsel was professionally inadequate in relying at trial on the work of three mental-status experts. *See Fitzgerald v. Greene,* 150 F.3d 357, 368–69 (4th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 389, 142 L.Ed.2d 321 (1998); *Waters v. Thomas,* 46 F.3d 1506 (11th Cir.), *cert. denied,* 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995); *Sidebottom v. Delo,* 46 F.3d 744, 752–54 (8th Cir.), *cert. denied,* 516 U.S. 849, 116 S.Ct. 144, 133 L.Ed.2d 90 (1995); *LaRette v. Delo,* 44 F.3d 681, 685–86 (8th Cir.), *cert. denied,* 516 U.S. 894, 116 S.Ct. 246, 133 L.Ed.2d 172 (1995); *O'Neal v. Delo,* 44 F.3d 655, 659–60 (8th Cir.), *cert. denied,* 516 U.S. 843, 116 S.Ct. 129, 133 L.Ed.2d 78 (1995); *Harris,* 949 F.2d at 1524–25.

### (3) & (4) Failure to present available defense and adequate sentencing case

Finally, appellant attacks his counsel's decisions on strategy and tactics on both the merits of his guilt and the sentence. Hindsight in these matters is not usually countenanced by this Court or by the Supreme Court, which said in *Strickland,* 466 U.S. at 689–90, 104 S.Ct. 2052:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to con-

clude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac,* 456 U.S. 107, 133–134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana, supra,* [350 U.S.] at 101 [76 S.Ct. 158]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. *See* Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983).

Therefore, appellant merits no relief on this issue. *See Wright,* 151 F.3d at 162 (organic-brain-dysfunction evidence "is a double-edged sword that might as easily have condemned [petitioner] to death as excused his actions"); *Thomas v. Gilmore,* 144 F.3d 513, 517 (7th Cir.1998) (aspects of psychological mitigation evidence could be used by prosecutor as further evidence in aggravation), *cert. denied,* —— U.S. ——, 119 S.Ct. 907, 142 L.Ed.2d 905 (1999).

### ISSUE VII

WHETHER THE ARMY COURT OF MILITARY REVIEW ERRED BY REFUSING TO GRANT APPELLANT'S FUNDING MOTION OF AUGUST 7, 1991.

### ISSUE VIII

WHETHER THE JUDGE ADVOCATE GENERAL OF THE ARMY (TJAG)'S

MEMORANDUM DATED DECEMBER 17, 1992, DEPRIVED APPELLANT OF HIS RIGHT TO EQUAL PROTECTION IN VIOLATION OF THE FIFTH AMENDMENT TO THE CONSTITUTION BECAUSE TJAG FAVORABLY CONSIDERED SIMILAR FUNDING REQUESTS IN THE ARMY'S TWO OTHER CAPITAL CASES, BUT ARBITRARILY DENIED APPELLANT'S REQUEST IN A SUMMARY MANNER.

## ISSUE IX

WHETHER THE POLICY MEMORANDUM OF THE JUDGE ADVOCATE GENERAL OF THE ARMY DATED DECEMBER 17, 1992, DEPRIVES APPELLANT OF DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

The three issues assigned above address the refusal of the Court of Military Review and the Judge Advocate General to make available funding to the defense, post-trial, to hire a defense background investigator and a mental-health expert. Appellant asserts that the requested funding is necessary so a behavioral neurologist can personally and professionally examine him and determine the true extent of his organic brain damage discovered for the first time after his trial. He contends that such information is critical not only to the question of his mental responsibility at the time of the offense but as extenuation and mitigation evidence in his death-penalty case. He also contends that he was denied equal protection of the law under the Fifth Amendment (*see United States v. Tuggle*, 34 MJ 89, 92 (CMA 1992)) because the Judge Advocate General had previously granted such funding to two other death-row inmates.

At the outset we note that we are asked to review the Court of Military Review's decision denying *post-trial* psychiatric assistance and investigative services to appellant. *United States v. Tharpe*, 38 MJ 8 (CMA 1993); *United States v. Curtis*, 31 MJ 395 (CMA 1990). *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), however, was a trial-assistance case, and its standard for granting such assistance may not be appropriate in a post-trial setting. *See United States ex rel. Collins v. Welborn*, 868 F.Supp. 950, 989 (N.D.Ill.1994), *aff'd sub nom. Bracy v. Gramley*, 81 F.3d 684 (7th Cir.1996), *rev'd on other grounds*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); *cf.* 21 USC § 848(q)(4)(B) and (q)(9) (indigent federal defendants in collateral attack on death penalty entitled to reasonably necessary investigative or expert services); *see Jackson v. Vasquez*, 1 F.3d 885, 888 (9th Cir.1993); *DeLong v. Thompson*, 790 F.Supp. 594, 617 (E.D.Va.1991), *aff'd*, 985 F.2d 553 (4th Cir.1993). In any event he certainly is not entitled to a more generous standard; accordingly, review under the reasonable-necessity standard of *Ake, supra* at 82–83, 105 S.Ct. 1087, and its progeny is appropriate. *See Tharpe, supra* at 14.

Turning first to the decision of the Court of Military Review, we note that it denied appellant's request for this assistance two times. *See* 37 MJ at 734–35. We also have denied this request. 34 MJ 164 (1991) and 40 MJ 25 (1994). To support his last request, appellant filed affidavits from a psychiatrist and a social worker asserting that appellant's pretrial evaluations were defective. Then he filed the results of certain psychiatric tests ordered by that same appellate court on December 31, 1991, which showed appellant had organic brain damage. 37 MJ at 742. Finally, he filed an affidavit from another psychiatrist, specializing in neurology, whose opinion was that appellant suffered "organic brain damage" and probably was not mentally responsible at the time of the charged offenses but further testing was required. Basically he argues that he has shown that the requested expert assistance is necessary as the Court of Military Review suggested it be shown in its earlier opinion of March 12, 1991. 32 MJ 730, 732–33.

■■■■ Our standard of review in assessing a Court of Military Review decision denying funding for additional appellate expert mental health assistance is abuse of discretion. *See Tharpe, supra* at 16; *see also United States v. Nichols*, 21 F.3d 1016, 1017

(10th Cir.), *cert. denied,* 513 U.S. 1005, 115 S.Ct. 523, 130 L.Ed.2d 428 (1994); *United States v. Rinchack,* 820 F.2d 1557, 1563 (11th Cir.1987). Here, we note that appellant had already been personally examined by three psychiatric experts at trial, two of whom were personally chosen by the defense. *See Wright,* 151 F.3d at 163; *Martin v. Wainwright,* 770 F.2d 918, 935 (11th Cir.1985), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986). Four more psychiatric experts examined appellant post-trial as a result of a sanity board ordered by the Court of Military Review and the additional psychiatric testing also ordered post-trial by that court. They specifically addressed the question of appellant's organic brain damage and rejected it as negating his criminal responsibility. 37 MJ at 743. Appellant also had, in post-trial affidavit form, the defense expert opinions of Doctor Pincus, a neurologist, that he was not mentally responsible at the time of the offense, and of Doctor Merikangas that earlier evaluations by others were defective. *See* 770 F.2d at 934–35; *see Lawson v. Dixon,* 3 F.3d 743, 753 (4th Cir.1993), *cert. denied,* 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 556 (1994). Finally, he had the results of the testing ordered by the Court of Military Review which indicated organic brain damage of some type in appellant. *See Nichols,* 21 F.3d at 1018; *Shaw,* 762 F.Supp. at 862. Thus, the lower appellate court had a sufficient basis in the record for considering the mental-state issues before it and concluding that additional defense psychiatric expenditures were not reasonably necessary. *See Wright v. Angelone, supra; Martin,* 770 F.2d at 935 (numerous defense or independent evaluations already conducted justified denial of additional testing); *see also Vickers,* 144 F.3d at 616 (weight-of-prior-evidence standard).

 Appellant further attacks the decision of the Acting Judge Advocate General on August 19, 1993, refusing to consider his post-trial request for funding for expert assistance. He complains that he was denied equal protection of the law because the Judge Advocate General had granted equally meritorious requests for funding in September and December of 1992 from two equally deserving death-row inmates. He also complains that TJAG's adherence to a new policy not to consider the merits of such requests unfairly burdened his access to the courts and denied him due process of law. We disagree.

In *United States v. Curtis,* 31 MJ 395 (1990), this Court ordered the Judge Advocate General to provide adequate assistance to a capital defendant "to properly litigate the unique constitutional issues ... which, indeed, affect the litigation of matters relating to imposition of the death penalty in each of the uniformed services." This Court directed that $15,000 be made available to appellate counsel and

> [t]hat the expenditure of such funds shall be approved by the same [appellate defense counsel] or his designee for such expenses as are determined by him to be reasonable and necessary in furtherance of the defense of the appellant in this appellate proceeding, subject to such procedures as are in effect within the Department of the Navy for the proper disbursement of public funds; [and]

> That the determination of such reasonable and necessary expenditures shall be subject to review only by this Court[.]

In 1992, without a court order, the Judge Advocate General of the Army made funding available to two other death-row inmates whose cases were on appeal.

On December 17, 1992, the Judge Advocate General of the Army issued the following memorandum on his policy covering *all* future requests for funding of experts:

SUBJECT: Fee Requests for Expert Services and Related Purposes in Capital Cases

1. *Purpose.* This memorandum provides policy guidance concerning fee requests for expert services and related purposes, which are submitted to The Judge Advocate General.

2. *Policy.*

a. The Judge Advocate General will not approve, nor consider on the merits, requests for funds to obtain expert services or for related purposes. Moreover, The

Judge Advocate General will not consider, *ex parte,* matters submitted in support of such requests.

b. Such requests for funding should be made to the appropriate authorities. Appropriate authorities include courts and convening authorities.

(1) The appropriate court is the court before which the case is currently pending. This would be the trial court (after referral but before authentication of the record of trial by the military judge) or the appellate court (the United States Court of Military Appeals or the United States Army Court of Military Review, as appropriate).

(2) The appropriate convening authority is the convening authority who presently exercises general court-martial jurisdiction over the accused/appellant.

3. Nothing in this policy is intended to diminish the legal authority of The Judge Advocate General to grant requests for funds for expert services and related purposes.

On August 19, 1993, the Acting Judge Advocate General of the Army issued the following memorandum in response to appellant's renewed request for expert funding:

SUBJECT: *Ex Parte* Request for Expert Assistance, *United States v. Specialist Ronald A. Gray,* 261–69–7258, ACMR 8800807, CMA 93–7001/AR

1. Your 9 August 1993 request, subject as above, is denied.

2. Pursuant to the policy established by The Judge Advocate General on 17 December 1992, fee requests for expert services and related purposes in capital cases are no longer considered on their merits or approved by The Judge Advocate General.

3. This policy does not act to deny your client access to funds when those funds are deemed warranted by the appropriate authorities. Appropriate authorities include the court presently hearing your client's case and the General Court–Martial Convening Authority. This policy was implemented to avoid interference by this office with the orderly functioning of the appellate process, and to avoid duplicating a function traditionally carried out by others.

4. Before 17 December 1992, there was no OTJAG policy regarding consideration of fee requests in capital cases. Apparently, the requests in *U.S. v. Loving* and *U.S. v. Murphy* were the first such requests addressed to this office, and the issue of our funding these requests was a novel one. With considerable reluctance, fees were approved by The Judge Advocate General in the *Loving* and *Murphy* cases. After our experience dealing with those requests, however, we concluded that it was not conducive to an orderly appellate process for this office to intervene and determine issues regarding fees during the appeal of capital cases. *We perceived no beneficial effect from duplicating a function adequately addressed by authorities already empowered to consider such requests for funding. Despite the 17 December 1992 policy, no litigant is left without funding when warranted by the law and facts of the case.*

5. Although your request for funds provided by The Judge Advocate [sic] is denied, you have not been prevented from addressing requests to traditional authorities for considering funding requests. My denial is not based on an assessment of the merits of the request for witness funding in your client's case, but is made in accordance with established policy. That policy affects not only your client's request, but similar requests submitted by all appellants in capital cases after 17 December 1992.

(Emphasis added.)

Appellant's equal protection argument is clearly without merit. The Equal Protection Clause is generally designed to ensure that the Government treats "similar persons in a similar manner." *See generally* R. Rotunda and J. Nowak, *Treatise on Constitutional Law: Substance and Procedure,* 2d § 18.38 at 488; § 18:41 at 495 (1992). As then-Chief Judge Everett, writing for this Court in *United States v. Means,* 10 MJ 162, 165 (1981), said:

For the Government to make distinctions does not violate equal protection guarantees unless constitutionally suspect classi-

fications like race, religion, or national origin are utilized or unless there is an encroachment on fundamental constitutional rights like freedom of speech or of peaceful assembly. The only requirement is that reasonable grounds exist for the classification used. *Cf. Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

We do not consider death-penalty inmates who submit requests for expert assistance after 1992 as being a suspect class. We also do not consider the action of the Judge Advocate General in establishing a *Curtis*-type procedure for dispensing expert assistance in the Army as unreasonable. *See United States v. Curtis,* 31 MJ 395 (CMA 1990). Finally, we hold that the action of the Judge Advocate General in Loving and Murphy did not create any fundamental constitutional right for capital defendants to initially request him to provide such funding.

■ Appellant's due process argument is also without merit. In substance he contends that the Judge Advocate General's policy of refusing to entertain future requests for expert and investigative assistance infringed his right to access the courts and process his appeal. *See generally Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). We disagree.

The Judge Advocate General's policy letter does not purport to deny appellant or any other servicemember expert assistance on appeal. Moreover, it does not suggest that the Judge Advocate General will refuse to make such funds available if so ordered by a competent court. *See United States v. Curtis, supra.* It does, however, establish a procedure by which a soldier's request for funding will be forwarded to the appropriate forum for consideration and action in a more efficient manner. *Cf.* Art. 73. Such a policy or procedure is reasonable in our view and does not deny appellant due process of law. *See DeLong,* 790 F.Supp. at 617, citing *United States v. Goodwin,* 770 F.2d 631 (7th Cir.1985), *cert. denied,* 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986).

## ISSUE X

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY ALLOWING THE GOVERNMENT TO USE APPELLANT'S STATEMENT MADE PURSUANT TO A GUILTY PLEA IN A CIVILIAN TRIAL, WHERE (1) CIVILIAN AUTHORITIES FAILED TO ADVISE APPELLANT OF HIS FIFTH AMENDMENT RIGHT AGAINST SELF–INCRIMINATION PRIOR TO ELICITING INCRIMINATING INFORMATION UNRELATED TO HIS CIVILIAN PLEA: (2) THE PARTIES DID NOT CONTEMPLATE USE OF THE STATEMENT UNLESS APPELLANT PLED GUILTY AT THE CIVILIAN TRIAL; (3) MILITARY DEFENSE COUNSEL WERE NOT PRESENT WHEN THE STATEMENT WAS RENDERED: AND (4) CIVILIAN DEFENSE COUNSEL SHOULD HAVE KNOWN THAT MILITARY AUTHORITIES HAD PREFERRED CHARGES AGAINST APPELLANT, WITH A VIEW TOWARD THE DEATH PENALTY, ON AUGUST 5, 1987.

## ISSUE XI

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING THE GOVERNMENT TO MAKE USE OF APPELLANTS STATEMENTS IN VIOLATION OF A CIVILIAN PLEA AGREEMENT.

## ISSUE XII

WHETHER THE OPINION OF THE ARMY COURT WHICH FOUND THAT APPELLANT'S STATEMENTS DID NOT CONTRIBUTE TO THE FINDINGS AND SENTENCE MISINTERPRETS AND MISAPPLIES THE FACTS OF RECORD.

## ISSUE XIII

WHETHER CIVILIAN AND MILITARY DEFENSE COUNSEL WERE

INEFFECTIVE IN FAILING TO LIM-IT APPELLANT'S CONFESSION MADE PURSUANT TO A CIVILIAN PLEA AGREEMENT, OR IN FAILING TO DRAFT TERMS LIMITING THE USE OF SUCH STATEMENT TO THE CIVILIAN TRIAL.

The four granted issues noted above are all directed to appellant's pretrial statements to North Carolina police officers on November 2 and 4, 1987. In these statements appellant admitted burglarizing the Miskanin trailer and taking a .22 caliber pistol and a VCR which he later pawned. He also admitted that he had this pistol in his possession "as late as" December 1986, around the time of the murder of Ms. Vickery–Clay. The prosecution at his court-martial called Detective Oakes to the stand to establish that appellant made these statements. The same .22–caliber pistol was found at the murder site of Laura Lee Vickery–Clay. The prosecution used all this evidence to show that appellant burglarized the Miskanin trailer as charged and as "circumstantial evidence" identifying him as the murderer of Ms. Vickery–Clay.

Appellant objected to admission of evidence of his pretrial statements at trial but the military judge ruled against him. The following colloquy occurred:

MJ: The motion to suppress the out-of-court statements of the accused rendered on the 2d and 4th of November, with regard to certain portions of those statements is denied. I specifically find that on the 6th of January—or the 7th of January—the accused was advised of his rights pursuant to *Miranda* [*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)]; that indeed, on the 13th of January, as represented by counsel, he exercised those rights; while there was a considerable passage of time between then and the 2d of—the 27th of September when the statement was actually rendered, there were no factors tending to indicate that the accused had in any way not recalled his right to remain silent, and indeed rendered the statements in the presence of his counsel and his counsel frequently, as reflected within the statements, interject-ed herself as the civilian counsel in the discussion and thereby, on behalf of the accused, exercised the right to remain silent; that indeed, as the Government suggests, the effect of the offer by—on behalf of the accused through counsel was an effective waiver of any such right to remain silent, prompted by his desire for the benefit of the transaction—the agreement that he reached; that in any event, it would have been a waiver.

Now, as to the portion or the portions of the statements rendered admissible by that ruling, contrary to the—and while I appreciate the significance perceived by the Government, contrary to the assertions of the Government, I perceive the admissions—or the statements relating to the actual shooting of the—Wilson, I believe her name was, with a .22–caliber pistol to be unduly prejudicial and is overly suggestive. Accordingly, any type of statements or any evidence provided by the witnesses pertaining to these admissions will pertain solely to the .22–caliber pistol, the statements of the accused regarding it and its larceny or removal from the residence of Sergeant Miskanin, if, indeed, that can be established, even that much is not readily apparent from the statements, inasmuch as the residence is not identified, if my memory serves me, within the statements, but rather, the parties doing the discussion at the time assumed that they were talking about a given residence. Counsel for both sides understand what I've said? If not, I'll clarify it.

DC: (Nodding in the affirmative) Understand.

MJ: I don't want a nod of your head. I want to know.

DC: Understand, yes, sir.

TC: Sir, I understand what you said. I wish to inquire of the court whether we can elicit testimony concerning the fact that the accused had admitted posses-sion—or having in his possession the .22–caliber pistol on the 11th of December—

MJ: Within the realm of that statement.

TC: —along with his admission that he had in fact hidden the .22–caliber pistol—

MJ: Anything pertaining to the possession, within the statement, of the .22–caliber pistol—how he obtained it, if it's the same one, and what he may have done with it in terms of hiding it, but not in terms of shooting Wilson.

TC: Understood, sir.

We initially note that appellant is correct in asserting that the Court of Military Review erred in stating that appellant's pretrial statements "were never brought to the attention of the court members...." and therefore could not have prejudiced appellant on findings and sentence. 37 MJ at 740–41. It is true that his guilty pleas to the two murders prosecuted in state court which gave rise to these statements were not presented to the members of his court-martial. Moreover, the actual written statements given to state authorities concerning these offenses were not admitted at his court-martial. However, as noted above, Detective Oakes did testify as to the fact that such statements were made by appellant.

Nevertheless, the question before us is whether admission of evidence of these statements by appellant was legal error. The Court of Military Review found no legal error, and we agree.

(1) Violation of Fifth Amendment

■ Appellant first argues that his statements made pursuant to his guilty pleas in state court were erroneously admitted because "civilian authorities failed to advise appellant of his Fifth Amendment right against self-incrimination prior to eliciting incriminating information unrelated to his civilian plea." Final Brief at 109. Initially, we note that the .22–caliber pistol taken from the Miskanin trailer was the same pistol used to kill Tammy Wilson, a crime to which he agreed to plead guilty in state court. The fact that questioning about this offense also touched on a matter relevant to his military offenses did not require more specific advice. *See Colorado v. Spring*, 479 U.S. 564, 576–77, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). Moreover, as noted by the military judge, appellant was advised of his rights against self-incrimination under the Fifth Amendment, invoked his right to counsel, consulted with

counsel, and agreed to provide information to state police concerning the murder of Tammy Wilson. Finally, appellant's civilian defense counsel was present with appellant at the time he made his statements to police and later to the court. *See generally* 1 W. LaFave and J. Israel, *Criminal Procedure* § 6.8 at 519 (1984) ("It is generally accepted that if the attorney was actually present during the interrogation, then this obviates the need for the warnings."). Accordingly, we conclude that these statements were not admitted in violation of the Fifth Amendment. *See generally United States v. Arrington*, 73 F.3d 144, 149–50 (7th Cir.1996); *see also United States v. Benson*, 640 F.2d 136, 139 (8th Cir.1981).

(2) Use of statements as violation of state plea agreement

■ Appellant next argues that evidence of these statements was erroneously admitted by the judge because their use at his court-martial violated his civilian plea agreement. Guilty pleas and accompanying statements in one jurisdiction are generally admissible in other jurisdictions to prove the element of other crimes. *United States v. Williams*, 104 F.3d 213, 216 (8th Cir.1997); *United States v. Benson, supra; United States v. Howze*, 668 F.2d 322, 324 n. 3 (7th Cir.1982). The civilian plea agreement in this case does not otherwise preclude use of his statements in a subsequent court-martial for different offenses. The Agreement only states, "In the event that the above plea arrangement is not carried out for whatever reason, no statement made by the Defendant pursuant to this agreement will be used against him in any subsequent prosecutions." App. Ex. XLVIII at 14. Appellant's suggestion that the agreement implies a limited use in state proceedings is simply unsupported by this record of trial.

(3) Violation of Article 31

■ Appellant next argues that evidence of his statements was erroneously admitted at his court-martial in violation of Article 31, UCMJ, 10 USC § 831. He contends that his investigation for murders in the Fayetteville

area by civilian and military police had "merged" within the meaning of the case law of this Court. Accordingly, he concludes that Article 31 warnings had to be given by civilian police when they questioned him about the offenses tried later in the court-martial. We disagree.

The premise of appellant's Article 31 argument is that the civilian and military investigations "merged" within the meaning of *United States v. Lonetree*, 35 MJ 396, 403 (CMA 1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993). However, we note that appellant's original motion to suppress his pretrial statements to civilian police made only a vague reference to Article 31. *See* App.Ex. XLVII. Moreover, no attempt to develop a proper factual basis for suppression on Article 31 grounds was made by the defense at the court-martial. Finally, both on questioning by the military judge (R. 353) and in his argument on the motion to suppress, defense counsel made clear that the basis of his motion to suppress was solely the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In this context we find no plain error under Article 31 in admission of those statements.

### (4) Ineffective Counsel

Appellant finally contends that he was denied effective assistance of counsel at his court-martial as guaranteed by the Sixth Amendment. He grounds his argument on conduct of his civilian defense counsel at his earlier state criminal trial for other murder charges which caused or permitted him to incriminate himself on the military offenses. He also cites his military defense counsel's failure to intervene in the earlier state proceedings and prevent this self-incrimination.

The thrust of appellant's argument is that an accused facing different charges in both state and military courts is entitled to a coordinated and unified defense, especially where he might receive the death penalty for his crimes in either forum. He has cited no authority for this proposition, other than general ineffective-assistance-of-counsel cases such as *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

Appellant particularly contends that his civilian defense counsel at his North Carolina trial should not have permitted him to admit as part of his guilty plea to state murder charges that he burglarized the Miskanin trailer in November of 1986, and stole a .22-caliber pistol. He notes that charges for burglary of the Miskanin residence and larceny of the pistol were pending referral to court-martial at the time of his admission in the State case. He further notes that he was later convicted of these offenses at his court-martial on the basis of this admission. Also, he notes that the charge of murdering Ms. Vickery–Clay was also pending court-martial at the time of this admission and that he was convicted of that offense based upon his admission at the State trial. In this regard, we note that a .22-caliber pistol taken from the Miskanin residence was shown at the court-martial to be the same pistol found at the murder scene of Ms. Vickery–Clay. He finally asserts that his military defense counsel in this case who attended the State court proceedings should have attempted to intervene and preclude these admissions.

 We reject appellant's ineffective-assistance-of-counsel claim for several reasons. First, the burden is on him to show deficient professional conduct by his counsel and prejudice resulting from such conduct. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Moreover, in showing less than reasonably competent conduct by counsel, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993), quoting *Strickland*, *supra* at 690, 104 S.Ct. 2052. Finally, the Supreme Court has recognized that "[s]heer outcome determination, [...], was not sufficient to make out a claim under the Sixth Amendment." 506 U.S. at 370, 113 S.Ct. 838.

 Appellant did not challenge admission of his state-trial guilty-plea statements at his court-martial on Sixth Amendment

grounds. He also did not call civilian defense counsel to explain his reasoning, the advice which he gave to appellant, or any awareness which he had as to the significance of these guilty-plea statements in a future court-martial. Here, the facts on the record were that civilian defense counsel avoided the death penalty in state court for two murder charges and he knew that appellant faced a possible capital court-martial referral for two other murder charges and related offenses. The record also shows that, at appellant's questioning, civilian defense counsel successfully objected to references in the questions to offenses under investigation by military authorities. We find no unreasonable professional conduct in these circumstances. *See Lane v. Singletary,* 44 F.3d 943 (11th Cir.), *cert. denied,* 515 U.S. 1163, 115 S.Ct. 2619, 132 L.Ed.2d 861 (1995); *see generally Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

Assuming appellant established constitutional error with respect to his Sixth Amendment right to counsel, we would still not reverse his convictions for burglary, robbery, and the Vickery–Clay murder on this basis. *See generally Lockhart,* 506 U.S. at 369 n. 2, 113 S.Ct. at 842 n. 2. The record in this case established beyond a reasonable doubt that any such error was harmless.

First, we note that appellant's admission that he took a .22–caliber pistol from the Miskanin trailer and possessed it around December 11, 1986, falls far short of a full confession to the Miskanin burglary on November 12, 1986, and the murder of Ms. Vickery–Clay 4 days later. *Cf. Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Second, appellant's admissions to taking the .22–caliber pistol from the Miskanin trailer was not the only evidence linking him to the burglary of that residence and the murder of Ms. Vickery–Clay. It was also established that appellant pawned a VCR taken with the pistol from the Miskanin trailer. Moreover, he was linked to the murder of Ms. Vickery–Clay by fingerprints and fiber evidence. In this context, the Government has persuaded us that any error by civilian defense counsel in failing to

limit appellant's guilty-plea statements in the North Carolina trial was harmless beyond a reasonable doubt in his court-martial.

## ISSUE XIV

WHETHER APPELLANT WAS DENIED A FAIR TRIAL BY AN IMPARTIAL COURT–MARTIAL PANEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS DUE TO PREJUDICIAL PRETRIAL PUBLICITY.

Appellant next attacks his conviction and death sentence on the basis that his court-martial panel was saturated with prejudicial pretrial publicity (*see Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)) and the military judge failed to take necessary steps to protect his right to a fair and impartial jury. *See Chandler v. Florida,* 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). He notes that 93 articles were published in five newspapers for over 14 months concerning appellant's civilian and military trials which "essentially convicted appellant prior to his court-martial." Final Brief at 144. He further notes that the military judge failed to grant timely motions by the defense to neutralize this publicity. "Timely motions were made to: sequester the members, or in the alternative, exclude the media; change the location (venue) of the court-martial; direct the convening authority to detail all the members from another command outside the 82d Airborne Division, or in the alternative, detail six additional members from a location other than Fort Bragg." Final Brief at 149–50.

To legally support his pretrial-publicity claim, appellant relies heavily on the Fifth Circuit decision in *Mayola v. State of Alabama,* 623 F.2d 992 (1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). There, that court stated:

II. *Prejudicial Pretrial Publicity*

One seeking to have his conviction nullified on the ground that he was denied a fair trial to an impartial jury due to adverse pretrial publicity *ordinarily* must demonstrate an actual, identifiable preju-

dice attributable to that publicity on the part of members of his jury. *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *United States v. Capo,* 595 F.2d 1086, 1090 (5th Cir.1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980); *Hale v. United States,* 435 F.2d 737, 746–47 (5th Cir. 1970)[,] *cert. denied,* 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).

623 F.2d at 996 (emphasis added).

That Court, however, also recognized that an exception to the rule requiring a showing of actual prejudice was established by the Supreme Court in *Rideau v. Louisiana, supra.* The Court said:

> The principle distilled from this holding by courts subsequently discussing the case is that where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, "[jury] prejudice is presumed and there is no further duty to establish bias." *United States v. Capo,* 595 F.2d at 1090. *E.g., Murphy v. Florida,* 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035–2036, 44 L.Ed.2d 589 (1975); *United States v. Haldeman,* 559 F.2d at 60–61; *McWilliams v. United States,* 394 F.2d 41, 44 (8th Cir.1968), *cert. denied,* 393 U.S. 1044, 89 S.Ct. 643, 21 L.Ed.2d 593 (1969); *Pamplin v. Mason,* 364 F.2d 1, 4–5 (5th Cir.1966). *See also, e.g., Jenkins v. Bordenkircher,* 611 F.2d 162, 165 (6th Cir. 1979) (reciting equivalent standard without referring to *Rideau* itself). These courts have held that where the *Rideau* principle applies, the petitioner clearly need not show that the pervasive community prejudice actually entered the jury box, *Pamplin v. Mason,* 364 F.2d at 5, and some circuits have indicated that the petitioner need not even demonstrate that the members of the jury panel or venire were, themselves, actually exposed to the publicity, *e.g. McWilliams v. United States,* 394 F.2d at 44.

623 F.2d at 997. Appellant asserts his case was like *Rideau.*

 To establish presumed prejudice, the record must demonstrate "that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime[s]." *See Troiani v. Poole,* 858 F.Supp. 1051, 1062 (S.D.Cal.1994). Here, we note that the challenged 93 articles by 5 different papers did not cover a single crime, a single investigation, or a single trial. Instead, they addressed a veritable crime spree, involving five murders, six rapes, and attendant lesser crimes. Moreover, they covered dual investigations and trials by state and military authorities. Appellant's gross-statistical-saturation argument ignores this context and, to that extent, is unpersuasive.

In any event, we are not persuaded by appellant that the pretrial publicity in his case was prejudicial and inflammatory. This is simply not a case like *Rideau,* where the defendant's uncounseled pretrial confession was broadcast three times on television before his trial. Here, the articles appear to be no more than routine reports of heinous crimes, investigation of these crimes, the arrest of appellant, and the preliminary steps taken to bring appellant to trial in both state and military courts. These articles do not appear to be unduly sensationalistic. *See Rock v. Zimmerman,* 959 F.2d 1237, 1253 (3d Cir.), *cert. denied,* 505 U.S. 1222, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992). Moreover, they clearly do not create any actual unfairness to appellant as a defendant in the sense delineated in *Rideau. See United States v. DiSalvo,* 34 F.3d 1204, 1222 n. 16 (3d Cir. 1994); *cf. Mayola,* 623 F.2d at 997–98.

 Appellant's remaining argument is that the military judge failed in his duty to ensure that he receive a fair trial. *See generally Chandler v. Florida, supra.* The military judge was in fact aware of the pretrial publicity surrounding appellant's case, but he did reject the defense-proffered solutions to this problem. However, the military judge did permit extensive *voir dire* of the panel members concerning exposure to pretrial publicity and its possible impact on deliberations in this case. He also instructed the members not to "expose" themselves to any

particular information pertaining to the accused and instructed the members to use "common sense" in dealing with media exposure. Finally, he twice ruled that the members of this court-martial were impartial in fact. We see no abuse of discretion by the judge in these matters.

### ISSUE XV

WHETHER THE MILITARY JUDGE FAILED TO PROPERLY DETERMINE, AND THE EVIDENCE OF RECORD ·FAILS TO CONCLUSIVELY DEMONSTRATE, THAT APPELLANT'S ELECTION AS TO FORUM WAS KNOWINGLY AND INTELLIGENTLY MADE.

 The factual basis for this issue is appellant's apparent signing of his request for a court-martial panel composed of at least one-third enlisted members with the words "Negative Reading." Appellant submitted his request so signed after twice being advised of his forum rights by the military judge and orally electing trial by enlisted members. At the urging of his counsel, he later signed his proper name above the words "Negative Reading."

We further note that the military judge did not accept appellant's request without his proper signature. The record states:

ACC: (confers with defense counsels) I will accept—

MJ: No, you won't accept. You'll elect. You'll either elect by officer members, or a court that includes enlisted members.

ACC: I will elect enlisted members. [Defense counsel begins to return document to the judge]

MJ: Wait a minute, leave that there. You have there before you a written request for enlisted members. On that appears your typed signature block, and above it what appears to be your signature. Is that your signature?

ACC: (Examining document) No, that's not my name.

MJ: Let me see that (receives document from defense counsel/examining document) What is that supposed to be?

DC: He's confused, Your Honor.

MJ: Well, let's un-confuse him.

[Defense counsel hands document to accused, who signs it, and defense counsel returns it to the judge.]

MJ: The record should reflect the accused has just now signed the written request for enlisted members.

Appellant asserts that the above record suggests that appellant did not understand his rights and was coerced by defense counsel to elect trial with enlisted members. We disagree. There is no question in this case that appellant understood his choice of forum rights and he voluntarily exercised it. *See* 37 MJ at 738. The military judge twice explained those rights to appellant; appellant twice acknowledged understanding those rights; and finally, appellant requested enlisted members both orally and in writing. *United States v. Barnes,* 8 MJ 115, 117 (CMA 1979); *United States v. Stegall,* 6 MJ 176, 177 (CMA 1979). Appellant's decision to submit his request signed "Negative Reading" rather than his proper name suggests confusion as to his name, not his right to choose a forum. The military judge's decision to permit counsel to have a reasonable opportunity to rectify this problem was not error. *See* RCM 801(a)(3).

### XVI

WHETHER APPELLANT WAS DENIED DUE PROCESS UNDER THE FIFTH AND FOURTEENTH [3] AMENDMENTS TO THE UNITED STATES CONSTITUTION AND MILITARY DUE PROCESS WHEN THE MILITARY JUDGE DENIED RESOURCES NECESSARY TO RETAIN EXPERT SERVICES IN CRIMINAL INVESTIGATION TO ASSIST THE DEFENSE IN THE EVALUATION, PREPARATION, AND PRESENTATION OF ITS DEFENSE.

Prior to trial, appellant twice requested the convening authority to provide an independent criminal investigator to assist in the preparation of his defense. The convening

---

**3.** The Fourteenth Amendment only applies to the States.

authority did not grant this request but he did make available the services of the Criminal Investigation Command (CID) who to a certain extent investigated the matters requested by the defense. At trial the defense renewed its "request" for an independent criminal investigator, noting three areas which had not been investigated to its satisfaction. The military judge denied this "request."

Citing the decisions of this Court in *United States v. Garries*, 22 MJ 288, *cert. denied*, 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986), and *United States v. Mustafa*, 22 MJ 165, *cert. denied*, 479 U.S. 953, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986), counsel argue that the military judge abused his discretion in denying his request for an independent criminal investigator. He asserts that his motion "was made at trial as a result of the failure of government investigators (CID special agents) to adequately provide the defense with critical information necessary for the formation of appellant's defense." Final Brief at 157. He particularly states:

> Appellant enumerated three areas to the military judge: 1) The failure of CID to provide the names and locations of all Terminal Taxi Cab Company drivers on duty at the time of Kim Ruggles' death; 2) the failure of CID to sufficiently coordinate with North Carolina and/or other federal law enforcement agencies, *e.g.*, the Drug Enforcement Agency [sic] (DEA), concerning the existence of a dark colored Lincoln automobile allegedly used in a drug transaction that Kim Ruggles was a party to on the night of her death; and 3) the failure of CID to contact the family, employer, and acquaintances of Tommy D. Arrington, a suspect in both murders who bears a strong resemblance to appellant, to ascertain Arrington's location on relevant dates. (R. at 159–61; App. Exh. XXXVII.)

Final Brief at 157–58. He concludes that "[n]one of the aforementioned areas were adequately investigated by CID." Final Brief at 158.

 It is beyond cavil in the military justice system that an accused has a right to investigative assistance at the expense of the Government if he demonstrates the necessity for such assistance. *United States v. Robinson*, 39 MJ 88 (CMA 1994); *United States v. Kelly*, 39 MJ 235 (CMA), *cert. denied*, 513 U.S. 931, 115 S.Ct. 324, 130 L.Ed.2d 284 (1994). In *United States v. Gonzalez*, 39 MJ 459, 461, *cert. denied*, 513 U.S. 965, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994), this Court recognized a three-step test for determining necessity, as follows:

> First, why the expert assistance is needed. Second, what would the expert assistance accomplish for the accused. Third, why is the defense counsel unable to gather and present the evidence that the expert assistant would be able to develop.

We review a military judge's decision on providing expert assistance on an abuse-of-discretion standard. *See United States v. Washington*, 46 MJ 477, 480 (1997); *see also United States v. Gadison*, 8 F.3d 186, 191 (5th Cir.1993); *United States v. Sanchez*, 912 F.2d 18, 22 (2d Cir.1990). Here, the military judge denied the requested expert assistance because he determined that the letter of the CID commander adequately responded to appellant's inquiries in the three areas noted.

To appellant's request for the taxi-driver information, the CID commander stated:

> 3. CPT BREWER requested that Terminal Taxi logs be researched to determine which drivers were working during the hours of 1800–2200 on the night of RUGGLES' death and their whereabouts be determined during that period. All of the taxi drivers were located, except for Mr. CRUMBLE, who was driving a Terminal owned taxi which was sub-leased to Christian Taxi Company, Fayetteville, NC. The only taxi driver known to have been in the area in which RUGGLES' was murdered was Mr. James FAUST, 309 Capital Drive, Spring Lake, NC, who stated that he had stopped along No Name Rd about dusk on 6 Jan 87 to attempt to help a disabled vehicle. FAUST was unable to remember who was with him in the taxi or who was in the vehicle he stopped to assist. All other drivers related that they had not been around the No Name Rd area of Ft Bragg, NC on the night of 6 Jan 87.

4. CPT BREWER requested that all drivers from Terminal Taxi be questioned as to whether they carried any passengers that fit the description given by SSG GRISBY and PVT STEPHENS. None of the drivers could remember whom they had in their taxis on 6 Jan 87.

To appellant's request for information on the dark Lincoln, he stated:

6. CPT BREWER requested that law enforcement agencies along Interstate 95 and Interstate 75 from Miami, FL to Maine and Naples FL to Michigan be contacted to determine if from Jan 87 to Oct 87 they arrested or received information pertaining to drug dealers who are black males and drove a dark Lincoln. A message was dispatched to the appropriate units, but no information concerning any individuals fitting the above description was obtained.

Finally, as to the Tommy–Arrington request, he stated:

8. CPT BREWER requested that the appropriate authorities in the Nash County Sheriff's Office and the Rocky Mount Police Department be contacted to determine if Tommy D. ARRINGTON's whereabouts on the times and dates of the crimes SP4 GRAY is currently charged with, can be determined. Further, CPT BREWER requested that blood and saliva samples be obtained from ARRINGTON. The Nash County Sheriff's Department and the Rocky Mount police Department did not have any information concerning AR-RINGTON's whereabouts. Mr. ARRING-TON was interviewed but could not determine his whereabouts on these dates. A blood and saliva sample was obtained and sent to USACIL–CONUS.

In our view, appellant has confused his right to *necessary* investigative assistance with an unrestricted right to search for any evidence which might be relevant in his case. Here the CID went beyond defense counsel's request and questioned all the drivers from Terminal Taxi. It also contacted appropriate police units along I–95 concerning the dark Lincoln as requested by defense counsel. Finally, it contacted Tommy Arrington and local police investigating him. Simply because

the results of these inquiries were not helpful to the defense does not render these efforts ineffective or provide a concrete explanation for further assistance. *See Castro v. Ward,* 138 F.3d 810, 827 (10th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998); *Goodwin,* 770 F.2d at 635. Accordingly, we conclude that a substantial basis existed for the judge to deny further expert assistance to appellant.

## ISSUE XVII

WHETHER THE MILITARY JUDGE VIOLATED APPELLANT'S RIGHT TO DUE PROCESS BY IMPROPERLY GRANTING THE GOVERNMENT CHALLENGE FOR CAUSE AGAINST MSG McCORMICK BASED UPON THAT MEMBER'S OPPOSITION TO THE DEATH PENALTY, WHERE MSG McCORMICK NEVER INDICATED THAT HE WAS "IRREVOCABLY COMMITTED ... TO VOTE AGAINST THE DEATH PENALTY REGARDLESS OF THE FACTS AND CIRCUMSTANCES ..." *SEE GRAY V. MISSISSIPPI,* 481 U.S. 648 (1987).

## ISSUE XVIII

WHETHER THE MILITARY JUDGE IMPROPERLY GRANTED THE GOVERNMENT CHALLENGE FOR CAUSE AGAINST CSM WOODS.

 Appellant argues that the military judge improperly granted two government challenges against detailed members of his court-martial because of their opposition to the death penalty. He relies on the Supreme Court decision in *Gray v. Mississippi, supra,* and asserts that neither MSG McCormick nor CSM Woods was "irrevocably committed ... to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings." Final Brief at 160. The Court of Military Review held that the correct "standard is whether the member's views would 'prevent or substantially impair the performance of his duties as a juror....'" *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct.

844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)); *see also Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *United States v. Curtis*, 33 MJ 101, 107 (CMA 1991)." 37 MJ at 736–37.

Appellant's argument is based on a faulty legal premise. The Supreme Court in *Gray*, 481 U.S. at 657–58, 107 S.Ct. 2045, addressed this question definitively:

In *Witherspoon*, this Court held that a capital defendant's right, under the Sixth and Fourteenth Amendments, to an impartial jury prohibited the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct., at 1776. It reasoned that the exclusion of venire members must be limited to those who were "irrevocably committed ... to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings," and to those whose views would prevent them from making an impartial decision on the question of guilt. *Id.*, at 522, n. 21, 88 S.Ct. at 1777, n. 21. We have reexamined the *Witherspoon* rule on several occasions, one of them being *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), where we clarified the standard for determining whether prospective jurors may be excluded for cause based on their views on capital punishment. We there held that the relevant inquiry is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.*, at 424, 105 S.Ct. at 851, quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

Here, MSG McCormick indicated that the chances of his voting for a death penalty were "very remote" (R. 745) and CSM Woods, an ordained minister, said he could never vote for the death penalty (R. 596). After careful examination of the record, we conclude, for the reasons stated by the Court

of Military Review, that the military judge, using the proper standard, did not abuse his discretion in granting these challenges. *See United States v. Gonzalez–Balderas*, 11 F.3d 1218, 1222 (5th Cir.) ("heightened scrutiny" of decision to grant challenge), *cert. denied*, 511 U.S. 1129, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994); *cf. United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir.1993) (abuse-of-discretion standard for decision to deny challenge), *cert. denied*, 512 U.S. 1227, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994).

## ISSUE XIX

WHETHER THE PEREMPTORY–CHALLENGE PROCEDURE IN THE MILITARY JUSTICE SYSTEM, WHICH ALLOWS THE GOVERNMENT TO REMOVE ANY ONE JUROR WITHOUT CAUSE, IS UNNECESSARY AND SUBJECT TO ABUSE IN ITS APPLICATION AND WAS ABUSED IN APPELLANT'S CASE.

## ISSUE XX

WHETHER THE MILITARY JUDGE FAILED TO COMPLY WITH *BATSON V. KENTUCKY*, 476 U.S. 79 (1986), AND *UNITED STATES V. MOORE*, 28 MJ 366 (CMA 1989), WHEN HE REFUSED TO HAVE TRIAL COUNSEL, ON THE RECORD, ARTICULATE A RACE–NEUTRAL EXPLANATION FOR THE GOVERNMENT'S PEREMPTORY CHALLENGE OF ONE OF ONLY TWO BLACK MEMBERS ON APPELLANT'S COURT–MARTIAL PANEL.

## ISSUE XXI

WHETHER THE GOVERNMENT ERRED BY USING ITS PEREMPTORY CHALLENGE TO EXCLUDE A PANEL MEMBER BASED UPON HIS SCRUPLES ABOUT THE DEATH PENALTY.

Appellant initially attacks the system of military justice because it unnecessarily permits the Government a peremptory challenge even when it has not been denied a challenge for cause. He cites *Ford v. Georgia*, 498

U.S. 411, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991), for the proposition that "the apparent reason for the one peremptory challenge procedure is to remove any lingering doubt about a panel member's fairness...." In such a system he asserts that "the [unrestricted] peremptory challenge becomes a device subject to abuse." Final Brief at 179. He thus suggests that his conviction and sentence should be overturned on this basis alone.

Article 41(b), UCMJ, 10 USC § 841(b), at the time of trial[4] provided: "Each accused and the trial counsel is entitled to one peremptory challenge." *See* RCM 912(g). Obviously, Congress and the President, the constitutionally authorized rulemakers for the military justice system, thought that a reason existed to provide the Government, as a party, a peremptory challenge. *See* 37 MJ at 737–38, citing *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), *overruled* by *Batson,* 476 U.S. at 93, 106 S.Ct. 1712. Neither *Ford v. Georgia, supra,* nor any other case invalidates their judgment. Thus, we reject this challenge to appellant's conviction and sentence, as we did in *Loving,* 41 MJ at 294–95.

■ Appellant next asserts that the military judge erred by failing to require the prosecution to "timely" articulate a "race-neutral" explanation for the Government's use of its peremptory challenge against one of only two black panel members. He contends that the belated submission of an unsworn statement by trial counsel does not comply with *Batson* or our case law. The Court of Military Review noted the facts surrounding this challenge and rejected appellant's timeliness argument. We agree.

The lower court stated:

When the government used its peremptory challenge to remove one of the two black court members, the defense counsel demanded an explanation on the record. Although the trial counsel offered to articulate the reason for the challenge, the military judge stated one was not necessary. We agree with the appellant that the trial counsel must articulate a race-neutral explanation for a peremptory challenge if objected to by the defense. *Batson,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Moore,* 28 MJ 366 (CMA 1989) *(per se* rule adopted; when the accused is a member of a recognized racial group and the government uses a peremptory challenge on a member of that racial group and the accused objects, the government is required to provide an explanation). The trial counsel did, however, provide a statement at the next court session, stating a race-neutral explanation for the challenge, to wit, the member's responses concerning the death penalty were equivocal. This statement was included in the record as Appellate Exhibit LVIII. *A statement included in the record is sufficient as long as it provides the court with a complete explanation for the challenge. Moore,* 28 MJ at 366, 368 n. 6–7. The trial counsel's statement provides a sufficiently race-neutral explanation for the challenge, and we find that public confidence in the military justice system has not been undermined. We therefore find the appellant's assertion to be without merit.

37 MJ at 738 (emphasis added). No legal authority has been proffered for appellant's untimeliness argument in these circumstances. *Cf. Morning v. Zapata Protein (USA), Inc.,* 128 F.3d 213, 215–16 (4th Cir. 1997). Moreover, we also find his unsworn-statement argument to be without merit. *See Moore,* 28 MJ at 368 nn. 7–8 (noting broad discretion afforded military judge in how to comply with *Batson* ), *rev'd after remand,* 30 MJ 162 (CMA 1990).

■ Our dissenting brothers, venturing somewhat beyond the particular claims of the defense on this appeal, conclude that the military judge failed to comply with all three of the requirements established in *Batson v. Kentucky, supra,* for evaluating peremptory

4. This provision became Article 41(b)(1) by amendment for courts-martial convened beginning November 5, 1990. The new version states: "Each accused and the trial counsel are entitled initially to one peremptory challenge of members of the court." Pub.L. No. 101–510, § 541(c) and (e), 104 Stat. 1565.

challenges. In *United States v. Greene*, 36 MJ 274, 278 n. 2 (1993), we summarized these requirements as follows:

> The three-step process includes: (1) a defendant must make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race; (2) the burden then shifts to the Government to articulate a race-neutral explanation for striking the jurors in question; and (3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson v. Kentucky*, 476 U.S. 79, 97–98, 106 S.Ct. 1712, 1723–24, 90 L.Ed.2d 69 (1986).

The dissent further concludes that this failure denied appellant his constitutional right to equal protection of the law and requires setting aside the findings of guilty and the sentence in this capital case. We disagree. *See generally United States v. Ladell*, 127 F.3d 622, 625 (7th Cir.1997); *United States v. Carter*, 111 F.3d 509, 512 (7th Cir.1997).

In this regard, we initially note that appellant was tried in 1987 and the early months of 1988, before the decision of this Court in *United States v. Moore*, 28 MJ 366 (1989), and *United States v. Santiago–Davila*, 26 MJ 380 (1988). At that time we had not yet held that *Batson* applied at courts-martial or that a *prima facie* case of discrimination could be made out by merely showing that a peremptory challenge was lodged against a court-martial member who was of the same minority race as the accused and he objected to that challenge. *See Moore*, 28 MJ at 368 ("After today [August 10, 1989], every peremptory challenge by the Government of a member of the accused's race, upon objection, must be explained by trial counsel."). Nevertheless, trial counsel did provide, albeit belatedly, a race-neutral explanation for his challenge, mooting any question of error in the judge's apparent determination that the defense had not made a sufficient showing to require government explanation. *See United States v. Cooper*, 30 MJ 201, 203 (CMA 1990); *Mahaffey*, 151 F.3d at 679.

Turning to the second *Greene* prong, we obviously conclude that the military judge

did not preclude trial counsel from offering any explanation for the challenge against Major Quander. The military judge did more than require trial counsel to simply state whether his "challenge was a result of his bias or prejudice against the black race...." Shortly after trial counsel denied such an intent and proffered unsuccessfully an explanation for that challenge, the military judge relented and permitted trial counsel to attach to the record a memorandum signed by trial counsel explaining the challenge. *See Turner v. Marshall*, 121 F.3d 1248, 1254 n. 2 (9th Cir.1997) (contemporary explanation of prosecutor favored), *cert. denied*, 522 U.S. 1153, 118 S.Ct. 1178, 140 L.Ed.2d 186 (1998); *cf. Simmons v. Beyer*, 44 F.3d 1160, 1168 (3d Cir.) (record not sufficient without prosecutorial explanation), *cert. denied*, 516 U.S. 905, 116 S.Ct. 271, 133 L.Ed.2d 192 (1995); *Cochran v. Herring*, 43 F.3d 1404, 1411 n. 11 (11th Cir.1995), *cert. denied*, 516 U.S. 1073, 116 S.Ct. 776, 133 L.Ed.2d 728 (1996). Finally, the reason articulated in the memorandum, *i.e.*, Major Quander's indecisiveness on the death penalty as a punishment, is a well recognized race-neutral explanation for a peremptory challenge. *See Howard v. Moore*, 131 F.3d 399, 407–08 (4th Cir.1997), *cert. denied*, — U.S. ——, 119 S.Ct. 108, 142 L.Ed.2d 86 (1998); *Kilgore v. Bowersox*, 124 F.3d 985, 992 (8th Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); *see generally United States v. Canoy*, 38 F.3d 893, 898 (7th Cir.1994).

Finally, on the third *Greene* prong, we do not agree with the dissent that "the military judge [did not] make a determination as to whether trial counsel's explanation was credible or pretextual." 51 MJ at 69. Optimally, an express ruling on this question is preferred. However, the judge clearly stated his satisfaction with trial counsel's disavowal of any racist intent in making the challenge. Moreover, he asked defense counsel whether they "have some facts that would indicate a different result," and he permitted trial counsel "to append to the appellate record a Memorandum for Record indicating the Government's reason for per-

empting Major Quander." Finally, he ensured that defense counsel had "seen" the memorandum for record and inquired whether there was "[a]nything else." Viewing this conduct of the judge in its entirety, we conclude that it constitutes an implied ruling on his part that trial counsel's explanation was genuine and that appellant's *Batson* claim was without merit. *See generally Purkett v. Elem,* 514 U.S. 765, 769, 115 S.Ct. 1769, 1771–72, 131 L.Ed.2d 834 (1995); *see also United States v. Clemons,* 941 F.2d 321, 323–24 (5th Cir.1991) (district court has discretion to determine procedures to test genuineness of race-neutral explanations); *cf. United States v. Tucker,* 836 F.2d 334, 340 (7th Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989); *see also United States v. Arce,* 997 F.2d 1123, 1127 (5th Cir.1993) (no need to make ruling where defense fails to dispute government explanation).

■ Appellant finally asserts that the Government's exercise of its peremptory challenge against Major Quander because of his scruples against capital punishment was unconstitutional. *See Brown v. North Carolina,* 479 U.S. 940, 942, 107 S.Ct. 423, 93 L.Ed.2d 373 (1986) (Brennan and Marshall, JJ., dissenting on denial of certiorari). The record indicates that Major Quander on *voir dire* admitted that "I would have a very difficult time doing it." The Government argues that his answers suggest that his views also would "prevent or substantially impair the performance of his duties as a juror ..." and this was a proper consideration under *Witt,* 469 U.S. at 412, 105 S.Ct. 844. Answer at 84 n. 57. The Court of Military Review opined that the Government proffered "a sufficiently race-neutral explanation" for its challenge which did not otherwise violate the Constitution. 37 MJ at 738.

We reject appellant's argument under the circumstances of this case. We note that extension of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to a peremptory challenge based on death-penalty scruples rather than on race has not been accepted by a majority of the Supreme Court. *See Brown,* 479 U.S. at 940–41, 107

S.Ct. 423 (O'Connor, J., concurring on denial of certiorari); *cf. id.* at 942, 107 S.Ct. 423 (Brennan and Marshall, JJ., dissenting on denial of certiorari). Moreover, even if *Batson* was extended to prevent the prosecutor from obtaining a "hanging jury" without death-penalty scruples, this rule would not apply to Major Quander's challenge. His removal was based on his "indecisive[ness]" about capital punishment, an attitude which "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *See Witt,* 469 U.S. at 424, 105 S.Ct. 844. Finally, no objection was lodged at trial against the Government's explanation of Major Quander's challenge on this basis; thus, we see no plain error by the judge in allowing the prosecutor's peremptory challenge. *See Arce,* 997 F.2d at 1126–27.

## ISSUE XXII

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT IN A CAPITAL CASE BY ADMISSION OF GRUESOME PHOTOS OF THE DECEDENTS, INCLUDING PROSECUTION EXHIBIT 214, WHICH IS A PHOTOGRAPH OF A VICTIM'S BADLY DECAYED FACE, WITH A GUNSHOT WOUND TO THE EYE SOCKET.

We reject appellant's argument for the reasons ably stated by the Court of Military Review. 37 MJ at 738–39. In this multiple violent-murder case, it cannot be seriously argued that these photographs were admitted only to inflame or shock this court-martial. Moreover, we agree with the court below that the photographs' probative value in this context was not substantially outweighed by any prejudicial effect. *See* Mil. R.Evid. 403, Manual, *supra.*

## ISSUE XXIII

WHETHER THE OUTCOME OF APPELLANT'S TRIAL WAS JEOPARDIZED BY THE ERRORS OF THE MILITARY JUDGE AND THE PROSECUTION WHEN THE PROSECUTION FAILED TO DISCLOSE THE IDENTI-

TY OF A REGISTERED SOURCE IN POSSESSION OF INFORMATION FAVORABLE TO THE DEFENSE, AND THE MILITARY JUDGE WOULD NOT ORDER DISCLOSURE.

For the first time on appeal before us, appellant challenges the decision of the military judge not to order the prosecution to reveal the identity of its informant, "Registered Source No. 0590 [hereinafter RS]." At trial he asserted that the judge's action precluded the defense from disproving the prosecution's factual theory that Ms. Vickery–Clay was murdered in the woods *prior* to the burning of her house trailer. *See Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). On appeal, he also asserts that the prosecution unfairly denied him an opportunity to question the RS about other possible defenses which might arise from his pretrial statements to CID. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The first step we must take to resolve this issue is to identify the expected testimony of the RS sought by the defense. Trial defense counsel initially asserted based on CID reports, that this witness would testify that "the Vickery–Clay vehicle [was parked] outside her trailer when the fire began." Final Brief at 193. He also would testify that he saw a large heavy set black male at the scene of the fire.

Next, we must address the question whether this information sought by the defense was relevant to the murder, rape, and sodomy charges concerning Ms. Vickery–Clay. We initially note that appellant was not charged with arson of Ms. Vickery–Clay's trailer. However, the prosecutor at this court-martial acknowledged that his murder-charge proof would show that appellant murdered Ms. Vickery–Clay in the woods, returned to her trailer in her car, and then burned that trailer to destroy any evidence linking him to the murder. In this context, RS' testimony on placement of the car next to the trailer before the fire was relevant, if not supportive, of the prosecution's theory of guilt. *See* Mil.R.Evid. 401 and 402.

Nevertheless, trial defense counsel asserted that the testimony of the RS in conjunction with a second expected defense witness was also helpful to his defense. He notes that Ms. Winhoult [or Wineholt] was expected to testify that, *prior to the fire,* she saw Ms. Vickery–Clay's automobile parked outside Ms. Winhoult's trailer and observed "a black, heavyset male leaning into the driver's window" and she heard "a female voice." Appellate counsel argues that the RS's testimony was material because

> [t]he defense counsel related that he had interviewed several witnesses and determined that the RS and one unknown individual with him were the only witnesses who saw the Vickery–Clay vehicle outside her trailer when the fire began. The defense argued that this evidence, combined with Ms. Winhoult's, demonstrated that when the Vickery–Clay vehicle was spotted prior to the fire, there was a female inside. Shortly after it was spotted, a heavy set black male walked away from the area. After this occurred, the vehicle was moved over to the Vickery–Clay trailer, and then the fire occurred. The defense counsel argued that this evidence created reasonable doubt in the government theory that the appellant killed Vickery–Clay in the woods, drove her car to the vicinity of the Winhoult trailer, and burned the Vickery–Clay trailer. (R. at 1022–27).

Final Brief at 193.

The military judge denied appellant's request for disclosure of the RS's identity on this somewhat complicated proffer. He held that "the benefit of this information the source could provide is far outweighed by the loss—of the Government would suffer as a consequence of a revelation of the name." There is no dispute in this case with the judge's determination that the RS was an "extremely productive" source of "long standing." The military judge reached this conclusion after reviewing *in camera* this operative's file. However, there was a dispute over the favorability of the RS's expected testimony to the defense and the judge's balancing of these concerns as required by *Roviaro,* 353 U.S. at 61, 77 S.Ct. 623. We conclude that the military judge did not

abuse his discretion in implicitly holding that, under the circumstances, "the disclosure of [this] informer's identity ... is [not] relevant and helpful to the defense of [this] accused, or is [not] essential to a fair determination of [this] cause[.]" *Id.* at 60–61, 77 S.Ct. 623; *see United States v. Sai Keung Wong,* 886 F.2d 252, 255 (9th Cir.1989).

In this regard, we note that the defense theory of contradiction of the prosecution's case was largely based on the expected testimony of Mrs. Winhoult, not that of the RS. She was supposed to testify that she observed Ms. Vickery–Clay's car parked outside the Winhoult trailer prior to the fire and heard an unidentified female voice in that car talk to a large male prior to the fire. Her testimony, even if corroborated in some respect by the RS, does not clearly establish that Ms. Vickery–Clay was alive prior to her trailer's fire, thus contradicting the prosecution's case. In any event, the defense did not even call this witness or otherwise pursue this theory of contradiction at trial. *Id.; see United States v. Robinson,* 144 F.3d 104, 107 (1st Cir.1998) (court need not order disclosure where informant not the only witness to contradict government case).

We further note that the defense did not establish that the RS would corroborate Mrs. Winhoult's testimony on any of its critical points. The RS was not expected to testify that he heard a female voice come from Ms. Vickery–Clay's vehicle prior to the fire talking to a large male. Moreover, the RS's expected testimony on the placement of the victim's vehicle as being adjacent to the victim's trailer contradicted Mrs. Winhoult's expected testimony. Finally, the speculative movement-of-the-car theory proposed by the defense was not directly supported by Mrs. Winhoult's statements. In this context, the military judge did not abuse his discretion, in refusing to disclose the identity of RS for testimony on what became an immaterial matter. *See United States v. Wright,* 145 F.3d 972, 975 (8th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 272, 142 L.Ed.2d 224 (1998); *cf. Devose v. Norris,* 53 F.3d 201, 206 (8th Cir.1995) (first-hand witness or participant in charged crime should be disclosed).

Further relying on other CID reports, appellant asserts that he was denied the opportunity to question the RS about various other matters which might have provided a defense to the Vickery–Clay murder charge. He asserts that the prosecution did not "disclose the full extent of the RS's involvement in appellant's case" until after trial. He notes that Appellate Exhibit LXX shows that the RS had additional knowledge about this case, as follows:

1. That the RS had seen appellant in the area of the Bragg hotel.

2. That another taxi driver named "Ann" had driven appellant around the Fort Bragg and Pope Air Force Base area on 16 December 1986 at approximately 2200–2300 hours.

3. That he had spoken with another taxi driver named "Debbie" who had driven SPC Gray and his wife to various destinations.

4. That one of the destinations included the East Coast Pawn Shop and "that Gray's wife did most of the pawning."

Final Brief at 194.

He concludes that in determining the RS's materiality, this Court should consider "the possible defense which questioning of the RS might have produced." Counsel identified these questions for the RS:

1. Was Vickery–Clay ... alive at the time of the fire, contrary to the theory of the government?

2. Did the RS see the same heavy set black male at the scene of the fire?

3. Was that individual SPC Gray?

4. If that individual was SPC Gray, had he departed the area prior to the fire?

5. Were the accused and his wife engaged in a pattern of "pawning" stolen property?

6. Was the accused's wife involved in the Miskanin offenses?

7. Whether the Miskanin pistol was stolen for the purpose of "pawning" it, rather than for the commission of premeditated murder?

8. Were "Ann" and "Debbie" the only other taxi cab drivers that had contact with SPC Gray?

9. What was the nature of that contact? Final Brief at 197.

Appellant's second approach to failure of the prosecution to disclose the identity of the RS suggests a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He asserts that his right to a fair trial is violated when exculpatory evidence in the prosecution's possession is not turned over to defense. Moreover, he asserts that the newly discovered knowledge of the RS's existence should be considered exculpatory (material and favorable to the defense) when the Government precludes the defense from fully investigating such information. *See United States v. Bagley*, 473 U.S. 667, 683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.), and *United States v. Fisher*, 24 MJ 358, 362 (CMA 1987).

We note that none of the information purportedly possessed by the RS comes anywhere near being considered exculpatory evidence. *See United States v. Watson*, 31 MJ 49, 54 (CMA 1990). It does not provide a defense to appellant or contradict the prosecution's case in any substantial way. Moreover, we are not inclined to speculate as to the answers the RS would have given to defense appellate counsel's questions where there is no basis in the record for concluding his answers would provide *Brady* material. *Cf. United States v. Rivera*, 24 MJ 156, 158 (CMA 1987) (content reasonably available from later defense proffer); *Fisher*, 24 MJ at 362 (record imports a reasonable possibility that proffered evidence was material). We find no violation of *Roviaro* or *Brady* in this context.

## ISSUE XXIV

WHETHER THE MILITARY JUDGE IMPROPERLY DENIED A DEFENSE MOTION FOR A MISTRIAL BASED ON TRIAL COUNSEL'S COMMENTS ON APPELLANT'S DEMEANOR AND RIGHT TO REMAIN SILENT.

 During his argument on sentencing, trial counsel stated the following:

You've had an opportunity to—to see the accused on a daily basis here for about three weeks. Ask yourself a question: has

he ever indicated to you by his actions any remorse for what he's done? You can consider that. You should consider that.

Defense counsel did not object at that time. At the conclusion of trial counsel's argument, defense counsel requested a side-bar conference and objected to the prosecutor's language as an impermissible comment on appellant's right to remain silent. The military judge then instructed the members as follows:

With regard to the counsel's indication, or phrase, "has the accused indicated by his actions any remorse?", that is susceptible of an interpretation of a comment upon his—the accused having remained silent and not having testified in the case, as I'm sure you [sic] aware. The right to remain silent is a constitutional guarantee of all of us, and no inference—adverse inference may be drawn from the fact that the accused elected not to testify in this case. And I'm sure that you will not draw any such adverse inference, nor read into it— the counsel's—trial counsel's closing argument, that that was a comment upon his right to remain silent.

At the conclusion of the military judge's instructions on sentencing, trial defense counsel made a motion for a mistrial.

The military judge was concerned enough with trial counsel's argument to issue an instruction to the members to prevent their being misled by it. *See Gaskins v. McKellar*, 916 F.2d 941, 951 (4th Cir.1990), *cert. denied*, 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991); *see also Resnover v. Pearson*, 965 F.2d 1453, 1465 (7th Cir.1992), *cert. denied*, 508 U.S. 962, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993). This instruction was protective in nature and expressly directed the members to refrain from drawing any inference from appellant's exercise of his right to remain silent. *Cf. United States v. Moore*, 917 F.2d 215, 226 (6th Cir.1990). We are satisfied that these circumstances did not require that the military judge grant a mistrial. *See United States v. Rushatz*, 31 MJ 450, 456 (CMA 1990) (mistrial is an extraordinary remedy; curative instruction "preferred remedy"); *see also Feltrop v. Delo*, 46 F.3d 766, 775 (8th

Cir.1995);[5] *Hughes v. Johnson,* 991 F.Supp. 621, 637 (S.D.Tex.1998); *Six v. Delo,* 885 F.Supp. 1265, 1285 (E.D.Mo.1995), *aff'd,* 94 F.3d 469 (8th Cir.1996), *cert. denied,* 520 U.S. 1255, 117 S.Ct. 2418, 138 L.Ed.2d 182 (1997).

### ISSUE XXV

WHETHER APPELLANT WAS SENTENCED TO DEATH IN VIOLATION OF THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT WHEN THE MILITARY JUDGE PRECLUDED THE SENTENCING PANEL FROM CONSIDERING APPELLANT'S BACKGROUND AS A BASIS FOR A SENTENCE LESS THAN DEATH.

Appellant asserts that the military judge committed constitutional error in his case by preventing the members from considering his social and family background as a mitigating circumstance in their death-penalty decision. He calls our attention to the military judge's denial of his request for the members to consider that his "difficult and impoverished upbringing" were "mitigating circumstances to be weighed against the aggravating" circumstances in determining his eligibility for the death penalty and whether to impose it in his case. *See* RCM 1004(b)(4)(c). He particularly notes the judge's decision excluding a videotape of a network television show dealing with the poor living conditions and social dynamics of his community, Liberty City, Miami, Florida. *See* RCM 1004(b)(3). Final Brief at 212–13. The judge's actions as a whole, he asserts, created an impermissible "risk that the death penalty ... [was] imposed in spite of factors which may call for a less severe penalty." *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion); *see Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Penry v. Lynaugh,* 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

▇▇ The first question we must address is whether exclusion of the defense-proffered video on life in Liberty City, a part of Miami, Florida, warrants reversal of appellant's death sentence. The military judge excluded it on relevance grounds, holding that "[t]he evidence before the court is to the effect that Gray was not affected factually by his environment and so, it's of no consequence." Appellant argues that this holding denied him evidence of mitigating circumstances required to be admitted by the Eighth Amendment. *See Lockett,* 438 U.S. at 605, 98 S.Ct. 2954 (opinion of Burger, C.J.), and *Hitchcock v. Dugger, supra.*

The Supreme Court has indeed recognized the broad right of a capital defendant to introduce mitigating evidence to avoid the death penalty. *See Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). This right is fully embraced in RCM 1004(b)(3). However, the Supreme Court has not attempted to rewrite the rules of evidence for capital-punishment proceedings. *See Romano,* 512 U.S. at 11–12, 114 S.Ct. at 2011. Relevance and other concerns expressed in a jurisdiction's rules of evidence are still to be applied in the traditional manner by the judge. *See Lockett,* 438 U.S. at 604 n. 12, 98 S.Ct. at 2965 n. 12 (opinion of Burger, C.J.).

Here, the military judge determined that evidence of conditions of appellant's hometown was irrelevant because up to that point all the evidence presented suggested that appellant was not affected by this environment. *See also Davis v. Scott,* 51 F.3d 457, 462 (5th Cir.), *cert. denied,* 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995). We agree with appellant, however, that the testimony of Doctor Armitage and Doctor Rose that Private Gray's background could have impacted upon his development established the necessary relevance of evidence of his background. *See Boyd v. French,* 147 F.3d 319, 325–27 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1050, 143 L.Ed.2d 56 (1999). However, we also hold that any error in excluding the videotape on Liberty City was harmless error. Other evidence was admit-

---

5. The subsequent opinion in this case, 91 F.3d 1178, 1182 (8th Cir.1996), did not affect the 1995 opinion regarding the issue here.

ted in this case through the testimony of appellant's mother and sister regarding his childhood "in the projects" of Miami, and his abusive relationship with his stepfather. Any error in excluding this videotape was clearly harmless beyond any doubt. *See also Castro*, 138 F.3d at 832.

■ Appellant's second argument is that the military judge precluded the members of his court-martial from considering admitted evidence of his family and social background as a mitigating circumstance in their death-penalty decision. *See Penry v. Lynaugh, supra.* He notes that the judge expressly refused to instruct as requested by the defense that background evidence be considered a mitigating circumstance. He also notes that the judge did not list these circumstances as mitigating to the members which suggested to the members that they should not be so considered. *See Hitchcock,* 481 U.S. at 398–99, 107 S.Ct. 1821. We disagree.

We initially note that the applicable principle of law established by *Lockett v. Ohio, supra,* and its progeny is well recognized. Recently, in *Johnson v. Texas,* 509 U.S. 350, 361–62, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993), Justice Kennedy for a majority of the Court stated:

"*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." *McKoy v. North Carolina,* 494 U.S. 433, 456, 110 S.Ct. 1227, 1240, 108 L.Ed.2d 369 (1990) (KENNEDY, J., concurring in judgment); *see also Graham,* 506 U.S. at 475, 113 S.Ct. at 901–02; *Saffle v. Parks,* 494 U.S. 484, 490–491, 110 S.Ct. 1257, 1261, 108 L.Ed.2d 415 (1990).

Moreover, in that same case, the Supreme Court noted the standard set out in *Graham v. Collins,* 506 U.S. 461, 475, 113 S.Ct. 892, 902, 122 L.Ed.2d 260 (1993), for determining whether an instruction effectively placed "relevant mitigating evidence ... beyond the effective reach of the sentencer." 509 U.S. at 366, 113 S.Ct. 2658. Justice Kennedy wrote:

The standard against which we assess whether jury instructions satisfy the rule of *Lockett* and *Eddings* [*v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ] was set forth in *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). There we held that a reviewing court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.,* at 380, 110 S.Ct., at 1198. Although the reasonable likelihood standard does not require that the defendant prove that it was more likely than not that the jury was prevented from giving effect to the evidence, the standard requires more than a mere possibility of such a bar. *Ibid.* In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.,* at 381, 110 S.Ct., at 1198.

509 U.S. at 367–68, 113 S.Ct. at 2669.

Turning to appellant's case, we note that the military judge did not expressly instruct the members not to consider appellant's family and social background as mitigating circumstances. Moreover, we reject appellant's argument that the reasonable implication of his mitigating-circumstances instruction was that this evidence should not be considered as a mitigating circumstance. Although the military judge did not expressly delineate this evidence as a mitigating circumstance, he did expressly instruct the members to consider the psychiatric opinions of Doctors Armitage and Rose concerning appellant's personality disorder. These opinions in turn were expressly based on and referenced appellant's family and social background. *Cf. Hitchcock v. Dugger, supra.*

Turning to the record, we note that the military judge instructed the members, *inter alia,* on mitigating circumstances as follows:

You must consider all evidence in extenuation and mitigation and balance them against the aggravating factors using the test I previously instructed you upon. Thus, you should consider the following extenuating and mitigating factors: the accused's age, which is 22 years, the accused's good military character, as well as his duty performance and the characterization of him as—by his—the various and sundry witnesses on extenuation and mitigation. . . .

Additionally, you should consider in extenuation and mitigation, and in weighing those against the aggravating factors, the accused's personality disorder as testified to by Dr. Armitage, Dr. Rose, and Dr. Warren. You can best recall precisely what they had to say. Additionally, the duration of the accused's pretrial confinement. . . .

Doctor Armitage's testimony on appellant's personality disorder includes express reference to appellant's social and family upbringing. He testified as follows:

Q: These personality disorders, are these—are these sub-groups—they're not self-inflicted on the part of Specialist Gray?

A: That's correct.

Q: They're something that he got either through—he inherited them or part of the child rearing or whatever?

A: Generally the—in the state of the knowledge that we have now, there are probably many different reasons that people end up the way Specialist Gray ends up, or the way any of us ends up—many different reasons.

Q: Were you able to identify any specific factors that caused Specialist Gray's personality disorders to develop?

A: There are a number of factors in his background that I think are less than helpful—were less than helpful in his development.

Q: Such as?

A: Well, he had early in life a fair—fairly substantial socioeconomic depravation, multiple male figures in the home, multiple physical moves, living in substandard—proverty [sic] conditions, circumstances where the electric lights were turned out by the company because bills were not paid, projectal [6] [sic] living, things of this nature—multiple school changes.

Now, some people could say that sounds like the military, multiple school changes, but the reason for the changes are different. They're not planned, group accepted changes. You have to move to some other place cause you can't pay the rent, so you end up in another school. Things of that nature. He had a stepparent at one time who was extremely abusive to his mother and abusive to himself, using belts on him to the point of inflicting injury, drawing blood. He felt the need to protect his mother from—from this abuse. Lived in a— in a part of Miami that certainly was—was not where you and I would want to live by any means. Curiously enough, in all of this, however, he didn't succumb to some behaviors that many people in those environments succumb to. He didn't become a drug abuser; he didn't become an alcoholic. As far as we know, didn't become a petty thief. . . .

\* \* \*

Questions by Military Judge:

Q: It may not seem quite as—germane, but it is to me. You've listened to all these factors that you perceive that have some sort of effect that would— or causation factor, and the result that you perceive in Gray, like economic depravation, multiple father figures, etcetera. If ah—with regard to the environment, if the evidence indicates this environment that is as you characterized—I believe in living—perhaps, I believe you may have said in an undesirable part of Miami, or some

6. Apparently meaning—in a housing project.

phraseology of that nature anyway—if the evidence indicated that the individual was not affected by that particular environment, then would that environment become relevant at all?

A: No, it wouldn't, and you raised a very excellent question, the answer to which we don't have. And the answer would require that we know why one individual is affected by the environment and why another isn't. But this we do know. People from backgrounds similar to Specialist Gray have much greater incidents of violations of societal rules and crime. There are several other features of his background that we haven't touched on that would address your question. And that is—when he came into the Army he was a pretty socially backward individual.

We conclude that a commonsense understanding of the instructions in light of all that took place at the trial was that the members should consider appellant's background as a mitigating circumstance. *See Castro*, 138 F.3d at 830; *Bolender v. Singletary*, 16 F.3d 1547, 1566 (11th Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994); *cf. Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

## ISSUE XXVI

WHETHER THE MILITARY JUDGE FAILED TO INSTRUCT THE PANEL MEMBERS THAT THE SPECIFICATION OF CHARGE IV (LARCENY) IS MULTIPLICIOUS FOR SENTENCING PURPOSES WITH THE SPECIFICATION OF CHARGE VII (BURGLARY).

The defense at trial made a motion that the burglary of the Miskanin residence and the larceny of property therefrom be considered multiplicious for sentencing. This motion was made prior to the decision of this Court in *United States v. Teters*, 37 MJ 370 (1993), and the military judge denied this motion, using a societal-norm test. *See* RCM 1003(c)(1)(C), Discussion ("No single test or formula has been developed which will resolve the question of multiplicity.") In view

of the numerous other offenses for which appellant was found guilty and their heinous nature, any error committed by the judge in this regard was harmless beyond any doubt. *See generally* Art. 59(a), UCMJ, 10 USC § 859(a).

## ISSUE XXVII

WHETHER APPELLANT'S DEATH SENTENCE VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND UCMJ, ARTICLE 55, IN THAT APPELLANT WAS GIVEN THE DEATH PENALTY BASED UPON A CONGLOMERATION OF AGGRAVATING FACTORS WHICH INEXTRICABLY DOUBLE COUNTED APPELLANT'S CRIMES, AND THE FAILURE OF THE MILITARY JUDGE TO INSTRUCT THE PANEL THAT ONE ACT CANNOT BE CONSIDERED AS TWO AGGRAVATING FACTORS WHEN DETERMINING IF AGGRAVATING FACTORS SUBSTANTIALLY OUTWEIGH EXTENUATING AND MITIGATING FACTORS.

Appellant was found guilty of two specifications of premeditated murder, in violation of Article 118(1), in addition to numerous other offenses in this case. As a first step to establish appellant's death-penalty eligibility, the Government had to establish "one or more of the ... aggravating factors" listed in subsection (c) of RCM 1004. Appellant asserts that the military judge erred by failing to instruct the members not to double count aggravating factors or find more than one aggravating factor based on the evidence of a single offense. Such double counting, he asserts, precludes the members from properly determining that he was eligible to receive the death penalty (RCM 1004(b)(4)(C)) and that he should, after all, receive it. *See People v. Harris*, 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433, 452 (1984), and *State v. Tittle*, 147 Ariz. 339, 710 P.2d 449, 454–55 (1985); *cf. People v. Proctor*, 4 Cal.4th 499, 15 Cal.Rptr.2d 340, 842 P.2d 1100, 1129–30 (1992); *see generally Stringer v. Black*, 503 U.S. 222, 235, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992) (must avoid "risk that the

jury ... treat[ed] the defendant as more deserving of the death penalty than he might otherwise be").

We initially note that the version of RCM 1004(b) applicable at trial provides the following concerning aggravating factors:

(2) *Evidence of aggravating factors.* Trial counsel may present evidence in accordance with RCM 1001(b)(4) tending to establish one or more of the aggravating factors in subsection (c) of this rule.

\* \* \*

(4) *Necessary findings.* Death may not be adjudged unless—

(A) The members find that at least one of the aggravating factors under subsection (c) existed;

(B) Notice of such factor was provided in accordance with paragraph (1) of this subsection and all members concur in the finding with respect to such factor; and

(C) All members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances admissible under RCM 1001(b)(4), including the factors under subsection (c) of this rule.

The version of RCM 1004(c)(7) applicable at trial provided:

(7) That, only in the case of a violation of Article 118(1):

\* \* \*

(B) The murder was committed while the accused was engaged in the commission or attempted commission of any robbery, rape, aggravated arson, sodomy, burglary, kidnapping, mutiny, sedition, or piracy of an aircraft or vessel, or was engaged in flight or attempted flight after the commission or attempted commission of any such offense;

\* \* \*

(I) The murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim; [and]

(J) The accused has been found guilty in the same case of another violation of Article 118[.]

The military judge instructed the members on aggravating circumstances as follows:

You're advised that, in view of your findings, the court is authorized to adjudge a sentence of death, or life imprisonment only, with other types of punishments like reduction and forfeitures, which I'll mention in just a moment.

You may adjudge a sentence of death only under certain circumstances. First, the death sentence may not be adjudged unless all the court members find beyond a reasonable doubt that one or more of the aggravating factors existed. Those aggravating factors which are set forth on the sentence worksheet for you are:

*that the premeditated murder of Laura Lee Vickery–Clay was committed while the accused was engaged in the commission of a rape or sodomy of the victim;*

*that as to Kimberly Ann Ruggles, that the premeditated murder of Kimberly Ann Ruggles was committed while the accused was engaged in the commission of a rape, sodomy, or robbery of the victim;*

*that as to the Vickery—Laura Lee Vickery–Clay, that the premeditated murder of Laura Lee Vickery–Clay was preceded by the intentional infliction of substantial mental and physical pain and suffering to the victim;*

*that as to the premeditated murder of Kimberly Ann Ruggles, that the premeditated murder of Kimberly Ann Ruggles was preceded by the intentional infliction of substantial mental and physical pain and suffering of the victim; and finally,*

*that the accused has been convicted in the same case—which he has—of more than one violation of Article 118.*

Again, you may not adjudge a death sentence unless all the court members— that is unanimously—find beyond a reasonable doubt that one or more of those aggravating factors existed. And again, those—those factors are set forth in the sentence worksheet.

All of the members of the court must agree beyond a reasonable doubt that one or more of those aggravating factors exist-

ed at the time of the offenses, or offense, or resulted from the offense. It is not sufficient that some members find that one aggravating factor existed, while the remaining members find that a different aggravating factor existed. Rather, all of you must find beyond a reasonable doubt that the same aggravating factor, or factors, existed before a sentence of death may be adjudged....

(Emphasis added.) The members found these five aggravating factors in this case.[7] See 37 MJ at 741 n. 8.

Appellant initially argues that an instruction against double counting is most appropriate in a case like his where two murder convictions exist. He asserts that without a proper instruction, the members might think that each murder conviction constitutes an aggravating factor for the other; providing two aggravating circumstances instead of one. He cites the decision of this Court in *United States v. Curtis*, 33 MJ 101 (1991), *cert. denied*, 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 421 (1992), as authority for prohibiting this double counting.

We note that in *Curtis*, this Court considered a different situation. There, Senior Judge Everett noted:

### COMPUTATION OF AGGRAVATING FACTORS

In one respect, however, the procedure employed may have prejudiced Curtis. As we noted in our earlier opinion, three "aggravating factors" were found by the members. In substance they were: 1) "the premeditated murder of" Mrs. Lotz "was committed while [Curtis] was engaged in the commission of a burglary"; 2) "with regard to the premeditated murder of" Mrs. Lotz, Curtis had "been found guilty in the same case of another murder"—that of Lieutenant Lotz; and 3) "with regard to the premeditated murder of" Lieutenant Lotz, Curtis had "been found guilty in the same case of another murder"—that of Mrs. Lotz. 32 MJ at 269.

33 MJ at 108. Clearly, this type of double counting did not occur in this case as double murder was considered only once as an aggravating factor. See 37 MJ at 741; *cf. People v. Harris, supra.*

■ Appellant, however, urges us to also adopt a rule against double counting aggravating circumstances based on a single offense and substantially the same evidence. See *Harris*, 201 Cal.Rptr. 782, 679 P.2d at 450. In *Harris*, a plurality of the Supreme Court of California made clear that such a rule against double counting was required in part by its state statutes. *Contra Proctor*, 15 Cal.Rptr.2d 340, 842 P.2d at 1129–30; *People v. Melton*, 44 Cal.3d 713, 244 Cal. Rptr. 867, 750 P.2d 741, 772–74 (1988). No such rule appears in RCM 1004, and we do not consider it required by the Due Process Clause of the Fifth Amendment. In any event, the Court of Military Review reconsidered this case "in light of the absence of such an instruction and determined that the sentence would have been the same." 37 MJ at 741, *citing Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). We agree.

### ISSUE XXVIII

WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE MEMBERS ON SENTENCING AS TO THE MEANING OF THE TERM "SUBSTANTIALLY OUTWEIGHED," WITH REGARD TO THE RELATIONSHIP OF MITIGATING CIRCUMSTANCES TO AGGRAVATING FACTORS.

■ We find no plain error in the military judge's instruction. He instructed the members *inter alia*, as follows:

If, however, you determine that at least one of the aggravating factors existed, then you may consider, along with all other appropriate sentence possibilities, whether a sentence of death should be adjudged. In this regard, you may not adjudge a

---

7. Although the aggravating factors found by the members were not orally announced as required by RCM 1004(b)(8), the sentence worksheet (App. Ex. CII) shows that all five were found by all the members.

sentence of death unless you find, by unanimous vote—again, by all members—that any and all extenuating and mitigating factors are substantially outweighed by any aggravating factors, including the factors which you've previously found existed in the first step of this procedure[.]

The phrase "substantially outweighed" is found in RCM 1004(b)(4)(C). It has been approved expressly and implicitly by this Court. *See Loving,* 41 MJ at 278–79; *Curtis,* 33 MJ at 107–08. We find no constitutional or other legal error in use of this term. *See generally Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994); *see also Ortiz v. Stewart,* 149 F.3d 923, 944 (9th Cir.1998).

### ISSUE XXIX

WHETHER THE FINDINGS MUST STATE EXPLICITLY THAT ALL MEMBERS CONCUR THAT ANY EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS FOUND BY THE MEMBERS.

There is no requirement as a matter of constitutional or military law that the findings *state* that all members concur in the balancing judgment. However, the military judge instructed the members on this responsibility (*see* 51 MJ at 45) and the vote sheet stated specifically: "The court-martial unanimously finds any and all extenuating and mitigating factors are substantially outweighed by the aggravating factors, . . . ." Therefore, appellant's contention in this regard is rejected. *See* 37 MJ at 756; *see also Loving,* 41 MJ at 296.

### ISSUE XXX

WHETHER THE DEATH PENALTY SENTENCING STANDARD REQUIRING AGGRAVATING FACTORS TO "SUBSTANTIALLY OUTWEIGH" EXTENUATING AND MITIGATING CIRCUMSTANCES IS IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS IN THAT THE ONLY ACCEPTABLE STANDARD MUST BE "BEYOND A REASONABLE DOUBT." *SEE ALSO* ART. 59(a), UCMJ.

Appellant acknowledges that the Supreme Court has held "that specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 761–62, 139 L.Ed.2d 702 (1998); *Zant v. Stephens,* 462 U.S. 862, 876 n. 13, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *see Walton v. Arizona,* 497 U.S. 639, 651–52, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). We also have particularly rejected appellant's argument that the military standard is unconstitutional. *See Loving,* 41 MJ at 291. No further action on this assignment of error is warranted. *See generally* RCM 1004(b)(4)(C); *see also Ortiz v. Stewart, supra.*

### ISSUE XXXI

WHETHER THE MILITARY JUDGE ERRED IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS IN FAILING TO EXPLICITLY INSTRUCT THAT EVEN IF THE MEMBERS UNANIMOUSLY FOUND ONE OR MORE AGGRAVATING FACTORS AND EVEN IF THE MEMBERS UNANIMOUSLY DETERMINE THAT THE EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS, EACH MEMBER STILL HAD THE ABSOLUTE DISCRETION TO DECLINE TO IMPOSE THE DEATH SENTENCE.

Appellant complains that the military judge should have expressly instructed the members concerning their absolute discretion to decide not to award the death penalty even if they determine he was eligible for that penalty. We find this argument to be without merit.

As pointed out by the appellate court below (37 MJ at 757), appellant's argument is not supported by the record. The military judge, responding to a question by the president of the court-martial, stated:

MJ: Assuming you got to that point and you unanimously found, obviously that means by all vote—all being—all concurring, that the aggravating factors substantially outweighed all extenuating and mitigating factors, then you can proceed to vote on the remaining elements of the sentence. *You don't have to, indeed, even if you were to do that, you may—you may not have to—you may not be of the mind to impose the death penalty.* Assuming you reach those two stages, then your decision is: Shall we impose a sentence of death or life as to those two elements? *There's—the fact that you found unanimously as to both those factors does not dictate death be imposed. It's your decision,* but you can only impose a death sentence if you reach those two—go through those two stages unanimously.

PRES: Okay, sir.

(Emphasis added.) This instruction substantially conveys the point urged by appellant in this assignment of error. *See Loving,* 41 MJ at 276–77.

### ISSUE XXXII

■■■ WHETHER THE AGGRAVATING FACTOR STATED IN RCM 1004(c)(7)(I) IS VAGUE, FAILS TO SUFFICIENTLY CLARIFY THE FACTOR INVOLVED, AND DOES NOT NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY, AND IS THEREFORE INVALID UNDER THE EIGHTH AMENDMENT TO THE CONSTITUTION.

The version of RCM 1004(c)(7)(I) in effect at the time of trial provided:

(c) *Aggravating factors.* Death may be adjudged only if the members find, beyond a reasonable doubt, one or more of the following aggravating factors:

\* \* \*

(7) That, only in the case of a violation of Article 118(1):

\* \* \*

(I) The murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim[.]

Appellant, relying on *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and *Maynard v. Cartwright,* 486 U.S. 356, 361–62, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), argues the above aggravating factor is unconstitutionally vague under the Eighth Amendment. He contends that the word "substantial" in that Rule is too vague to provide meaningful guidance to the members in awarding the death penalty. *See Arnold v. State,* 236 Ga. 534, 224 S.E.2d 386, 391–92 (1976).

Appellant concedes that RCM 1004(c)(7)(I) might not be constitutionally vague. He states:

The aggravating factor sufficiently channels discretion only *if it is viewed as contemplating physical harm or prolonged pain and suffering which preceded and was demonstrably separate and distinct from the acts which constituted the murder.*

Final Brief at 259 (emphasis added). He argues, however, that the military judge erred by not explaining this point to the members. *Id.* However, government counsel correctly notes this precise point was made clear to the members by the military judge. Answer at 110. The military judge advised the members as to this factor:

that as to the Vickery—Laura Lee Vickery–Clay, that the premeditated murder of Laura Lee Vickery–Clay *was preceded* by the intentional infliction of substantial mental and physical pain and suffering to the victim; [and]

that as to the premeditated murder of Kimberly Ann Ruggles, that the premeditated murder of Kimberly Ann Ruggles *was preceded* by the intentional infliction of substantial mental and physical pain and suffering of the victim[.]

(Emphasis added.)

We find no constitutional infirmity in the aggravating factor delineated in RCM 1004(c)(7)(I) and set out above. *See Loving,* 41 MJ at 294; *see also Ortiz,* 149 F.3d at 942; *Duvall v. Reynolds,* 139 F.3d 768, 793 (10th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct.

345, 142 L.Ed.2d 284 (1998). We also find no error in the judge's explanation of it. Finally, any error in this regard was unquestionably harmless beyond a reasonable doubt in view of the other aggravating factors found in this case. *See Zant,* 462 U.S. at 881 and 884, 103 S.Ct. 2733.

## XXXIII

WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR, AFFECTING SUBSTANTIAL RIGHTS OF APPELLANT, WHEN HE ALLOWED THE PANEL TO RECESS PRIOR TO ARRIVING AT A SENTENCE, DETERMINE A SENTENCE WHILE ON RECESS, AND REENTER THE COURTROOM TO ANNOUNCE THAT SENTENCE WITHOUT EVER CLOSING THE COURT TO DELIBERATE ON A SENTENCE; SUCH ERROR SERIOUSLY AFFECTED THE FAIRNESS, INTEGRITY, AND PUBLIC REPUTATION OF APPELLANT'S COURT–MARTIAL.

After the military judge's instructions on sentencing in this case, the president of the court-martial asked for a recess prior to going into deliberations. This recess lasted 11 minutes from 4:50 p.m. to 5:01 p.m. on April 11, 1988. At that point the court reassembled with all parties being present. The military judge then closed the court for deliberations. At 5:29 p.m., the court assembled with the members, and the military judge recessed the court for the night. The court reconvened at 9:05 a.m. on April 12, 1988, and the military judge clarified some instructions which he had previously given to the members. At 9:14 a.m., the court was again closed for deliberations. At 10:20 a.m. April 12, 1988, the panel returned to the courtroom and requested a 15–minute recess. It then recessed at 10:21 a.m., and at 10:34 a.m. on April 12, 1988, the court came to order and the military judge asked the president if the court had "determined a sentence." The president said, "Yes, sir, it has," and gave it in written form to the military judge. The

president later orally announced this sentence to appellant.

Appellant contends:

The actions of the military judge in the present case, charging the court members with presentencing instructions, allowing them to recess, arrive at a sentence while on recess, and reenter the courtroom to announce sentence, all without ever closing to deliberate on sentence, are patently improper and created a fair risk of prejudice to SPC Gray's substantial rights. The military judge's oversight presented the court members with an opportunity to commit several potential evils, any of which create a fair risk of prejudice.[95]

---

[95] *E.g.* that all court members were not present to deliberate on sentence; that all court members were not present to vote; that one of the court members indulged in unauthorized communication with another court member or an interloper during break, or during deliberations; or, that unauthorized publications were taken into the closed session.

Final Brief at 261.

Appellant's argument is not supported by the record. Early in this trial, the military judge instructed the members on their duties and how they must be performed, as follows:

You must keep an open mind throughout the trial, impartially hear the evidence, and only—and instructions on the law, *and only when you're in closed session deliberations may you properly make a determination* as to whether the accused is guilty or not guilty, and, should it become necessary, *as to an appropriate sentence.* Furthermore, with regard to sentencing, should it become necessary, you may not have any preconceived idea or formula as to either the type or amount of punishment that should be imposed based solely upon the fact of conviction for an offense alone. You must first hear the evidence in extenuation and mitigation, as well as that in aggravation, if any, and *only when you're in closed session deliberations may you properly arrive at an appropriate sentence,* should it become necessary, after

considering all the alternative punishments, of which I will later advise you.

(Emphasis added.)

Later he added these instructions:

*During any recess or adjournment you may not discuss the case among yourselves, nor may you discuss the case with anyone else.* You must not listen to or read any account of the trial, or consult any source, written or otherwise, as to matters involved in the case. *You must hold your discussions in the case until you are all together in closed session deliberations so that all the panel members have the benefit of your discussions.* If anyone attempts to discuss the case in your presence during any recess or adjournment, I want you to immediately tell them to stop, and immediately report that occurrence to me. We will try to estimate the times for recesses or hearings out of your presence. Frequently their duration is extended by considerations of new issues arising at such hearings. Your patience and understanding regarding these will contribute greatly to an atmosphere consistent with the fair administration of justice.

When you're in closed session deliberations only the members will be present. You must remain together, and you may not allow any unauthorized intrusion into your deliberations.

(Emphasis added.)

Finally, prior to findings, he instructed the members as follows:

The Uniform Code of Military Justice prohibits me or anyone else from entering your closed session deliberations. You may not consult the Manual for Courts–Martial or any other legal publications. If it's necessary for administrative reasons that your deliberations be interrupted by a recess for whatever reason, for anyone to depart the deliberations, it's necessary that we formally gather, formally recess, and then formally reassemble. This is an absolute legal requirement. And I would assume that the court would like to take a brief recess before you begin deliberations.

On this basis, we conclude that appellant's argument on this issue is without merit. *See also United States v. Jones*, 37 MJ 321, 324 (CMA 1993) (if error, no structural defect; and no prejudice since members instructed on limitations for closed deliberations).

## ISSUE XXXIV

WHETHER THE ARMY COURT ERRED BY REFUSING TO ABATE THE PROCEEDINGS IN APPELLANT'S CASE AFTER APPELLANT INGESTED AN OVERDOSE OF DOXIPIN.

 The Court of Military Review summarily denied appellant's "motion to abate the proceedings" against him "to ensure that the appellant, as a result of an apparent drug overdose, had suffered no permanent brain damage which would prevent his full participation in assisting with his appeal." 37 MJ at 753. A basis for such action exists on the record before us. Def.App. Ex. B, which appellant relies on to raise this claim, also asserts that appellant's condition had stabilized and he apparently suffered "no permanent deficits" from this episode. *See United States v. Young*, 43 MJ 196 (1995).

## ISSUE XXXV

WHETHER APPELLANT WAS DENIED HIS FIFTH AMENDMENT RIGHT TO A GRAND JURY PRESENTMENT OR INDICTMENT.

## ISSUE XXXVI

WHETHER COURT–MARTIAL PROCEDURES DENIED APPELLANT HIS ARTICLE III RIGHT TO A JURY TRIAL.

The Court of Military Review rejected appellant's argument of a right to grand-jury presentment because of the language of the Fifth Amendment and Supreme Court cases. 37 MJ at 754–55. It also rejected his argument of an Article III right to a jury trial on the basis of the Supreme Court's and our case law. *Id.* at 755; *see also Loving, supra* at 287; *Curtis*, 32 MJ at 267–68. No further consideration of this claim is warranted.

## ISSUE XXXVII

WHETHER ARTICLE 18 OF THE UCMJ AND RCM 201(f)(1)(C), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATE THE FIFTH AND EIGHTH AMENDMENT GUARANTEE OF DUE PROCESS AND A RELIABLE VERDICT.

This Court has resolved the above issue against the appellant in *Loving*, 41 MJ at 291 and *United States v. Matthews*, 16 MJ 354, 363 (CMA 1983). *See generally Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965). We adhere to this position in appellant's case.

## ISSUE XXXVIII

WHETHER, ASSUMING ARGUENDO THAT HE DESIRED TO PLEAD GUILTY, RCM 1004'S PROHIBITION–AGAINST GUILTY PLEAS IN CAPITAL CASES [8] DEPRIVED APPELLANT OF A CRITICAL MITIGATING FACTOR AND CAUSED OTHER IRREPARABLE PREJUDICE.

This issue was decided against appellant in *Loving*, 41 MJ at 292. There, this Court relied on its previous decision in *Matthews*, 16 MJ at 362–63. We continue to adhere to this position. *See United States v. Dock*, 28 MJ 117 (CMA 1989).

## ISSUE XXXIX

WHETHER APPELLANT WAS DENIED DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND UCMJ ARTICLE 55, BECAUSE HE WAS TRIED IN A PEACETIME CAPITAL CASE BY A COURT–MARTIAL PANEL (*I.E.* JURY) COMPOSED OF LESS THAN TWELVE MEMBERS.

A majority of this Court has consistently rejected this argument as a matter of constitutional law. *Loving*, 41 MJ at 287; *Curtis*, 32 MJ at 267–68; *but see Curtis, supra* at 271 (Sullivan, C.J., concurring).

## ISSUE XL

WHETHER APPELLANT WAS DENIED HIS RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS BECAUSE THE PANEL–MEMBER SELECTION POOL IN APPELLANT'S CASE DID NOT INCLUDE ANY FEMALES.

Appellant did not raise this issue at trial. *See Gray*, 37 MJ at 759. He now asserts that the convening authority "deliberately" kept "women as a group off" his court-martial panel. Final Brief at 295. No statistical argument has been made to support this claim. Instead, appellant relies on the simple fact that no woman was detailed to sit on this court-martial panel. Such a showing is inadequate to establish this claim or plain error. *See Loving*, 41 MJ at 283–87; *see id.* at 308–09 (Sullivan, C.J., concurring in part and in the result).

## ISSUE XLI

WHETHER ARTICLE 25(c)(1)'S EXCLUSION FROM COURT–MARTIAL SERVICE OF ENLISTED MEMBERS OF THE SAME UNIT AS THE ACCUSED INJECTS AN IMPROPER CRITERION (ENLISTED STATUS) IN SELECTING THE MEMBERS POOL.

Appellant asserts that his Fifth Amendment right to due process of law was violated by Article 25(c)(1). It states:

(c)(1) Any enlisted member of an armed force on active duty *who is not a member of the same unit as the accused* is eligible to serve on general and special courts-martial for the trial of any enlisted member of an armed force who may lawfully be brought before such courts for trial, but he shall serve as a member of a court only if, before the conclusion of a session called by the military judge under section 839(a) of this title (Article 39(a)) prior to trial or, in the absence of such a session, before the court is assembled for the trial of the accused, the accused personally has requested orally on the record or in writing

---

8. See Art. 45(b), UCMJ, 10 USC § 845(b).

that enlisted members serve on it. After such a request, the accused may not be tried by a general or special court-martial the membership of which does not include enlisted members in a number comprising at least one-third of the total membership of the court, unless eligible enlisted members cannot be obtained on account of physical conditions or military exigencies. If such members cannot be obtained, the court may be assembled and the trial held without them, but the convening authority shall make a detailed written statement, to be appended to the record, stating why they could not be obtained.

(Emphasis added.) Appellant notes that this same limitation does not apply to officer members and denies him cross-representation on his jury panel.

The "same command" exclusion or restriction on trial by enlisted men does not apply to trial by officers. However, an officer has no right to trial by enlisted persons. Moreover, this provision of law is not arbitrary or capricious. *See United States v. Wilson*, 21 MJ 193 (CMA 1986). Finally, appellant has not met his burden to show that this procedure violates the Fifth Amendment's Due Process Clause.

The Supreme Court in *Weiss v. United States*, 510 U.S. 163, 177–78, 114 S.Ct. 752, 761, 127 L.Ed.2d 1 (1994), noted the appropriate test to determine due process violations in court-martial procedure. It stated:

We therefore believe that the appropriate standard to apply in these cases is found in *Middendorf, supra*, where we also faced a due process challenge to a facet of the military justice system. In determining whether the Due Process Clause requires that servicemembers appearing before a summary court-martial be assisted by counsel, we asked "whether the factors militating in favor of counsel at summary courts-martial are so extraordinarily weighty as to overcome the balance struck by Congress." 425 U.S., at 44, 96 S.Ct. 1281. We ask the same question here with respect to fixed terms of office for military judges.

Appellant has not even proffered such an analysis in this case and, therefore, no relief is required on this basis.

### ISSUE XLII

WHETHER APPELLANT WAS DENIED HIS RIGHT TO AN IMPARTIAL JURY BY THE ACCEPTED PRACTICE IN THE MILITARY OF ALLOWING PANEL MEMBERS TO ASK QUESTIONS OF WITNESSES.

Mil.R.Evid. 614(b) provides:

(b) *Interrogation by the court-martial.* The military judge or members may interrogate witnesses, whether called by the military judge, the members, or a party. Members shall submit their questions to the military judge in writing so that a ruling may be made on the propriety of the questions or the course of questioning and so that questions may be asked on behalf of the court by the military judge in a form acceptable to the military judge. When a witness who has not testified previously is called by the military judge or the members, the military judge may conduct the direct examination or may assign the responsibility to counsel for any party.

There is no federal civilian counterpart to this rule. However, the practice of court-member questioning is of long standing at courts-martial. *See* W. Winthrop, *Military Law and Precedents* 178 (2d ed. 1920 Reprint), and reluctantly recognized in a majority of jurisdictions. *See United States v. Martinsmith*, 41 MJ 343, 348 n. 5 (1995); *but see Morrison v. State*, 845 S.W.2d 882, 884 n. 5 (Tex.Crim.App.1992). We are not persuaded by appellant's argument that such questioning renders a member partial or biased as a matter of law. Allowing questions by a juror is a good way to have a more informed juror—one who is in a better position to determine the truth in a trial. Moreover, looking at the process in this case, the court-martial members in this trial record of over 2500 pages asked only 39 questions, only one of which was objected to by the parties. (R. 1921) Accordingly, this argument is also unsupported as a matter of fact and law in this case.

## ISSUE XLIII

WHETHER APPELLANT WAS DE-
NIED DUE PROCESS OF LAW
WHEN THE MILITARY JUDGE IM-
PROPERLY ABANDONED HIS ROLE
OF IMPARTIALITY AND BECAME A
PARTISAN ADVOCATE FOR THE
GOVERNMENT.

Appellant asserts that "the military judge repeatedly abandoned his role of impartiality and acted as a partisan advocate for the Government." Final Brief at 301. He then notes six examples of this supposedly pro-government conduct, as follows:

See, e.g., R. at 158–61 (military judge characterizes defense questions as "fishing expedition"), R. at 433–36 (military judge criticizes defense counsel for not interviewing unavailable witness), R. at 513–14 (military judge attacks defense counsel's legitimate voir dire question), R. at 678 (military judge flippantly insults defense counsel concerning challenge for cause of member), R. at 940 (military judge acting as government advocate concerning questioning of witness), R. at 2498 (military judge disregarding defense counsel attempt at explaining alternate perception theory).

Final Brief at 301. We have examined the record of trial concerning these purported incidents of judicial bias and find no abandonment by the judge of his impartial role. See United States v. Reynolds, 24 MJ 261, 265 (CMA 1987). We further note that the members were not present during any of these incidents.

The first comment by the military judge concerned a defense request for investigative services by CID and the CID Commander's response to that request. We note that the judge used this expression two times in this context. (R. 158, 160.) However, we are also aware that it is a commonly used term of art describing a general request for information favorable to one's client without any basis for concluding such information exists. See United States v. Irwin, 30 MJ 87, 94 (CMA 1990), quoting United States v. Enloe, 15 USCMA 256, 262, 35 CMR 228, 234 (1965); United States v. Hagen, 25 MJ 78, 85

(CMA 1987), cert. denied, 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 981 (1988).

Appellant's second challenge to the military judge's impartiality rests on his purported criticism of defense counsel's failure to interview possible defense witnesses concerning a fire in the car of Ms. Vickery–Clay. These comments were made in the context of a defense request to reveal the identity of a government source as a witness to that fire during a hearing to determine whether such action was necessary. This comment was not biased or inappropriate in light of the constitutional standard of necessity. See Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

The third challenged comment by the judge concerned a question asked by defense counsel on voir dire. The record states:

DC: What kind of first degree, premeditated murders would you not vote for a death sentence on?

COL CUSICK: I don't know. I don't know how many kinds there are. I don't understand the question maybe.

DC: Okay, of the great range of premeditated murders, from the worst to the least aggravated, are there premeditated murders—even the least aggravated—that you would vote for a life sentence as versus a death sentence?—or would it have to be second degree, or unpremeditated murder, or something like that?

COL CUSICK: I don't know. I don't know if I can make that distinction. I'd have to hear, you know, matters in extenuation and mitigation, and after that make—if guilt was determined, then I'd have to listen to the extenuating and mitigating circumstances before I could say whether I would go for other than a death penalty.

Subsequent to this questioning, outside the presence of the members, the military judge suggested to defense counsel a more effective way to communicate a question concerning the "various ranges of premeditated murder" to a layman. The military judge also criticized a voir dire question of trial counsel on clarity grounds. Moreover, the following col-

loquy makes it obvious that his comments applied to both counsel:

MJ: Well, you can't get their feelings until such time as you define for them what you're talking about. The same is true about your questions as well, counsel (to trial counsel). I want you people to bear in mind, put yourself in their position, "How could I answer this question?" . . .

\* \* \*

MJ: Make your questions clearer. Try to give them questions—and obviously, we're all searching for a witness [sic] who has no bias, who has no pre-knowledge, and I'm of the mind they're going to give us honest answers. I certainly hope so because we have to assume they will. But make the question such that—pose it so that you, if you were the individual, could answer it in an intelligent, informative manner. And that's why I say you'll have time to contemplate it. We're in recess.

Any suggestion of bias in these circumstances is illusory.

The fourth comment by the judge is again on the problem of intelligible *voir dire* questions. After a defense challenge for cause against Major Peterson, the military judge said:

MJ: I think he's—his difficulty with the mitigating factors is your inability to intelligently articulate it. The challenge for cause is denied.

Call Major Lewis in.

You ought to—I've just told you you've got to talk to these folks—and indeed, if you want to talk about mitigating factors and how they're going to weigh it, why don't you give them a scenario to base it on. Ask a man what mitigating factors would make him change his mind. Put yourself in their positions, what mitigating factors would? You've got to know what the factors are. If you want to use it, use the checklist in the Benchbook as an example, go down and check it off for them. Call him in.

We see no flippant insult in this context and, for reasons noted above, we see no bias in these comments.

The fifth challenged comment of the military judge concerns his response to a challenge of trial counsel's questioning of a government witness, Special Agent Billiter, referring several times to one of the charged crimes "as a murder." The military judge denied that request, saying:

MJ: Well, I don't mind his characterization of that. Indeed, that's what the Government says it is. His characterization don't [sic] make it so. I won't instruct him to say something different.

We see no partiality in this comment.

 The final challenge concerns the military judge's alleged disregard of defense counsel's attempt to explain his perception of a witness' previous testimony. The question at issue was whether a defense-proffered videotape of life in a Miami ghetto, where appellant grew up, was relevant on sentencing. This colloquy ensued:

DC: Your Honor, could I recall Doctor Armitage in a 39(a) to go over a couple more of these questions to determine if there's relevancy?

MJ: I've already established, in my view, the relevant—the lack of relevancy is already established. The evidence before the court is to the effect that Gray was not affected factually by his environment and, so, it's of no consequence.

DC: That was not my perception from the witnesses.

MJ: Well, I don't have any other perception. Maybe I'm in—wrong. Maybe I'm in error, but I will not allow the exhibit to be shown. You've recorded for posterity.

DC: Yes, sir. That's it.

Denial of admission of evidence on relevance grounds does not alone establish bias against the defense.

### ISSUE XLIV

WHETHER APPELLANT KNOWINGLY AND INTELLIGENTLY WAIVED HIS ARTICLE 38(b)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL OR HIS ARTICLE 38(b)(3)(B) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION WHERE THE MILITARY COUNSEL FAILED TO AD-

VISE APPELLANT OF HIS PROFES-
SIONAL DEFICIENCIES (WHICH IN-
CLUDED NO CAPITAL EXPERIENCE,
NO CAPITAL TRAINING, AND NO EX-
PERIENCE IN DEFENDING A MUR-
DER CHARGE) AND FAILED TO AD-
VISE APPELLANT THAT HE HAD
DETAILED HIMSELF TO THE CASE.

### ISSUE XLV

WHETHER APPELLANT KNOWING-
LY AND INTELLIGENTLY WAIVED
HIS ARTICLE 38(b)(2) STATUTORY
RIGHT TO CIVILIAN COUNSEL OR
HIS ARTICLE 38(b)(3)(B) STATUTORY
RIGHT TO MILITARY COUNSEL OF
HIS OWN SELECTION WHERE THE
MILITARY JUDGE MISLED APPEL-
LANT BY STATING THAT HIS COUN-
SEL WERE "QUALIFIED LAWYERS"
AND THAT HIS LEAD COUNSEL WAS
A "LAWYER OF CONSIDERABLE EX-
PERIENCE," WHEN NEITHER
COUNSEL HAD TRIED A CAPITAL
CASE, TRIED A MURDER CASE, OR
RECEIVED ANY DEATH PENALTY
CONTINUING LEGAL EDUCATION.

### ISSUE XLVI

WHETHER DUE PROCESS RE-
QUIRES THAT THIS COURT ESTAB-
LISH MINIMUM STANDARDS FOR
TRIAL AND APPELLATE DEFENSE
COUNSEL IN CAPITAL CASES.

### ISSUE XLVII

WHETHER THE SYSTEM OF AP-
POINTING CAPITAL COUNSEL IN
THE UNITED STATES ARMY PREJU-
DICED APPELLANT BECAUSE HE IS
NOT GUARANTEED EITHER CONTI-
NUITY OF COUNSEL OR COMPE-
TENT COUNSEL UNDER ANY OF
THE QUALIFICATIONS FOR CAPI-
TAL ATTORNEYS IN FORCE IN ANY
JURISDICTION IN AMERICA.

The premise of appellant's unintelligent-
waiver arguments is his assertion that his
trial defense counsel believed himself unqual-
ified to represent him in this capital case.

Based on trial defense counsel's post-trial
affidavit, he asserts: "It appears that Cap-
tain Brewer questioned his ability to compe-
tently represent SPC Gray (Def.App.Exh. L),
yet failed to advise his client of this fact. His
failure to do so prevented SPC Gray from
knowingly and fully exercising his right to
counsel under Article 38, UCMJ." Final
Brief at 303. We disagree.

In that post-trial affidavit trial defense
counsel stated the following:

4. I was very concerned that SPC Gray
receive the best quality of legal represen-
tation possible in this death penalty case.
In fact, in December of 1987 I wrote the
Ethics Committee of the Florida Bar, my
licensing state, and asked for an advisory
opinion on whether I was qualified to rep-
resent SPC Gray in a capital case. The
advisory opinion in a nutshell was "if in my
professional judgment after careful evalua-
tion I could provide competent representa-
tion it would be ethical for me to continue."
I decided to continue representing SPC
Gray. An Individual Military Counsel was
assigned to help represent SPC Gray, and
Captain Craig Teller and I shared the
responsibility of defending SPC Gray at
his court-martial. Captain Teller took no
part in working with the psychologists and
psychiatrists in this case, as this was my
area of responsibility.

The first issue assigned above has no merit
as a matter of law or fact in appellant's case.
The legal predicate for this duty-to-inform
argument asserted by appellant is *United
States v. Thomas,* 33 MJ 694 (ACMR 1991).
There the Court of Military Review stated:

If a lawyer believes he cannot represent a
client competently, he should so inform the
client and withdraw from representation
subject to protection of the client's interest
and the approval of the court. *See gener-
ally* Dep't of Army Pam 27–26, Rules of
Professional Conduct for Lawyers, Rule
1.16 (31 Dec. 87); and Model Rules of
Professional Conduct Rule 1.16 (1983)
(amended 1990.)

33 MJ at 701–02. Appellant's argument,
however, rests on the apparent existence of a
question as to competence rather than an

actual belief of the same. No authority whatsoever is proffered for the necessity of a warning in the former circumstances. In addition, we note that military defense counsel's affidavit is not only post-trial but stops short of asserting or implying his belief in his inability to handle this case.

■ Appellant also argues that the military judge had a duty to inform him about trial defense counsel's total inexperience in capital and murder cases, and their lack of death-penalty continuing legal education. Moreover, he asserts that he clearly breached that duty when he labeled these lawyers "qualified" and "of considerable experience." As a result, he asserts that he did not knowingly and intelligently waive his right to civilian counsel under Article 38(b)(2) or individual military counsel under Article 38(b)(3)(B). No legal authority is offered to support this argument, and we cannot draw such authority from our decisions in *United States v. Johnson*, 21 MJ 211 (1986), or *United States v. Donohew*, 18 USCMA 149, 39 CMR 149 (1969). *See generally United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). We are satisfied that counsel possessed the necessary qualifications.

The final two issues address the process of appointing defense counsel and appellate defense counsel in capital cases in the military justice system. First, appellant asserts that there should be minimum standards established for such defense counsel before they can practice at capital courts-martial. Second, he asserts that a system without such standards denies him due process of law under the Fifth Amendment. *See Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). We reject this argument.

We initially note that the Supreme Court has spoken on the question of establishing minimum standards for qualifications in death-penalty cases. It said:

> We consider in this case only the commands of the Constitution. We do not pass on the wisdom or propriety of appointing inexperienced counsel in a case such as this. *It is entirely possible that many courts should exercise their supervi-*

*sory powers to take greater precautions to ensure that counsel in serious criminal cases are qualified. See generally, e.g.,* Committee to Consider Standards for Admission to Practice in Federal Courts, Final Report, 83 F.R.D. 215 (1979); Bazelon, The Defective Assistance of Counsel, 42 U.Cin.L.Rev. 1, 18–19 (1973); Berger, The Special Skills of Advocacy: Are Specialized Training and Certification of Advocates Essential to Our System of Justice?, 42 Ford.L.Rev. 227 (1973); Burger, Some Further Reflections on the Problem of Adequacy of Trial Counsel, 49 Ford.L.Rev. 1 (1980); Schwarzer, Dealing with Incompetent Counsel—The Trial Judge's Role, 93 Harv.L.Rev. 633 (1980). *We address not what is prudent or appropriate, but only what is constitutionally compelled.*

*Cronic*, 466 U.S. at 665 n. 38, 104 S.Ct. 2039 (emphasis added).

Accordingly, for the reasons stated in *Loving*, 41 MJ at 300, we again decline the invitation to establish such a standard on our own. Nevertheless, on a case-by-case basis, we remain vigilant as to the quality of representation provided servicemembers in capital cases in the military justice system. *Id.; see generally Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

As for appellant's second argument based on *Medina v. California, supra*, we also must reject it. The test for determining systemic due process violations in the military justice system is found in *Middendorf v. Henry*, 425 U.S. 25, 44, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976). *See Weiss*, 510 U.S. at 177, 114 S.Ct. at 760–61 (*Medina* does not control these questions in the military context.) No argument on this basis has been presented to this Court. In addition, despite 21 USC § 848(q)(5)–(7), the few state authorities cited by appellant in his brief, and the American Bar Association Guidelines, we are not persuaded that "[c]ontemporary practice" demonstrates a "settled view" on this question. *See Medina*, 505 U.S. at 447–48, 112 S.Ct. at 2578. Finally, a similar argument (*see* issue XLVII, *supra*) has been previously rejected by this Court in *Loving*, 41 MJ at 298–99.

## ISSUE XLVIII

WHETHER APPELLANT HAS BEEN DENIED EQUAL PROTECTION UNDER THE LAW IN VIOLATION OF THE FIFTH AMENDMENT IN THAT ALL OTHER CIVILIANS IN THE UNITED STATES ARE AFFORDED THE OPPORTUNITY TO HAVE THEIR CASES REVIEWED BY AN ARTICLE III COURT, BUT MEMBERS OF THE UNITED STATES ARMY BY VIRTUE OF THEIR STATUS AS SERVICE-MEMBERS ARE NOT.

This argument was considered and rejected in *Loving*, 41 MJ at 295–96. We adhere to that holding in appellant's case.

## ISSUE XLIX

WHETHER THIS COURT OR THE ARMY COURT HAVE JURISDICTION OR THE AUTHORITY TO REVIEW THE CONSTITUTIONALITY OF THE RULES FOR COURTS–MARTIAL AND THE UNIFORM CODE OF MILITARY JUSTICE BECAUSE THIS COURT IS AN ARTICLE I COURT, NOT AN ARTICLE III COURT WHICH HAS THE POWER TO CHECK CONGRESS AND THE EXECUTIVE UNDER *MARBURY V. MADISON*, 5 U.S. (1 Cranch) 137 (1803).

We reject this argument. *See Loving*, 41 MJ at 296. The position of this Court on this issue was articulated by Chief Judge Everett in *Matthews*, 16 MJ at 364–68. We continue to adhere to this view.

## ISSUE L

WHETHER THE MILITARY JUDGE ERRED IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS AND UCMJ ARTICLE 55 IN HIS FAILURE TO INSTRUCT THE PANEL MEMBERS THAT THE ONLY OFFENSES FOR WHICH APPELLANT COULD BE SENTENCED TO DIE WERE FELONY MURDER AND PREMEDITATED MURDER AND THAT APPELLANT COULD NOT BE SENTENCED TO DIE ON THE BASIS OF THE AGGREGATE OR CUMULATIVE EFFECT OF ALL THE OFFENSES.

Appellant asserts that the military judge erred by failing to instruct the members "that death was an authorized sentence *only* for the offenses of premeditated murder and felony murder." Final Brief at 323. He grounds such a duty to instruct on the Fifth and Eighth Amendments and Article 55. He further asserts that appellant was prejudiced by this failure to instruct because

> appellant may have been sentenced to die because the panel members felt that, although appellant did not deserve to die for the specific capital crimes he was convicted of, he did deserve to die when the additional offenses of rape, robbery, burglary, and larceny were thrown into the equation. This latter result is clearly improper and cannot be discounted in this case.

Final Brief at 324. He cites decisions of this Court in *United States v. Wheeler*, 17 USC-MA 274, 277, 38 CMR 72, 75 (1967); *United States v. Yocom*, 17 USCMA 270, 273, 38 CMR 68, 71 (1967); *United States v. Hutton*, 14 USCMA 366, 370, 34 CMR 146, 150 (1964).

Appellant's argument is not supported in law or fact. As a starting point, we note that no legal authority has been cited to this Court which prohibits the members from considering appellant's other crimes in their decision to impose the death penalty. In any event, the military judge early on in this case told the members that this was a capital murder case permitting the death penalty. Moreover, prior to findings, he told the members that whether the vote for the premeditated murders and the felony murders was unanimous should be announced. Also, the military judge instructed the members that, "in view of your findings, the court is authorized to adjudge a sentence of death or life imprisonment only, with other types of punishments...." Finally, appellant did not object to these instructions on the basis asserted on this appeal or specifically request the complained about missing instructions. *See* RCM 1005(f) (rule of waiver for sentencing instructions); *cf.* Art. 51(c), UCMJ, 10 USC § 851(c). In this context, we conclude that there is no "reasonable likelihood" that the

members of this court-martial were acting in any unconstitutional manner. *See also Boyde*, 494 U.S. at 380, 110 S.Ct. 1190.

## LI

WHETHER THERE IS NO MEANINGFUL DISTINCTION BETWEEN PREMEDITATED AND UNPREMEDITATED MURDER IN THE MILITARY, ALLOWING DIFFERENTIAL TREATMENT AND SENTENCING DISPARITY IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS.

## LII

WHETHER THE MILITARY JUDGE ERRED BY INSUFFICIENTLY DESCRIBING THE DISTINCTION BETWEEN THE OFFENSES OF PREMEDITATED AND UNPREMEDITATED MURDER.

The first issue noted above asserts as its premise that there is no meaningful distinction in military law between premeditated murder and unpremeditated murder. We implicitly resolved this question long ago in *United States v. Teeter*, 16 MJ 68, 71–72 (1983). More recently in a capital-case context we again resolved this question contrary to appellant's argument. *Loving*, 41 MJ at 279–80. Accordingly, we conclude that appellant's argument on this issue must again be rejected.

The second issue noted above focuses on the military judge's instructions explaining the distinction between premeditated murder and unpremeditated murder. We note that appellant did not object at trial to the instructions on this matter given by the judge or proffer a substitute. 37 MJ at 759. Moreover, the judge gave the following instruction on the difference between the two types of murder:

> You'll notice that the principal difference between this offense—that is, premeditated murder—and unpremeditated murder is that there would—the accused must have had the premeditated design to kill, that is, had considered the act prior to the application of the force and must have had the

specific intent to kill, whereas unpremeditated murder requires the specific intent to kill or inflict great bodily harm without premeditation.

We approved such an instruction in *Teeter, supra* at 71–72, absent any objection by the defense. In this context and in view of the overwhelming evidence of premeditation in this case we find no error on this basis. *Loving*, 41 MJ at 280.

## LIII

WHETHER THE PREDOMINANCE OF MISLEADING LANGUAGE IN THE REASONABLE–DOUBT INSTRUCTIONS GIVEN BY THE MILITARY JUDGE FOR FINDINGS AND SENTENCING CREATED A HIGHER DEGREE OF DOUBT THAN IS REQUIRED UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT.

Appellant notes that the military judge in this case gave the following instruction on reasonable doubt:

> A "reasonable doubt" is what the words imply, a doubt founded in reason. It is not a fanciful or ingenious doubt, or conjecture, but an honest conscientious doubt suggested by the material evidence or lack of it in the case. It is an honest misgiving caused by the insufficiency of proof of guilt. "Proof beyond reasonable doubt" means *proof to a moral certainty*, although not necessarily an absolute or mathematical certainty. A reasonable doubt is a *doubt which would cause a reasonably prudent person to hesitate to act in the more important and weighty of his own personal affairs*. The proof must be such as to exclude not every hypothesis or possibility of innocence but every fair and rational hypothesis except that of guilt. The rule as to reasonable doubt extends to every element of the offense, although each particular fact advanced by the prosecution which does not amount to an element need not be established beyond reasonable doubt. However, if on the whole evidence you are satisfied beyond a reasonable doubt of the truth of each and

every element, you should find the accused guilty.

(Emphasis added.) He further notes that a similar instruction was given on sentencing concerning the existence of aggravating factors. (R. 2561–62) Relying on *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and several of the separate opinions of the Justices in *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), he asserts that these instructions were constitutionally defective, so his conviction and sentence must be reversed. *See Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

We note that the reasonable-doubt instruction in appellant's case was taken from paragraph 2–29.1 of the Military Judges' Benchbook at 2–34 (Oct 1986). A similar instruction was approved by this Court in *United States v. Meeks*, 41 MJ 150, 155–57 (1994). We also note that appellant did not object to this instruction or offer an alternative. *See United States v. Robinson*, 38 MJ 30 (CMA 1993). In our view there was no reasonable probability that appellant's court-martial members used a lower standard of guilt or a higher standard for acquittal than required by law. *Victor v. Nebraska, supra*; *see Loving*, 41 MJ at 281.

LIV

WHETHER THE MILITARY JUDGE'S INSTRUCTIONS RESTRICTED FREE CONSIDERATION OF THE EVIDENCE BY REQUIRING THE MEMBERS TO VOTE ON THE MOST SERIOUS OFFENSE FIRST.

Appellant asserts that the voting-procedure instructions given by the military judge in this case restricted the members' free consideration of the evidence. In particular he complains that requiring the members to vote on the greater more serious offense first precluded their full and fair consideration of lesser-included offenses. He contends that

the risk of danger in this regard is greatest in savage murder cases because they naturally call for the "maximum denunciation." *See Austin v. United States*, 382 F.2d 129, 138 (D.C.Cir.1967).

We initially note that appellant does not support his argument with any authority except *Austin v. United States, supra*. That case does not support creation of a new rule for voting on findings in murder cases, but only comments in dicta on the natural unrestrained tendencies of the layman as compared to a judge. 382 F.2d at 138–39. We also note that the challenged instructions are based on RCM 921(c)(5),[9] which states:

(5) *Included offenses.* Members shall not vote on a lesser included offense unless a finding of not guilty of the offense charged has been reached. If a finding of not guilty of an offense charged has been reached the members shall vote on each included offense on which they have been instructed, in order of severity beginning with the most severe. The members shall continue to [10] vote on each included offense on which they have been instructed until a finding of guilty results or findings of not guilty have been reached as to each such offense.

We fail to appreciate any real prejudice that appellant may suffer as a result of this procedure, and appellant has not made a legally sufficient denial-of-due process argument in this regard. *See Weiss v. United States*, 510 U.S. 163, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994). Accordingly, we resolve this issue against appellant.

LV

WHETHER DESIGNATION OF THE SENIOR MEMBER AS THE PRESIDING OFFICER FOR DELIBERATIONS ESTABLISHES THE SENIOR MEMBER'S SUPERIORITY IN AND CONTROL OF THE DELIBERATION PRO-

9. At the time of the offense, this was RCM 921(c)(4), but as of March 12, 1987, it was renumbered as RCM 921(c)(5). *See* Exec. Order No. 12586 §§ 1 [L] & 5, 52 Fed.Reg. 7106 & 7112.

10. Change 2 to the Manual for Courts–Martial (15 May 1986) contains the correct word ("to"); beginning with Change 3 (1 June 1987) the word "the" is erroneously substituted. This error is contained in the 1995 and 1998 edition.

CESS AND DENIED APPELLANT DUE PROCESS OF LAW AND A FAIR AND IMPARTIAL CONSIDERATION OF THE EVIDENCE BY THE MEMBERS.

RCM 502(b)(1) states:

(b) *President.*

(1) *Qualifications.* The president of a court-martial shall be the detailed member senior in rank then serving.

(2) *Duties.* The president shall have the same duties as the other members and shall also:

(A) Preside over closed sessions of the members of the court-martial during their deliberations;

(B) Speak for the members of the court-martial when announcing the decision of the members or requesting instructions from the military judge; and

(C) In a special court-martial without a military judge, perform the duties assigned by this Manual to the military judge except as otherwise expressly provided.

It is a traditional practice at courts-martial since at least 1828. *See* W. Winthrop, *Military Law and Precedent* 170 (2d ed. 1920 Reprint). Moreover, the members of appellant's court-martial were instructed on their "equal voice" with the president of the court-martial in discussing, deciding, and voting. They were also instructed that "[t]he influence of superiority in rank will not be employed in any manner to attempt to control the independence of members in the exercise of their own personal judgment." In these circumstances, appellant has failed to establish a due process violation resulting from the designation of the president of the court-martial. *See Weiss v. United States, supra.*

LVI

WHETHER THE MILITARY JUDGE'S INSTRUCTION THAT "YOU MAY NOT ADJUDGE A SENTENCE OF DEATH UNLESS YOU FIND THAT ANY AND ALL EXTENUATING [AND] MITIGATING [FACTORS] ARE SUBSTANTIALLY OUTWEIGHED BY ANY AGGRA-VATING FACTORS ..." DID NOT SUFFICIENTLY INFORM THE MEMBERS THAT THIS FINDING MUST BE UNANIMOUS.

Appellant's basic argument is that the military judge's sentencing instructions could be construed to permit a less-than-unanimous finding by the members on the weighing-death-eligibility question. The record as a whole does not support this argument. It [11] states:

Your deliberation on the aggravating factors should properly include a full and free discussion of all the evidence that's been presented. After you've completed your discussion, then voting on the—each aggravating factor must be accomplished by secret written ballot. All members are required to vote. *If you fail to find unanimously that at least one of the aggravating factors existed, then you may not adjudge a sentence of death.* If, however, you determine that at least one of the aggravating factors existed, then you may consider, along with all other appropriate sentence possibilities, whether a sentence of death should be adjudged. In this regard, *you may not adjudge a sentence of death unless you find, by unanimous vote—again, by all members—that any and all extenuating and mitigating factors are substantially outweighed by any aggravating factors,* including the factors which you've previously found existed in the first step of this procedure. Thus, in addition to the aggravating factors that have been found by unanimous vote—assuming you do—you may consider the following aggravating factors as well:

[list of factors omitted].

(R. 2562–63) (emphasis added). The "you singular" or "you plural" ambiguity argument also posited by appellant, Final Brief at 347, is not a reasonable likelihood in these circumstances. *See generally Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).

11. Certain instructional language was omitted from the assigned issue but was included in the first paragraph of the discussion of this issue in his brief. Final Brief at 346.

## LVII

WHETHER THE MILITARY DEATH PENALTY SCHEME IS INVALID DUE TO *FURMAN V. GEORGIA,* 408 U.S. 238 (1972), AND THE SEPARATION OF POWERS DOCTRINE.

This is the fourth time this issue has been presented to this Court. *Loving,* 41 MJ at 293; *United States v. Curtis,* 32 MJ 252 (CMA), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), and *Matthews,* 16 MJ at 381. The Supreme Court has resolved this issue in the Government's favor. *Loving v. United States,* 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996).

## LVIII

WHETHER RCM 1004 FAILS TO IN-CORPORATE CONGRESSIONALLY MANDATED PROTECTIONS TO PRE-VENT RACIALLY MOTIVATED IMPO-SITION OF THE DEATH PENALTY IN VIOLATION OF UCMJ ARTICLE 55 AND THE EIGHTH AMENDMENT TO THE CONSTITUTION.

## LIX

WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR WHEN HE FAILED TO *SUA SPONTE* IN-STRUCT THE PANEL MEMBERS THAT RACE COULD NOT BE CON-SIDERED AS A FACTOR IN THE SEN-TENCING PROCESS.

Appellant calls this Court's attention to 21 USC § 848(*o*)(1), which states:

(*o*) **Right of the defendant to justice without discrimination**

(1) In any hearing held before a jury under this section, the court shall instruct the jury that in its consideration of wheth-er the sentence of death is justified it shall not consider the race, color, religious be-liefs, national origin, or sex of the defen-dant or the victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defen-dant, or the victim, may be. The jury shall return to the court a certificate signed by each juror that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommenda-tion regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be.

This provision of federal law was enacted after appellant's court-martial (November 18, 1988—102 Stat. 4545). It is not constitution-ally mandated. *Loving,* 41 MJ at 274. Fi-nally, this provision of law is specifically lim-ited in its application to offenses under 21 USC.

## LX

WHETHER IMPOSITION OF THE DEATH PENALTY IN THIS CASE VIO-LATED APPELLANT'S RIGHT TO EQUAL PROTECTION UNDER THE FIFTH AMENDMENT BECAUSE RCM 1004 SUBJECTS APPELLANT, AS A MEMBER OF THE ARMED FORCES, TO A PENALTY WHICH IS NOT OTH-ERWISE AVAILABLE UNDER THE CRIMINAL CODE OF THE UNITED STATES FOR IDENTICAL CRIMINAL CONDUCT.

Article 118 authorizes imposition of the death penalty in this case. *Cf.* 21 USC § 848(e). Article 118, as it read at the time of trial, stated:

§ 918. **Art. 118. Murder**

*Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he—*

(1) has a premeditated design to kill;

(2) intends to kill or inflict great bodily harm;

(3) is engaged in an act which is inher-ently dangerous to others and evinces a wanton disregard of human life; or

(4) is engaged in the perpetration or attempted perpetration of burglary, sod-

omy, rape, robbery, or aggravated arson;

is guilty of murder, and shall suffer such punishment as a court-martial may direct, except that if found guilty under clause (1) or (4), he shall suffer death or imprisonment for life as a court-martial may direct.

RCM 1004 further delineates the capital-sentencing procedures at courts-martial. For the reasons stated in *Loving*, 41 MJ at 294, we reject appellant's equal protection argument.

## LXI

WHETHER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS DO NOT PERMIT, IN PEACETIME, A CONVENING AUTHORITY TO HAND-PICK MILITARY SUBORDINATES, WHOSE CAREERS HE CAN DIRECTLY AND IMMEDIATELY AFFECT AND CONTROL, TO SERVE AS MEMBERS IN A CAPITAL TRIAL FOR OFFENSES THAT OCCUR ON A MILITARY BASE BUT WHERE THERE IS CONCURRENT JURISDICTION WITH A STATE AUTHORITY.

Article 25(d) states:

(1) When it can be avoided, no member of an armed force may be tried by a court-martial any member of which is junior to him in rank or grade.

(2) When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament. No member of an armed force is eligible to serve as a member of a general or special court-martial when he is the accuser or a witness for the prosecution or has acted as investigating officer or as counsel in the same case.

Appellant's constitutional arguments not only ignore Article 37, UCMJ, 10 USC § 837, but also the decision of the Supreme Court in *Weiss v. United States*, 510 U.S. 163, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994). *See United States v. Graf*, 35 MJ 450 (CMA 1992), *cert. denied*, 510 U.S. 1085, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994), and *United States v. Mabe*, 33 MJ 200 (CMA 1991). We again reject these arguments. *See Loving*, 41 MJ at 297.

## LXII

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY ALLOWING THE PROSECUTION, DURING THE SENTENCING PORTION OF A CAPITAL CASE, TO ENGAGE IN IMPROPER ARGUMENT THAT EMPHASIZED VICTIM–IMPACT STATEMENTS IN VIOLATION OF *BOOTH V. MARYLAND*, 482 U.S. 496 (1987). *BUT SEE PAYNE V. TENNESSEE*, 501 U.S. 808, 111 S.Ct. 2597 (1991).

▮ Appellant in his final brief offers no specifics on this issue. Trial counsel's argument did make reference to the rights of the two murder victims and their friends and relatives (R. 2539, 2537) and he referred to the pain and anguish suffered by the victims prior to their deaths. This was not legal error. *Payne* overruled *Booth*. *See* 37 MJ at 739; *see also Loving*, 41 MJ at 292.

## LXIII

WHETHER MILITARY DUE PROCESS AND FUNDAMENTAL NOTIONS OF FAIRNESS REQUIRE THAT EACH MEMBER OF THE COURT–MARTIAL SIGN HIS OR HER NAME TO THE DEATH–SENTENCE WORKSHEET OR THAT THE CONDEMNED ACCUSED BE AFFORDED THE RIGHT AND OPPORTUNITY TO POLL THE MEMBERS. *SEE UNITED STATES V. CURTIS*, 33 MJ 101, 110 (COX, J., CONCURRING). *BUT SEE* RCM 922(e).

▮ RCM 1007(c) provides:

(e) *Polling prohibited.* Except as provided in Mil.R.Evid. 606, members may not otherwise be questioned about their deliberations and voting.

RCM 922(e) contains virtually identical language. Appellant has not framed his due process challenge to the above military procedures in terms of the recent decision of the Supreme Court in *Weiss v. United States*,

*supra.* In any event, the death-penalty verdict at a court-martial must be unanimous. *Loving,* 41 MJ at 296.

## LXIV

WHETHER THE CAPITAL SENTENCING PROCEDURE IN THE MILITARY IS UNCONSTITUTIONAL BECAUSE THE MILITARY JUDGE LACKS THE POWER TO ADJUST OR SUSPEND A SENTENCE OF DEATH THAT IS IMPROPERLY IMPOSED.

The above argument is submitted to this Court without further briefing. We rejected this same argument in *Loving,* 41 MJ at 297. Moreover, appellant has not otherwise convinced us that this procedure is unconstitutional under the standard provided in *Weiss v. United States, supra,* and *Middendorf,* 425 U.S. at 43, 96 S.Ct. 1281.

## LXV

WHETHER COURT–MARTIAL PROCEDURES DENIED APPELLANT HIS SIXTH AMENDMENT RIGHT TO JURY TRIAL AND AN IMPARTIAL CROSS–SECTION OF THE COMMUNITY.

Appellant's Sixth Amendment attacks on the court-martial system are without merit. *See Loving,* 41 MJ at 285; *United States v. Smith,* 27 MJ 242, 248 (CMA 1988); *Santiago–Davila,* 26 MJ at 389; *see generally Ex parte Quirin,* 317 U.S. 1, 39–41, 63 S.Ct. 2, 87 L.Ed. 3 (1942); *Dynes v. Hoover,* 61 U.S. (20 How.) 65, 15 L.Ed. 838 (1858).

## LXVI

WHETHER APPELLANT'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.

Appellant has not chosen to otherwise brief this issue. Thus, we assume that he argues that a death sentence *per se* violates the Eighth Amendment as cruel and unusual punishment. Supreme Court case law does not support this argument as a matter of law. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *see United States v. Matthews,* 16 MJ 354 (CMA 1983).

## LXVII

WHETHER THE NUMEROUS ERRORS WHICH OCCURRED DURING APPELLANT'S COURT–MARTIAL CAN BE FOUND HARMLESS BEYOND A REASONABLE DOUBT WHEN CONSIDERED COLLECTIVELY.

Appellant argues that the principle of cumulative error warrants reversal of his death sentence. *See Mak v. Blodgett,* 970 F.2d 614 (9th Cir.1992), *cert. denied,* 507 U.S. 951, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993). He argues that

> at a minimum, the following issues warrant reversal in his case: the newly discovered evidence of organic brain damage; the ineffective assistance of his counsel; the denial of expert resources; the incompetent assistance from his mental health experts; the improper granting of challenges during *voir dire;* the use of his civilian plea agreement against him; and the military judge's instructional errors.

Final Brief at 383. We disagree.

The implied premise of the cumulative-error doctrine is the existence of errors, "no one perhaps sufficient to merit reversal, [yet] in combination [they all] necessitate the disapproval of a finding" or sentence. *United States v. Banks,* 36 MJ 150, 170–71 (CMA 1992). Assertions of error without merit are not sufficient to invoke this doctrine. Here, we have found no merit in appellant's assertions of error.

## LXVIII

WHETHER THE ARMY COURT'S PROPORTIONALITY REVIEW IN THIS CASE WAS INSUFFICIENT AS A MATTER OF LAW.

In *Curtis,* 32 MJ at 270–71, this Court held that a "proportionality review" by a Court of Military Review is required by Article 66(c), UCMJ, 10 USC § 866(c), in death-penalty cases. Later, in our second opinion in *Curtis,* 33 MJ at 109, Chief Judge Everett de-

fined the scope of the required review, as follows:

> We recognize that this is the first case decided under the procedural changes promulgated by the President in the Manual for Courts–Martial, United States, 1984, and hence, there will be few, if any, cases in military or federal district courts which would be proper subjects for proportionality comparison. However, the gravamen of the offenses here (*i.e.*, double homicide during a burglary) is not unique to the military, and it *would be fitting for the Court of Military Review to consider generally similar cases reviewed by the Supreme Court of the United States in which state courts have imposed the death penalty for like crimes on that basis. See United States v. Curtis*, 32 MJ at 270, 271. The Court of Military Review should determine whether the sentence here is appropriate for the crimes of which the accused stands convicted and whether the sentence is generally proportional to those imposed by other jurisdictions in similar situations. *See generally McCleskey v. Kemp*, 481 U.S. 279, 306–08, 107 S.Ct. 1756, 1774–76, 95 L.Ed.2d 262 (1987); *Pulley v. Harris*, [465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) ].

(Footnote omitted; emphasis added.)

The Court of Military Review in appellant's case performed a proportionality review, as follows:

> We have examined a number of cases and have concluded that the sentence is generally proportional to those imposed by other jurisdictions in similar situations.[13]

[13] A computer search was used to examine cases reviewed by the Supreme Court since the reinstatement of the death penalty following *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Among the cases examined were *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); and *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

37 MJ at 749. A similar proportionality review was approved by this Court in *Loving*, 41 MJ at 290–91.

Appellant challenges the Court of Military Review's "proportionality review" because it failed to designate appropriate proportionality standards. Counsel refers this Court to a state-court decision in *State v. Marshall*, 130 N.J. 109, 613 A.2d 1059 (N.J.1992), as a model for such a review and asserts that the Court of Military Review's decision on this issue pales by comparison. Counsel suggests that the following important characteristics be considered in an adequate proportionately review:

> Vulnerability of the victim (*i.e.;* [sic] child, female, infirmity, frailty); 2) Lack of remorse; 3) Extent of mutilation or torture; 4) Number of victims; 5) Degree of premeditation (planning v. spontaneity); 6) Scene of the crime (victim's home v. public setting); 7) Personal background of the accused; 8) Prior murder by the accused at some time in the past; 9) Murder for hire; 10) Cop killer; 11) Killing to escape detection or capture; 12) Felony-murder; 13) Emotional disturbance of accused; 14) Age of accused; 15) Duress on accused at the time of the killing; and 16) Intoxication level of accused at the time of the killing.

Final Brief at 387.

Appellant's initial argument is that proportionality review prescribed by this Court in the *Curtis* decisions is inadequate because it has no standards. He contends that the term "generally similar cases" as used in *Curtis (II)*, 33 MJ at 109, is unduly vague and creates a "risk of arbitrariness" in the appellate review of death sentences. Final Brief at 390, 391. We disagree. *See Loving, supra* at 290–91.

At the outset we note that the "proportionality review" ordered in the *Curtis* decisions is not constitutionally required. *See McCleskey*, 481 U.S. at 306–07, 107 S.Ct. 1756; *cf. Zant*, 462 U.S. at 879, 890, 103 S.Ct. 2733. We, however, have held that this review is required by Article 66(c) in capital cases as part of the "sentence appropriateness" determination by the court below. *Curtis*, 33 MJ

at 109; *see generally United States v. Healy*, 26 MJ 394, 395 (CMA 1988). In view of this unique appellate power (*see Ryder v. United States*, 515 U.S. 177, 187, 115 S.Ct. 2031, 2038, 132 L.Ed.2d 136 (1995)), adoption of the proportionality reviews utilized by other state or federal jurisdictions is neither required nor appropriate.

We also disagree with appellant's argument that *Curtis II* provides no standard for the Court of Military Review to conduct its proportionality review. It is true that our decision does not provide the detailed and in-depth review that *Marshall* does. That review was mandated by a state statute, N.J.S.A. 2C:11–3e, which then required "the Supreme Court ... to determine whether the [death] sentence ... is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant" and was an "offender-oriented proportionality review." 613 A.2d at 1062, 1069; *see State v. DiFrisco*, 142 N.J. 148, 662 A.2d 442, 448–50 (1995). Our system, however, employs a general "offense-oriented proportionality review." (613 A.2d at 1067–68, which also is in effect in New Jersey, *id.* at 1068 ("does the punishment fit the crime?")); *see Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (reckless-indifference murder); *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (aider and abettor to felony murder); *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (rape); *see also State v. DiFrisco, supra.*

Finally we do not find the proportionality review of the Court of Military Review in this case to have violated our command in *Curtis II*. That court considered Supreme Court decisions on state cases, which presented situations similar to appellant's. 37 MJ at 749 and n. 13. In these cases, death penalties were imposed in various state jurisdictions for a single murder occurring during or after a robbery or burglary. Appellant's court-martial involved multiple premeditated murders preceded by rapes or forced sodomies. We see no general disproportionality in appellant's sentence or with the sentence in *United States v. Loving*, 41 MJ 213 (1994).

## LXIX

WHETHER THE ARMY COURT ERRED IN CONCLUDING THAT THE DEATH SENTENCE WAS AN APPROPRIATE SENTENCE IN THIS CASE.

Appellant challenges the Court of Military Review's decision that "under all of the facts and circumstances of the case the death sentence is appropriate, Art. 66(c). *Curtis*, 32 MJ at 271." 37 MJ at 749. He also notes that the Court of Military Review held "beyond a reasonable doubt that even with the introduction of the organic brain damage the panel would still have imposed the death sentence." Final Brief at 397. Appellant asserts that such determinations are untenable and unsupported by the record of trial.

In exercising its unique-sentencing power under Article 66(c), the Court of Military Review may take into consideration matters not considered by the court members. *See United States v. Healy, supra.* In this regard we note that the Court of Military Review was fully aware of the post-trial materials establishing appellant's organic brain damage. Moreover, it had been informed of the evidence of a personality disorder which had been presented to the members. Finally, they were well aware of appellant's two murders, his aggravated assault on a third woman, and the numerous sexual offenses committed on these victims. In these circumstances, we see no abuse of discretion or other error of law in the Court of Military Review's sentence—appropriateness determination. *See generally United States v. Dukes*, 5 MJ 71 (CMA 1978).

## ISSUE LXX

ISSUES PERSONALLY ASSIGNED PURSUANT TO *UNITED STATES V. GROSTEFON*, 12 MJ 431 (CMA 1982).

In footnote 3 to the Final Brief counsel calls the attention of this Court to 31 issues personally assigned by appellant that are contained in Appendix C to that brief. *See* Attachment. We note that *Grostefon* does not permit an appellant to raise such issues in an untimely manner without good cause.

*See Healy,* 26 MJ at 397. No good cause is averred for this untimely pleading in appellant's case. Moreover, all these issues were raised without any general or particular assertion that appellant was prejudiced by these claimed legal errors. *See generally United States v. Pollard,* 38 MJ 41, 51–52 (CMA 1993); *see* Rule 21(b)(4), United States Court of Military Appeals Rules of Practice and Procedure (requiring "[a] direct and concise argument showing why there is good cause to grant the petition, demonstrating with particularity why the errors assigned are materially prejudicial to the substantial rights of the appellant. . . ."). 31 MJ 465.

In any event, we have considered these issues (*see United States v. Matias,* 25 MJ 356, 361 (CMA 1987)), and note that five of them [ (nos. 1–4, 26 duplicates no. 4) ] raised questions of ineffectiveness of counsel which are cumulative of issues previously raised by appellate defense counsel and resolved in our opinion against him. The same applies to no. 14 (Issue XVI), no. 20 (Issue LXV), and no. 22 (Issue XXII). No. 15 is resolved by *Solorio.* The evidentiary-sufficiency questions (nos. 27 and 29) we reject out of hand as unsupported in law. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The other 20 issues challenged trial decisions by the military judge. We have reviewed the record of trial and find no abuse of discretion or otherwise reversible error by the judge in these rulings (nos. 5–13, 16–19, 21, 21–25, 28, 30, and 31). *See generally Matias, supra* at 361.

The decision of the United States Army Court of Military Review is affirmed.

### ATTACHMENT

Pursuant to *United States v. Grostefon,* 12 MJ 431 (CMA 1982), appellant invites the Court's attention to the following, noninclusive list of personally asserted errors:

1. His counsel did not provide him with effective assistance of counsel due to the fact that they failed to inform him whether they met the prevailing professional standards promulgated by the American Bar Association and the National Legal Aid and Defender Association for capital representation.

Captain Brewer stated in his post-trial affidavit, (Def.App.Exh. L), that he contacted his state bar association regarding this matter; however, SPC Gray was never informed of it. Had SPC Gray known of this, he would have requested that CPT Brewer be released from his case.

2. Appellant submits that his counsel were ineffective because they failed to fully investigate his mental health history. Specialist Gray had informed his counsel that he had experienced headaches since he was a child, and constantly felt as though there was "bleeding" inside his head. To his knowledge, however, his counsel disregarded this information.

3. Specialist Gray's counsel were ineffective for allowing him to plead guilty to the civilian charges against him. The fact that he had received eight life sentences as a result of his plea created a heavy bias in the panel members against him. This information, in combination with the sparse case in mitigation, severely disadvantaged appellant when the time came to argue that the members should punish him by adding one more term of life to his sentence as opposed to sentencing him to death.

4. Captain Brewer failed to effectively represent appellant when, during his sentencing argument, CPT Brewer referred to appellant as a nut, and said that he was personally in favor of the death penalty.

5. The military judge erred by refusing to grant appellant pretrial confinement credit from January 6, 1987, when he was first apprehended by civilian law enforcement authorities, until the date of his trial.

6. The military judge improperly denied appellant's request for additional peremptory challenges. (R. at 16; App. Exh. III; App. Exh. XI.)

7. The military judge improperly denied the defense motion to sequester the panel members. (R. at 119.)

8. The military judge improperly denied the defense motion to dismiss charges based on speedy trial. (App. Exhs. XXV, XXVa, and XXXVI.)

9. The military judge improperly denied the defense motion for a new pretrial investigation pursuant to UCMJ art. 32. (App.Exh. XXVII.)

10. The military judge improperly denied the defense motion for change of venue. (App. Exhs. XXVIII, XXVIIIa.)

11. The military judge improperly refused to review a videotape in support of the defense motion for a change of venue. (R. at 141–43; App. Exh. XXX.)

12. The military judge improperly denied the defense motion to sever charges. (R. at 155; App. Exh. XXXV.)

13. The military judge improperly denied appellant's motion to hold unconstitutional Manual for Courts–Martial, United States, 1984, Rule 916(k)(2). *See* App. Exh. XXXIV.

14. The military judge improperly denied the defense request for an independent investigator. (R. at 156–161.)

15. The military judge improperly denied the defense motion to dismiss Charges IV and VI for lack of jurisdiction. (R. at 463; App. Exh. XXXVIII.)

16. The military judge (1) improperly failed to order a new pretrial advice due to improper advisement as to maximum punishment for the offense of rape; and (2) failure to advise the convening authority of mitigating factors. (R. at 172.)

17. The military judge improperly denied appellant's request for production of evidence. (R. at 176.)

18. The military judge improperly denied the defense motion to suppress the black "ninja" pants. (App.Exh. XLIV.)

19. The military judge improperly denied appellant's motion to suppress items seized from appellant's personal effects drawer at the confinement facility, even though the military judge found that appellant had a reasonable expectation of privacy in the items seized. (R. at 346.)

20. The military judge improperly denied appellant's motion for a panel composed of members reflecting a fair cross-section of the community. (R. at 414–419.)

21. The military judge improperly denied the defense objection to handwriting exemplars gathered from appellant. (R. at 419–22; App. Exh. XLIX.)

22. The military judge improperly denied the defense request for the identity of a CID registered agent. (R. at 425.)

23. The military judge improperly denied the defense challenges for cause against Captain Barner and First Sergeant Peden. (R. at 706, 733.)

24. The military judge improperly denied the defense request for a mistrial based on a witness' reference to an uncharged rape occurring "in November [1986]." (R. at 829.)

25. The military judge improperly denied the defense request for a mistrial based on trial counsel's comment on appellant's silence (*i.e.,* appellant has shown no remorse).

26. The trial defense counsel was ineffective in commenting that he personally was in favor of the death penalty.

27. The evidence is insufficient to support the finding of guilty of attempted premeditated murder (Charge I and its specification) where appellant allegedly said to Private Nameth, "don't scream or me and my buddy will come back and kill you."

28. The military judge improperly denied defense motions to suppress prosecution exhibits throughout the trial.

29. The military judge improperly denied the defense motions for a finding of not guilty of offenses. (R. at 1876–1886, 2059.)

30. The military judge improperly denied the defense request for instructions on lesser-included offenses.

31. The military judge improperly admitted evidence of appellant's civilian convictions in aggravation. (R. at 2240–48.)

EFFRON, Judge, with whom COX, Chief Judge, joins (dissenting):

I

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that the discriminatory use of peremptory challenges by the prosecution to remove members of the same cognizable

minority racial group as the defendant from a jury violated the constitutional right to equal protection of the laws. In *United States v. Santiago–Davila*, 26 MJ 380, 389–90 (1988), we applied *Batson* to the exercise of peremptory challenges in courts-martial even if the accused had been tried prior to the Supreme Court's decision in *Batson*.

The majority suggests that *Batson* does not apply to this case or that it does not apply with full force, because appellant was tried before we published our decisions in *Santiago–Davila* and *United States v. Moore*, 28 MJ 366 (1989), in which we applied *Batson* to trials by court-martial. The majority's position is contrary to precedent in our Court and in the Supreme Court.

In *Santiago–Davila*, where we first adopted the *Batson* framework for the military, the accused was tried on July 10, 1985—9 months before the Supreme Court's decision in *Batson*. The military judge in that case did not have the benefit of the Supreme Court's decision when he ruled on Santiago–Davila's objection to the Government's peremptory challenge; in fact, the military judge in that case was faced with directly contradictory language in the 1984 Manual for Courts–Martial (RCM 912(g)(1), Discussion), which suggested that the reasons for a peremptory challenge need not be stated. 26 MJ at 386. Furthermore, the defense in *Santiago–Davila* did not rely on federal law but relied solely on decisions of the California Supreme Court and other state and federal courts in its argument at trial. *Id.* at 385.

Nonetheless, even in those circumstances, we held that *Batson* "applied ... retroactively to trials that preceded its rendition," *id.* at 390, citing the Supreme Court's decision in *Griffith v. Kentucky*, 479 U.S. 314, 316, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (applying *Batson* retroactively to cases not final at the issuance of *Batson* ). We ultimately granted Santiago–Davila a hearing on his *Batson* claim, *id.* at 392. *See also Moore*, 28 MJ at 367 n. 2, 368 (remanding for factfinding hearing where accused was tried after *Batson* but before *Santiago–Davila* ).

The present case does not involve a pre-*Batson* trial. Appellant was tried in late–1987 and early–1988—over one year after *Batson* was decided. The defense expressly cited *Batson* at trial as the basis of its objection. The military judge had the benefit of the Supreme Court's decision in *Batson*, yet declined to apply the Supreme Court's precedent. In view of the relief granted in *Santiago–Davila*—where the military judge did not even have the opportunity to consider the Supreme Court's decision in *Batson*—it is inappropriate to suggest that appellant should be denied the constitutional protections of *Batson* because of concerns about retroactivity.

## II

In *Batson*, the Supreme Court established a three-part procedure for addressing objections to the exercise of peremptory challenges. First, the trial judge must determine whether the defense has established "a *prima facie* case of purposeful discrimination." 476 U.S. at 96–97, 106 S.Ct. 1712. Second, if "the requisite showing" is made, "the burden shifts to the" prosecution to "articulate a neutral explanation [for the challenge] related to the particular case to be tried." *Id.* at 96–98, 106 S.Ct. 1712. Finally, the trial judge "will have the *duty* to determine if the defendant has established purposeful discrimination." *Id.* at 98, 106 S.Ct. 1712·(emphasis added); *see United States v. Greene*, 36 MJ 274, 278 n. 2 (CMA 1993). In the case before us, the military judge committed prejudicial error by failing to perform his duty under *Batson*.

## III

The peremptory challenge at issue in this case was exercised by the Government to remove an African–American officer, Major Quander, from appellant's court-martial panel. Appellant also is an African–American. At the conclusion of challenges for cause, none of which were directed at Major Quander, the prosecution sought to challenge Major Quander peremptorily. Defense counsel, relying on the fact that appellant and Major Quander were of the same racial minority,

objected to the challenge and asked the military judge to require trial counsel to demonstrate that the challenge was being exercised for a reason other than Major Quander's race.[1]

The military judge refused to require the prosecution to provide a race-neutral explanation for the peremptory challenge, asserting that no explanation was necessary. Subsequently, he asked trial counsel to state on the record that the challenge was not based on appellant's race, and trial counsel did so. When trial counsel offered to "give some sort of articulation as to the reason we feel that we should perempt [sic] him based on—," the military judge cut him off in mid-sentence. The military judge refused to allow any further explanation by trial counsel and granted the peremptory challenge against Major Quander. The military judge did not enter any findings of fact or conclusions of law on the merits of the defense objection to the prosecution's exercise of the peremptory challenge.

After the peremptory challenge was allowed, the military judge recessed the trial for the weekend. When the court-martial reconvened following the weekend recess, trial counsel filed appellate exhibit LVIII, a memorandum for the record, in which the prosecution team stated that "[t]he peremptory challenge against Major Quander was exercised because we believed his responses

concerning the death penalty were equivocal."[2]

## IV

In the present case, the military judge erred by granting the peremptory challenge without requiring the Government to provide a race-neutral explanation for the peremptory challenge of Major Quander. This error was compounded by the military judge's reliance on the mere denial by trial counsel of discriminatory intent, his failure to make findings of fact and conclusions of law, and his failure to rule on the credibility of the post-hoc explanation filed by trial counsel as an appellate exhibit.

When the defense objected at trial to the peremptory challenge of Major Quander, the Government responded by stating on the record that the challenge was not based on racial grounds. The Supreme Court has explained, however, that a mere denial of discriminatory intent or an affirmance of good faith does not comply with *Batson*'s second step. *Batson*, 476 U.S. at 98, 106 S.Ct. 1712; *see also Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The Government is obligated to provide a race-neutral explanation for its challenge. In the military justice system, "all the reasons proffered by trial counsel [must] be untainted by any inherently discriminatory motives." *Greene*, 36 MJ at 280.

---

1. Because appellant and Major Quander were both African–American, once appellant objected to the Government's peremptory challenge of Major Quander, he met his burden to establish a *prima facie* case of discrimination under *Batson* as applied in the military justice system. *See Greene*, 36 MJ at 278; *Moore*, 28 MJ at 368 (*per se* showing of *prima facie* case of discrimination when African–American accused objects to prosecution challenge of African–American panel member). The majority notes, 51 MJ at 34, that we mandated application of the *per se* rule for cases arising after *Moore*. That approach was designed to ensure that the *per se* rule would not be applied to reverse a case tried before *Moore* in which the military judge—conscientiously applying the first prong of *Batson*—required more of a showing than the fact that the defendant and the challenged member both were African–American. Here, however, the prosecution did not claim that the defense had failed to meet the first

prong of *Batson*, nor was that the basis of the military judge's ultimate ruling on the challenge. In fact, the military judge simply declined to address the first prong of *Batson*. Had he done so, and had he required appellant to demonstrate more than a *per se* showing, we would have before us appellant's evidence as well as the findings and conclusions of the military judge as the basis for determining whether to sustain the military judge's ruling. In the absence of a record that demonstrates that the military judge followed the literal requirements of *Batson*, appellant is entitled to rely on his *per se* showing to meet the first prong of *Batson*. *Cf., e.g., United States v. Cooper*, 28 MJ 810, 814 (ACMR 1989), *aff'd* 30 MJ 201 (CMA 1990); *see United States v. Ruiz*, 49 MJ 340 (1998).

2. The text of the memorandum is set forth in the Appendix to this opinion.

In this case, the military judge made clear that he was not going to enter any findings of fact or conclusions of law on the issue of discrimination. Trial counsel subsequently filed as an appellate exhibit an unsworn statement asserting a race-neutral reason for the peremptory challenge against Major Quander. The mere filing of an appellate exhibit, after the military judge has refused to require compliance with *Batson*, does not remedy the error by the military judge.

The Supreme Court has made clear that the mere articulation of a race-neutral explanation does not satisfy *Batson*: "Once the prosecutor offers a race-neutral basis for his exercise of peremptory challenges, '[t]he trial court then [has] the duty to determine if the defendant has established purposeful discrimination.'" *Hernandez v. New York*, 500 U.S. 352, 363, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (quoting *Batson*, 476 U.S. at 98, 106 S.Ct. 1712). The Supreme Court in *Hernandez* emphasized the role of the trial judge in evaluating the sincerity of the Government's explanation for a peremptory challenge, noting:

> In the typical peremptory challenge inquiry, *the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.* There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Id.* at 365, 111 S.Ct. 1859 (emphasis added); *see also Purkett*, 514 U.S. at 768, 115 S.Ct. 1769 (emphasizing that it is the responsibility of the trial judge, at the third step of the *Batson* process, to assess "the persuasiveness" of the proffered "justification"). In *Batson* and its progeny, the Supreme Court has placed on the trial judge the responsibility to evaluate the explanation for a peremptory challenge, and the cases all recognize the critical importance of the judge in uncovering pretextual explanations.

Our Court has made clear that the military judge bears "the ultimate responsibility ... to determine the existence of purposeful discrimination on the part of trial counsel." *Greene*, 36 MJ at 281 (citing plurality and O'Connor opinions in *Hernandez*). In *Greene*, we described the three steps that the military judge must take to fulfill this responsibility, as follows: The military judge must, first, "review the record"; second, "weigh trial counsel's credibility"; and third, make "a factual determination regarding the presence or absence of purposeful discrimination in the panel member's rejection." 36 MJ at 281. We further emphasized the critical importance of the military judge's determination in the *Batson* equation by noting:

> [E]ven if a race-neutral explanation has been proffered by trial counsel for the peremptory challenge, it does not end the military judge's duties under *Batson*. *The military judge must still determine whether "the asserted justification is merely a pretext for intentional race-based discrimination. See Batson* [476 U.S.] at 93, 106 S.Ct. at 1721."

36 MJ at 281 (citation omitted; emphasis added) (quoting *Hernandez*, 500 U.S. at 375, 111 S.Ct. 1859 (O'Connor and Scalia, JJ., concurring in the judgment)).

In this case, the military judge failed completely to comply with the critical third step of *Batson*—evaluation of the credibility of the Government's proffered explanation. *Batson* is not satisfied merely by trial counsel's articulation of a race-neutral reason for a peremptory challenge; rather, *Batson* places on the military judge an affirmative duty to assess whether the Government's explanation is credible or merely a pretext.

In *Moore*, we noted that we would "not rule out" the possibility that, in a future case, "a clearly articulated affidavit" might provide post-trial proof of a non-discriminatory intent. 28 MJ at 368 n. 7. Although there may be cases in which the record of trial provides such clear and unambiguous support for trial counsel's post-hoc rationale that it is possible to find the military judge's error to be harmless, this is not such a case. *See generally Bennett v. Collins*, 852 F.Supp.

570, 584–85 (E.D.Tex.1994) (prosecution's rationale that juror "had not given much thought to the death penalty" treated as "pretextual" by federal habeas judge in ruling prosecution's exercise of peremptory challenge against African–American venirepersons unconstitutional).

The credibility of the prosecution's rationale was clearly at issue in this case. The record of trial reflects thoughtful responses by Major Quander to questions about the death penalty. He made clear that he could do his duty, follow the law as instructed by the military judge, and vote for the death penalty. He stated: "I can definitely consider it. I would honestly have to say I would have some problems saying yes, but I could do it." Such a response is not particularly remarkable from a member facing the awesome responsibility of adjudging the ultimate penalty.

In light of this record, it was critical that the military judge make a determination as to whether trial counsel's explanation was credible or pretextual. If the military judge had done so, we would sustain his "findings on this factual question unless clearly erroneous." *Greene,* 36 MJ at 281 (citing *Hernandez,* 500 U.S. at 369, 111 S.Ct. 1859). In the absence of such a determination, however, we have no indication that the military judge based his allowance of the challenge on a permissible criteria, and there is no trial-level ruling for us to review.

Although it is possible that the military judge allowed the challenge in compliance with *Batson, i.e.,* after determining that the Government's explanation was not pretextual, there are three other equally likely grounds for his decision, all of which would violate *Batson:* (1) the military judge may have complied with the then-existing provisions of the Manual for Courts–Martial, under which no explanation was required for the exercise of a peremptory challenge [3]; (2) the military judge may have found that the Government's rationale was pretextual but

believed that a pretextual reason was permissible [4]; or (3) the military judge may not have considered at all the questions of discrimination and pretext and simply allowed the peremptory challenge.

Despite the absence of a definitive ruling by the military judge, the majority claims that the military judge "did more than require trial counsel to simply state whether his 'challenge was a result of his bias or prejudice' " (51 MJ at 35) and that the judge made an "implied ruling" on the question of pretext (51 MJ at 35). These assertions are not supported by the record.

The exchange between defense counsel, trial counsel, and the military judge demonstrates that the judge determined that he was not required to address the *Batson* issue. When trial counsel offered to "give some sort of articulation as to the reason" for the challenge, the military judge simply stated that his blanket denial of racial bias would suffice. When trial counsel proffered his explanation for the challenge at the next session of court, the military judge did not provide any indication that he considered it, but merely allowed trial counsel to submit the statement as an appellate exhibit. There is absolutely no indication that the military judge attached any evidentiary value to trial counsel's statement, and the statement did not constitute in any way a ruling on the part of the military judge. In such circumstances, the military judge's "judicial inaction ... constituted clear legal error." *Greene,* 36 MJ at 282.

In this regard, this case is controlled by *Santiago–Davila,* a case which we remanded because the military judge neither required an explanation from the Government nor ruled on the issue of discrimination, 26 MJ at 386; and by *Moore,* where we remanded for a *DuBay* hearing on the *Batson* issue and instructed the judge to "determine whether trial counsel has articulated a neutral explanation relative to this particular case." 28 MJ at 369. *Accord United States v. Ruiz,* 49

---

3. *See Santiago–Davila,* 26 MJ at 386.

4. *See Purkett,* 514 U.S. at 768, 115 S.Ct. 1769; *Greene,* 36 MJ at 282 (remanding where the

military judge ruled only "on the race-neutrality" of the proffered reason and not on trial counsel's "true motive").

MJ 340 (1998); *see also Purkett*, 514 U.S. at 768, 115 S.Ct. 1769 (responsibility of trial judge to uncover justifications that are merely "pretexts for purposeful discrimination"); *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995) (remanding where district court "failed to rule squarely" on whether a peremptory strike was motivated by "race-neutral" purposes; concluded that "on this record, we cannot determine whether the district court applied the proper legal analysis" in overruling the defense's objection to the peremptory challenge); *cf. United States v. Clemons*, 941 F.2d 321, 325 (5th Cir.1991) (applying clearly-erroneous standard and upholding district court finding that "race-neutral" reasons were not pretextual).

V

To support the evidentiary value that it attaches to the explanation submitted by trial counsel, the majority cites *Turner v. Marshall*, 121 F.3d 1248, 1254 n. 2 (9th Cir.1997), *cert. denied*, 522 U.S. 1153, 118 S.Ct. 1178, 140 L.Ed.2d 186 (1998); *Simmons v. Beyer*, 44 F.3d 1160, 1168 (3d Cir.), *cert. denied*, 516 U.S. 905, 116 S.Ct. 271, 133 L.Ed.2d 192 (1995); and *Cochran v. Herring*, 43 F.3d 1404, 1411 n. 11 (11th Cir.1995), *cert. denied*, 516 U.S. 1073, 116 S.Ct. 776, 133 L.Ed.2d 728 (1996). None of these cases addresses the proper evidentiary value to be accorded to a post-hoc explanation for a peremptory challenge or support the proposition that it is appropriate to sustain a trial judge on the basis of an "implied ruling." On the contrary, these cases emphasize the importance of a factual ruling by the trial judge.

Moreover, in each case, the court of appeals found the *Batson* defect sufficiently serious to warrant either a grant of relief or a remand for further proceedings. In *Cochran*, the Eleventh Circuit affirmed the district court's grant of habeas corpus relief on a *Batson* claim; in *Simmons*, the Third Circuit ordered a new trial because the defendant had established a *prima facie* case of discrimination under the first prong of *Batson*, and the reconstructed record was inadequate to review the *Batson* issue; and in *Turner*, the Ninth Circuit reversed as "clearly erroneous" the district court's finding that the peremptory challenge was not racially based.

In support of its assertion that the entirety of the military judge's conduct constitutes an "implied ruling on his part that trial counsel's explanation was genuine and that appellant's *Batson* claim was without merit," 51 MJ at 35, the majority cites *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Clemons*, 941 F.2d at 323–24; *United States v. Tucker*, 836 F.2d 334, 340 (7th Cir.1988), *cert. denied*, 490 U.S. 1105, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989); and *United States v. Arce*, 997 F.2d 1123, 1127 (5th Cir.1993).

*Purkett* bears no relation to the majority's concept that a trial judge can make an "implied ruling" on the question of pretext in a *Batson* case. On the contrary, the Supreme Court's decision in *Purkett* stressed the importance of a ruling by the trial judge in the *Batson* procedure. 514 U.S. at 768, 115 S.Ct. 1769; *see also* Part IV, *supra*.

In *Clemons*, the Fifth Circuit affirmed the district court's denial of a *Batson* challenge on the ground that a brief sidebar conference provided a sufficient opportunity for the defense to rebut the prosecution's race-neutral explanation of a peremptory challenge. 941 F.2d at 324. "The district judge ... made a finding that the race-neutral reasons stated by [the] prosecutors for striking [two black jurors] were sufficient and non-pretextual," *id.* at 322; the Fifth Circuit reviewed the record and concluded that this finding was "not clearly erroneous," *id.* at 325.

In contrast to this case, where the military judge made no factual ruling, the Fifth Circuit was presented with the district court's express ruling on the question of pretext. *Clemons*, as the majority notes, reiterates *Batson's* express delegation of procedural implementation to the trial courts, but the case does not permit an appellate court to rely on an "implied ruling" by the trial judge. To the contrary, the Fifth Circuit emphasized the need for the district court to "evaluate the prosecutor's explanation and determine whether the explanations are pretextual," *id.* at 323, "[b]ecause the issues pre-

sented in a *Batson* challenge turn on evaluations of credibility," *id.* at 325.

Similarly, *Tucker* does not address the validity of an "implied ruling" on a *Batson* challenge. On the contrary, the district court in *Tucker* made an express ruling when, "[a]fter considering the government's explanation, the court 'concluded and was satisfied that racial bias was not responsible for the challenge of the black venirepersons.'" 836 F.2d at 337. The Seventh Circuit affirmed the district court's denial of the *Batson* challenges on the grounds that the particular procedure employed by the District Court (an *ex parte* proceeding, *id.* at 338) was justified under the circumstances. *Id.* at 340. Although *Tucker* supports the well-established proposition discussed by the majority—that a district court has discretion to adopt procedures for litigating *Batson* claims—*Tucker* does not permit a trial judge to eschew any factfinding and decision-making procedures but still be affirmed on the basis of "implied rulings."

Finally, in *Arce*, the Fifth Circuit found waiver where the defense failed to dispute one of the reasons proffered by the Government for a peremptory challenge during a *Batson* proceeding. 997 F.2d at 1126–27. *Arce*, however, has no bearing on the present case. In *Arce*, the prosecutor asserted his reasons for a peremptory challenge during a *Batson* proceeding, and the defense did not object. Here, however, the military judge did not conduct a *Batson* proceeding; he made clear that he would not apply *Batson*. Although the Government filed an appellate exhibit that asserted reasons for its challenge, the matter was never litigated before, or ruled on by, the military judge.

## VI

The prosecution's unsworn after-the-fact memorandum in this case is no substitute for the findings and conclusions that should have been made by the military judge who had presided during the *voir dire* of Major Quander, observed the demeanor of trial counsel and Major Quander, and heard the tone of trial counsel's questions and Major Quander's responses. The end result in this case is that trial counsel was, in effect, both the advocate for striking Major Quander and the judge of the credibility of his own explanation. That is unacceptable under *Batson, Greene,* and their progeny.

The potential for error was called to the attention of the military judge, and he had ample opportunity to make the determination required by *Batson*. The military judge, however, expressly declined on the record to apply Supreme Court precedent. That clear error, which prejudiced the constitutional rights of the accused, requires that we follow our precedent in *Santiago–Davila* and return the case

> to the Judge Advocate General of the Army for referral to an officer exercising general court-martial jurisdiction for the purpose of ordering a limited hearing on the reasons for the peremptory challenge by the prosecution. The findings and conclusions of the military judge at this hearing, or notice of the convening authority's determination that such a hearing is impracticable, should be provided by appellee directly to this Court.

26 MJ at 393 (citing *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967)).[5] *See United States v. Ruiz, supra.*

## APPENDIX

The memorandum referred to at n. 2, *supra*, is an undated document, signed by trial counsel and assistant trial counsel, entitled "MEMORANDUM FOR RECORD. For Appellate Record, *U.S. v. Gray.*" The document contains the following text:

---

**5.** This is the type of procedure used by the federal courts as an appropriate remedy for a trial court's failure to comply with the procedural requirements of *Batson*. *See, e.g., Bryant v. Speckard,* 131 F.3d 1076, 1076–77 (2d Cir.1997) (decision after reconstruction hearing held by state trial court), *cert. denied,* —— U.S. ——, 118 S.Ct. 2066, 141 L.Ed.2d 143 (1998); *Turner,* 121 F.3d at 1250 (decision after magistrate judge held evidentiary hearing on *Batson* claim); *United States v. Garrison,* 849 F.2d 103, 105 (4th Cir.1988) (decision after "adversary hearing" before district court on *Batson* issue), *cert. denied,* 488 U.S. 996, 109 S.Ct. 566, 102 L.Ed.2d 591 (1988).

1. On Friday 18 March 1988, the government exercised its one peremptory challenge against Major Francis Quander. Major Quander is a black soldier and the exercise of this challenge left the panel with only one black member. We carefully considered all of the notes we had taken along with our independent recollections of the voir dire process. We both agreed that the peremptory challenge should be exercised against Major Quander.

2. The peremptory challenge against Major Quander was exercised because we believed his responses concerning the death penalty were equivocal. He indicated that he had never really thought about the death penalty and that he was neither for it or against it. When asked if he could vote for the death penalty he indicated that he "thought" he could. He also stated he had "problems" with the death penalty and the evidence would have to be "devastating" before he could vote for it. He said he could vote for the death penalty but could not say if he would vote to impose the death penalty.

3. Our impression of Major Quander was that he was indecisive and equivocal on the death penalty issue and that it was in the government's interest to challenge him. We did not have a sufficient basis to challenge him for cause so the peremptory challenge was exercised on him. Major Quander's race was of no consequence in the decision making process except that we considered not making the challenge to avoid any possibility of an appearance of exclusion on a racial basis. Our peremption [sic] of Major Quander was based on our professional judgement [sic] that it was in the prosecution's best interest to remove him.